1  Catherine E. Lhamon (SBN 192751)
   clhamon@publiccounsel.org
2  Jennifer K. del Castillo (SBN 244816)
   jdelcastillo@publiccounsel.org
3  PUBLIC COUNSEL LAW CENTER
4  610 South Ardmore Avenue
   Los Angeles, California 90005
5  T: (213) 385-2977  F: (213) 385-9089
6
7  Neal S. Dudovitz (SBN 68848)
   ndudovitz@nls-la.org
8  Nu Usaha (SBN 190094)
   NuUsaha@nls-la.org
9  Maria E. Palomares (SBN 266206)
10 MariaPalomares@nls-la.org
   NEIGHBORHOOD LEGAL SERVICES
11 OF LOS ANGELES COUNTY
12 13327 Van Nuys Boulevard
   Pacoima, California 91331
13 T: (818) 834-7544
14
15 Attorneys for Plaintiffs
   (see next page for additional counsel)
16        IN THE UNITED STATES DISTRICT COURT
17          CENTRAL DISTRICT OF CALIFORNIA
18 THE COMMUNITY ACTION LEAGUE,    Case CV11 04817 ODW VBK
19 a California non-profit organization;
   CALIFORNIA STATE CONFERENCE    **COMPLAINT FOR VIOLATIONS**
20 OF THE NATIONAL ASSOCIATION    **OF:**
   FOR THE ADVANCEMENT OF        **(1) 42 U.S.C. § 3604(a);**
21 COLORED PEOPLE, a non-profit   **(2) 42 U.S.C. § 3604(b);**
22 organization; JANE ROE, an individual;  **(3) 42 U.S.C. § 3617;**
   and JUDY DOE, an individual,   **(4) U.S. CONST. AMEND. XIV;**
23        Plaintiffs,             **(5) CAL. GOV'T CODE § 12955(k);**
                                  **(6) CAL. GOV'T CODE § 11135;**
24                               **and**
              vs.                 **(7) CAL. CONST. ART. I § 7, ART.**
25                               **IV § 16**
26 CITY OF LANCASTER and CITY OF
   PALMDALE,                      **JURY TRIAL DEMANDED**
27        Defendants.
28

---

COMPLAINT

Alexander Prieto (SBN 270864)*
AlexanderPrieto@nls-la.org
NEIGHBORHOOD LEGAL SERVICES OF LOS ANGELES COUNTY
13327 Van Nuys Boulevard
Pacoima, California 91331
T: (818) 834-7544

Dorcas R. Gilmore *(pro hac vice application forthcoming)**
dgilmore@naacpnet.org
Victor L. Goode *(pro hac vice application forthcoming)**
vgoode@naacpnet.org
NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE
4805 Mount Hope Drive
Baltimore, MD 21215
T: (410) 580-5673  F: (410) 358-9350
*of counsel

Gary L. Blasi (SBN 70190)
blasi@law.ucla.edu
UCLA School Of Law *(for identification purposes only)*
405 Hilgard Avenue
Los Angeles, California 90024
T: (310) 206-9431  F: (310) 206-1234

Bill Lann Lee (SBN 108452)
blee@lewisfeinberg.com
Lindsay Nako (SBN 239090)
lnako@lewisfeinberg.com
LEWIS, FEINBERG, LEE, RENAKER, & JACKSON, P.C.
476 9th Street
Oakland, California 94607
T: (510) 839-6824  F: (510) 839-7839

Michael C. Small (SBN 222768)
MSmall@akingump.com
Kalia C. Petmecky (SBN 194094)
kpetmecky@akingump.com
B. Jacob Phillips (SBN 275665)
jphillips@akingump.com
Oluwafemi Morohunfola (SBN 272284)
fmorhunfola@akingump.com
AKIN GUMP STRAUSS HAUER & FELD LLP
2029 Century Park East Suite 2400
Los Angeles, California 90067-3010
T: (310) 229-1000  F: (310) 229-1001

1  Plaintiffs The Community Action League ("TCAL"), California State
2  Conference of the National Association for the Advancement of Colored People
3  ("NAACP"), Jane Roe, and Judy Doe (collectively, "Plaintiffs") bring this action
4  against Defendants City of Lancaster ("Lancaster") and City of Palmdale ("Palmdale)
5  (collectively, the "Cities" or "Defendants") for violation of the equal protection
6  clauses of the United States and California Constitutions, the federal Fair Housing
7  Act (42 U.S.C. §§ 3604, 3617), the California Fair Employment and Housing Act
8  (Cal. Gov't Code § 12955), and California Government Code § 11135.[1]  Plaintiffs'
9  claims are based on Defendants' intentional race-based exclusion of and
10 discrimination against black and Latino families and individuals, and on the
11 unjustified racially disparate impact of Defendants' policies and practices upon them.
12 Plaintiffs allege upon personal knowledge with respect to themselves and their own
13 acts, and upon information and belief with respect to all other matters, as follows:

14                          **NATURE OF THE ACTION**

15     1.   Through this action, Plaintiffs seek to end the Cities' racial and ethnic
16 discrimination against low income black and Latino residents caused by the Cities'
17 policies and practices that target certain black and Latino families for intimidation,
18 harassment, and exclusion – specifically, those black and Latino families who
19 participate in the Section 8 Housing Choice Voucher program.

20     2.   The Section 8 Housing Choice Voucher program, commonly referred to
21 as "Section 8," is a federal program funded and administered by the U.S. Department
22 of Housing and Urban Development ("HUD") that provides rental subsidies for low
23 income families and individuals, including those who are elderly or disabled.  The
24 purpose of the Section 8 program is to enable the historic victims of discrimination to
25
26

27 [1] Plaintiffs Jane Roe and Judy Doe will be moving *ex parte* to proceed with this action under
28 pseudonyms pursuant to *Does I through XXIII v. Advanced Textile Corp.*, 214 F.3d 1058 (9th Cir. 2000).

1   live in communities of their own choosing and to encourage economic and racial
2   integration.

3       3.      HUD generally delegates administration of the Section 8 program to a
4   local housing authority.  In most of Los Angeles County, including Lancaster and
5   Palmdale, the local housing authority is the Housing Authority of the County of Los
6   Angeles ("HACoLA").

7       4.      As the name implies, housing choice is an important element of the
8   Section 8 program.  Once a participant is approved by the local housing authority, he
9   or she may apply for tenancy with any landlord who agrees to accept payment
10  through a Section 8 voucher.  The landlord then receives payment from the local
11  public housing authority for a portion of the participant's rent.  The remainder is paid
12  by the participant.  In order to qualify for the Section 8 voucher program in 2010, a
13  family of four in Los Angeles County was required to have an income at or below
14  $41,400, and 75% of new admissions must have had incomes at or below $24,850.[2]
15  Participants undergo rigorous criminal background checks and are randomly selected
16  for credit checks to verify their income.

17      5.      Under the provisions of the federal program, Section 8 housing choice
18  vouchers issued by a public housing authority may be used to obtain housing within
19  the issuing housing authority's jurisdiction.   Lower housing costs have made
20  Lancaster and Palmdale attractive for Section 8 participants looking to provide a
21  better quality of life for their families.  For example, a recent review of rental listings
22  accepting Section 8 vouchers shows that the same $1,100/month voucher that can be
23  used to obtain a two-bedroom, one-bath apartment in Alhambra, Covina, or
24  Inglewood, can be used to rent a three-bedroom, two-bath single-family house in
25  Palmdale or Lancaster.[3]

26

27  _____
    [2] See http://www.huduser.org/portal/datasets/il/index_il2010.html.
28  [3] See http://www.socialserve.com/tenant/index.html?state_id=4107&rid=32066&ch=HACOLA.

1        6.     Approximately 3,600 primarily black and Latino families[4] (or 11,400

2   individuals[5]) with Section 8 vouchers have chosen to live in Lancaster or Palmdale.

3   According to HUD's statistics for 2008, the most recent year available, 70% of

4   Lancaster Section 8 tenants were black and 14% were Latino.[6]   Similarly, in

5   Palmdale, 67% of Section 8 participants identified themselves as black and 18% as

6   Latino.[7]

7        7.     The Cities have not welcomed these Section 8 families.   Rather, City

8   officials have treated Section 8 participants as outsiders who have been imposed or,

9   as one Lancaster official put it, "dumped" upon Lancaster and Palmdale.[8]   In the

10  words of a Palmdale Council Member, the Cities fear they will be "swarm[ed]" by

11  Section 8 participants.[9]   Thus, the Cities have targeted these black and Latino Section

12  8 voucher holders – and other black and Latino individuals whom the Cities' officials

13  and residents assume to be program participants – with punitive surveillance and

14  harassment.   Moreover, the Cities have sought to exclude Section 8 voucher holders

15  currently living elsewhere by discouraging them from moving into the Cities.

16       8.     The constant surveillance and harassment to which Section 8 participants

17  have been subject is part of a carefully orchestrated campaign by the Cities.   As stated

18  by Lancaster's Mayor, "[T]his City wants to limit the number of Section 8 units that

19  are placed in this community. . . .   [I]t is a problem that is crushing the community . .

20

21  _____

22  [4] See HACoLA Antelope Valley Section 8 Activity Report to Michael D. Antonovich, dated Oct. 19, 2010.

23  [5] See http://www.huduser.org/portal/picture2008/index.html.

24  [6] See id.

    [7] See id.

25  [8] See, e.g., June 10, 2008 Lancaster City Council Minutes, June 24, 2008 Lancaster City Council

26  Minutes. Lancaster City Council Minutes, as well as agendas, videos, and some staff reports, are available on the City of Lancaster's webpage, http://www.cityoflancasterca.org.

27  [9] September 19, 2007 Palmdale City Council Meeting Video.  Videos of Palmdale's City Council

28  meetings, as well as agendas, minutes, and some staff reports, are available on the City of Palmdale's webpage:  http://www.cityofpalmdale.org.

COMPLAINT

1  . and *it is time to go to war*."[10]  The only Section 8 participants who are safe from the

2  Cities' campaign are those Section 8 participants who are elderly or have disabilities,

3  and who are less likely to be black or Latino.  City officials have treated these

4  individuals as "deserving" Section 8 assistance and spared them from attack.[11]

5       9.    Lancaster and Palmdale have taken a number of ongoing steps that

6  operate together in furtherance of their unlawful exclusion of and discrimination

7  against Section 8 participants.

8       a.    Unrelenting Surveillance and Investigative Activity.  Both

9  Lancaster and Palmdale have entered into annual agreements with HACoLA

10  and the County of Los Angeles to pay for targeting Section 8 participants for

11  markedly greater levels of investigations.  For example, according to data

12  provided to the Cities on a monthly basis, between July 2008 and June 2009,

13  approximately 1 in 12 Palmdale Section 8 tenants and 1 in 21 Lancaster

14  Section 8 tenants had their vouchers terminated for purported fraud or some

15  other program violation.[12]  In the rest of HACoLA's jurisdiction, the rate

16  during the same period was roughly 1 in 114.[13]  The Cities have renewed and

17  expanded these agreements to increase the hours or number of investigators

18  several times since their inception.  In turn, these investigators have engaged in

19  disproportionate and extraordinarily aggressive tactics, including: mounting

20  intimidating multi-agency Section 8 "sweeps;" unnecessarily enlisting armed

21  deputies to join investigators when performing "compliance checks;" and

22  recommending far more program terminations than their colleagues in other

23  parts of the County – many of which are patently unfounded.  In order to be

24  able to specifically target Section 8 families, the Cities entered into additional

25  _____

26  [10] June 10, 2008 Lancaster City Council Minutes (emphasis added).

[11] June 24, 2008 Lancaster City Council Minutes.

27  [12] See HACoLA Antelope Valley Section 8 Activity Report to Michael D. Antonovich, dated July 16, 2009.

28  [13] Id.

COMPLAINT

agreements with HACoLA to obtain, on a monthly basis, the names and addresses of every Section 8 participant and every landlord renting to Section 8 participants in the Cities.  At the Cities' request, those lists have at least on some occasions been disaggregated by family status and age to narrowly identify those Section 8 voucher holders to target for harassment.  In addition, City officials direct several "public safety" programs that reinforce the activities of the additional housing investigators.  Lancaster operates two subprograms within its public safety department that target rental properties: LAN-CAP and CORE.  LAN-CAP polices multi-unit buildings, while CORE focuses its efforts on nuisance-type complaints.  Palmdale likewise has a subprogram focused on rental units, called PAC.

     b.    Putting Out The "Not-Welcome" Mat.  Lancaster and Palmdale have met with HACoLA repeatedly in order to attempt to exclude Section 8 tenants from the Antelope Valley.  The Cities asked HACoLA to produce an ad campaign to dissuade voucher participants from moving to the Antelope Valley by falsely suggesting that there were no jobs, no services, and that the cost of living was high.  The Cities also asked to be present at orientation meetings for voucher participants, in order to lecture participants and "lay down the law."[14]

     c.    Discriminatory Use of Business License and Inspection Ordinances for Rental Properties.  Lancaster and Palmdale have enacted and used business licensing and inspection ordinances to target landlords who rent to Section 8 participants.  Lancaster, for example, asks registering landlords whether they will be accepting Section 8 payments, and has sought to limit the number of licenses it gives to Section 8 landlords.  Both Cities directed HACoLA to send threatening letters to Section 8 landlords whose properties

---

[14] See email from R. Nishimura, HACoLA, to M. Badrakhan, HACoLA, dated July 15, 2009 re: FW: City of Lancaster Letter.  Letters and emails cited in this Complaint, as well as certain reports and minutes not available on the Cities' websites, were produced to attorney Blasi in response to California Public Records Act requests submitted to Lancaster, Palmdale, and HACoLA.

were not licensed stating that they must obtain licenses or risk losing their right to Section 8 payments. Finally, both Cities have used their rental inspection ordinances as an additional means of entering Section 8 households and harassing tenants.

d. <u>Lancaster's Discriminatory Nuisance Ordinance.</u> After Lancaster's mayor specifically asked the City Council to "[l]ook into a means for making it very easy for neighbors to file nuisance lawsuits with the assistance of the City against . . . Section 8 housing,"[15] Lancaster enacted a nuisance ordinance that provides enhanced penalties where there are multiple calls to the police or public safety entities for service – even where there is no actual criminal activity.

e. <u>Lancaster's Section 8 Commission.</u> In 2008, Lancaster's City Council designated a "Section 8 Commission" to investigate ways for Lancaster to take over administration of Section 8 from HACoLA in order to further remove and exclude Section 8 participant families. The Commission was later renamed the "Neighborhood Vitalization Commission," but it remains focused on removing and excluding Section 8 participants from the City. When a consultant reported in 2008 that it was not feasible for Lancaster to take over administration of the Section 8 program, the Commission turned its attention to other means of excluding Section 8 participants. Among these was the development of a "Good Neighbor Guide" encouraging Lancaster residents to report possible Section 8 violations by their neighbors and make other nuisance complaints. In 2010, the City commissioned another consultant to explore again how Lancaster could seize control of the Section 8 program and impose its own administrative rules.

---

[15] June 10, 2008 Lancaster City Council Minutes.

COMPLAINT

10.    Officials in both Cities have spread false stereotypes about Section 8 participants in order to justify unlawful discrimination and exclusion. Notwithstanding the threshold requirement for participation in the Section 8 program that voucher holders pass rigorous criminal background checks, and the lack of any correlation between Section 8 tenants – who constitute a very small portion of the population – and crime rates, officials in both Cities have wrongly labeled their Section 8 residents as criminals in an effort to justify their surveillance and harassment.[16]

11.    Similarly, the Cities claim that large numbers of Section 8 participants have committed fraud in order to obtain assistance, and, therefore, that "cracking down" on Section 8 fraud is appropriate.[17]   Notably, even in the isolated event that a Section 8 participant receives federal assistance to which he or she was not technically eligible, there is no resulting loss to either Lancaster or Palmdale, so their intense interest in Section 8 fraud is not fiscally reasonable.

12.    Finally, City officials have propagated false stereotypes about children of Section 8 families as truants or troublemakers and their parents as indifferent to their education or wellbeing, and sought to have Section 8 families whose children miss school terminated from the program and evicted.[18]   They have done so while simultaneously acknowledging that the stereotypes underlying these efforts are without factual support.[19]

13.    As detailed below, individual Plaintiffs and members of the organizational Plaintiffs have suffered from unlawful discrimination resulting in invasion of their privacy and public humiliation in front of their neighbors.   In addition, the Cities have sent each individual and organizational Plaintiff the

---

[16] See, e.g., February 19, 2009 Lancaster Section 8 Commission Minutes.

[17] See, e.g., June 24, 2008 Lancaster City Council Minutes; September 19, 2007 Palmdale City Council Meeting Video.

[18] See October 26, 2010 Lancaster City Council Meeting Minutes.

[19] See October 26, 2010 Lancaster City Council Meeting Video.

COMPLAINT

1  unmistakable – and unlawful – message that black and Latino residents in Lancaster
2  and Palmdale are unwelcome and should be excluded.  The Cities' actions have
3  forced Section 8 participants to choose between holding onto a better home for their
4  families and fleeing hostilities of the Cities' unrelenting war.

5      14.    The Cities' conduct constitutes a pattern or practice of intentional
6  discrimination and has an unjustified disparate impact in violation of both federal and
7  state law. As noted above, the vast majority of the families who receive Section 8
8  assistance in Los Angeles County and who bring their vouchers to Lancaster and
9  Palmdale – and who are targeted by the Cities – are black and Latino.  As a result, the
10  Cities' campaign to remove Section 8 participants from their Cities amounts to a
11  knowing and deliberate attempt to re-segregate their historically virtually all-white
12  communities.

13      15.    Indeed, a 2009 letter from HUD warned Lancaster that "[b]ecause the
14  majority of voucher holders in the city of Lancaster are African-Americans," actions
15  seeking to limit their numbers "could be found to result in an unlawful disparate
16  impact ... under the [Fair Housing] Act."[20]  Plaintiffs echoed this warning in a pre-
17  litigation demand to both Cities.  Neither HUD's warning nor Plaintiffs' demand has
18  had any effect.  At the June 1, 2011 Palmdale City Council meeting, held after the
19  City had received and reviewed Plaintiffs' pre-litigation demand, a Council Member
20  proclaimed that the City would continue its current course of action without
21  "waver[ing]" so "legitimately" "deserving" individuals could use the vouchers.[21]

22      16.    The Cities are adamant that they will not end their war against their
23  Section 8 residents.  Accordingly, Plaintiffs request that the Court enjoin their
24  discrimination against Section 8 Housing Choice Voucher program participants and
25  order such other relief as is just and proper.

26

27  _____
    [20] Letter from B. Fulton, HUD, to H. McKeon, U.S. Congress, rec'd May 5, 2009.
28  [21] June 1, 2011 Palmdale City Council Meeting Video.

## JURISDICTION AND VENUE

17. This Court has jurisdiction over the subject matter of the federal claims asserted herein pursuant to 28 U.S.C. § 1331 (federal question) and 42 U.S.C. § 3613(a) (Fair Housing Act).

18. This Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction).

19. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because Defendants reside in this judicial district and a substantial part of the events or omissions giving rise to the claim occurred in this District.

## PARTIES

20. Plaintiff TCAL is a community organization formed in 2010 that helps low income individuals and people of color in the Antelope Valley act to fight for their civil rights and eliminate race prejudice. TCAL has black and Latino members who participate in the Section 8 voucher program in Lancaster and Palmdale, and who have been injured by the Defendants' harassment of black and Latino Section 8 tenants. TCAL's mission is to empower, improve, and advance the economic, political, and social conditions of the residents of the Antelope Valley. To fulfill its mission, TCAL serves the community in the areas of housing, public policy, youth, business, and community organizing. TCAL's Board of Directors and its members are all residents of the Antelope Valley. TCAL has been forced to dedicate extensive time and resources to investigating and combating the Cities' discriminatory policies and practices, including door knocking, outreach and education meetings, press conferences, and public meetings. TCAL operates a toll-free hotline where the community can share their complaints about housing discrimination. The need to divert its resources to addressing the Cities' practices has frustrated TCAL's mission. Because of the Cities' actions, TCAL has been unable to devote sufficient resources to other areas that are critical to its mission, such as youth outreach programs and programs addressing racial profiling by police in the Antelope Valley.

21.    Plaintiff California State Conference of the National Association for the Advancement of Colored People ("NAACP") is a nonprofit, civil rights organization that serves as the state-wide entity of the NAACP.  NAACP is the nation's oldest and largest civil rights organization, founded in 1909 with a particular historic commitment to combating exclusion and discrimination in housing.  The California State Conference of the NAACP consists of local branches throughout the state, including branches in and around the Antelope Valley.  The NAACP has members who have been injured by the Cities' exclusion and discrimination and face an imminent threat of future injury as long as the Defendants' discriminatory conduct continues.

22.    The NAACP's mission is to ensure the political, educational, social, and economic equality of all persons and eliminate race prejudice.  As part of this mission, the State Conferences and branches are dedicated to ensuring compliance with laws designed to prevent housing discrimination.  Branches within the California State Conference have worked to counter the effects of the defendants' discriminatory conduct.  Working with other community organizations, the Antelope Valley Branch has engaged in outreach and education programs designed to counter the effects of the Cities' discriminatory conduct, and other branches have provided counseling services to help low-income families, including those who use Section 8 vouchers, locate affordable housing.  The exclusion and discrimination challenged in this action have impaired the NAACP's ability to refer Section 8 recipients to Lancaster and Palmdale to find homes.  The Cities' discriminatory practices have therefore frustrated the NAACP's mission, and hindered the NAACP's efforts to help Section 8 participants locate affordable housing.  In order to investigate and counteract the Cities' exclusion and discrimination, the NAACP has diverted resources from other efforts.

23.    Plaintiff Jane Roe is a black Section 8 participant who lived in Lancaster until mid-2010.  Ms. Roe and her family continue to participate in the Section 8

1  program, and would likely return to the Antelope Valley if the Cities ceased engaging
2  in exclusion and discrimination.

3      24.    Plaintiff Judy Doe is a black Section 8 participant who lived in Palmdale
4  until shortly before the initiation of this litigation and now lives in Lancaster.  Ms.
5  Doe and her family of four children live in fear of discrimination from the Cities.

6      25.    Defendant City of Lancaster, California, is a municipal entity located in
7  Los Angeles County.   Lancaster is located in the area of Los Angeles County
8  northeast of the City of Los Angeles known as the Antelope Valley.   It has a
9  population of approximately 157,000.[22]  Law enforcement services are provided by
10  the Los Angeles County Sheriff under contract with the City.  Approximately 9.3% of
11  the housing units – or 4,843 homes – in Lancaster are vacant.[23]  As of September
12  2010, there were 2,226 Section 8 households in Lancaster.[24]

13      26.    Defendant City of Palmdale, California, is a municipal entity located in
14  Los Angeles County.   Palmdale is also located in the area of Los Angeles County
15  northeast of the City of Los Angeles known as the Antelope Valley.   It has a
16  population of approximately 153,000.[25]  Law enforcement services are provided by
17  the Los Angeles County Sheriff under contract with the City.  Approximately 7.7% of
18  the housing units – or 3,592 homes – in Palmdale are vacant.[26]   As of September
19  2010, there were 1,416 Section 8 households in Palmdale.[27]

20              **FACTS COMMON TO ALL CLAIMS**

21      27.    The Antelope Valley, particularly its major cities of Lancaster and
22  Palmdale, was the site of intense racial segregation well into the 1970s and home to

---

[22] See 2010 Census Data at http://factfinder2.census.gov/faces/nav/jsf/pages/index.xhtml.

[23] Id.

[24] HACoLA Antelope Valley Section 8 Activity Report to Michael D. Antonovich, dated Oct. 19, 2010.

[25] See 2010 Census Data at http://factfinder2.census.gov/faces/nav/jsf/pages/index.xhtml.

[26] Id.

[27] HACoLA Antelope Valley Section 8 Activity Report to Michael D. Antonovich, dated Oct. 19, 2010.

11
COMPLAINT

1   white supremacist groups.[28]   Prior to the advent of fair housing laws, Palmdale was

2   recognized as a "sundown town" – that is, a town from which all blacks had to leave

3   by sundown.[29]   The nearby community of Sun Village traces its existence to

4   Palmdale's segregated housing policies, providing a place for blacks to live because

5   they could not live within Palmdale itself.[30]   A dramatic increase in the numbers of

6   non-whites in the Antelope Valley in the 1990s was marked by a dramatic surge in

7   the number of hate crimes, particularly attacks on black persons and families.[31]

8   According to a 1999 study of hate crimes across Los Angeles County, "[i]n Antelope

9   Valley . . . the vast majority of [hate crime] victims are African American."[32]   In

10   1990, during the Palmdale elections, "vote white" was spray-painted on a black

11   woman's campaign sign.[33]   In July 1997, in Palmdale, two white men and one white

12   woman murdered a black man so that one of them could earn a white supremacist

13   tattoo.[34]   In February of 2004, two black men were stabbed in two separate bars in

14   Lancaster by the son of a mayoral candidate – the attacker was quoted saying "white

15   power."[35]   In July 2008, two Palmdale homes were plastered with words offensive to

16

17   [28] See Lynda Thompson Taylor, History of the Antelope Valley NAACP, undated.  Available at

18   http://av-naacp.org/Documents/History_of_the_AVNAACP.pdf ; Karen Umemoto & Kimi Mikami, A Profile of Race-Bias Hate Crimes in Los Angeles County, UCLA Lewis Center for Regional

19   Studies, Working Paper Series, June 1, 1999; John Sanders, AV Leaders Decry Label of Racism, Daily News – Los Angeles, Nov. 16, 1999.

20   [29] See http://sundown.afro.illinois.edu/sundowntownsshow.php?id=1117 (a compilation of oral

21   histories regarding sundown towns in the United States).

22   [30] See Sebastian Rotella, Sun Village: Black Enclave Withers Amid Antelope Boom, L.A. Times, Aug. 27, 1989.

23   [31] See Karen Umemoto & Kimi Mikami , A Profile of Race-Bias Hate Crimes in Los Angeles

24   County, UCLA Lewis Center for Regional Studies, Working Paper Series, June 1, 1999; see also John Sanders, AV Leaders Decry Label of Racism, Daily News – Los Angeles, Nov. 16, 1999.

25   [32] Karen Umemoto & Kimi Mikami, A Profile of Race-Bias Hate Crimes in Los Angeles County, UCLA Lewis Center for Regional Studies, Working Paper Series, June 1, 1999, at 14.

26   [33] See John Chandler, Racial Scrawl on Election Poster Angers Palmdale, L.A. Times, Apr. 7, 1990.

27   [34] See Richard Fausset, 3 Charged with Hate Crimes in 1997 Killing of Black Man, L.A. Times, Jan. 28, 2004.

28   [35] See Hector Becerra, Son of Mayoral Hopeful Charged, L.A.Times, Feb. 21, 2004.

12

COMPLAINT

Jews and blacks along with "white power" and a swastika.[36]  In August of 2010, the Church of Jesus Christ of Latter-day Saints in Lancaster and the First African Methodist Episcopal Church in Palmdale were firebombed.[37]  Area hate crimes have specifically targeted Section 8 recipients.  In January 2011, a Palmdale Section 8 participant discovered graffiti stating "I hate Section 8" and "Nigger" on her garage.[38]

28.    Although the Cities have disavowed this ugly past as mere history and characterize more recent actions as those of a few disturbed individuals, the Cities' officials now seek to perpetuate prior discrimination by subjecting Section 8 participants – who are overwhelmingly black and Latino families — to exclusion and discrimination.

29.    Indeed, 84% of Section 8 participants in Lancaster and 85% in Palmdale are black and Latino.[39]  According to HUD's statistics for 2008, the most recent year available, of the 7,203 individuals in Section 8 voucher holders' households in Lancaster, 70% were black and 14% were Latino.[40]  Similarly, in Palmdale, 67% of the 4,146 individuals in Section 8 voucher holder households identified themselves as black and 18% as Latino.[41]  Lancaster's and Palmdale's harassment and intimidation of Section 8 participants already living in their Cities are targeted primarily against blacks and Latinos.

30.    Across Los Angeles County and the nation, black and Latino families also make up the majority of Section 8 tenants.  In Los Angeles County, 47% of the

---

[36] See Leo Stallworth, Palmdale houses vandalized in "hate crime," KABC-TV July 8, 2008, http://abclocal.go.com/kabc/story?section=news/local&id=6252533.

[37] See Church Arsons, Ourweekly.com, Aug 31,2010, http://www.ourweekly.com/antelope-valley/church-arsons .

[38] See Leo Stallworth, "Palmdale family target of Section 8 hatred," KABC-TV Jan. 4, 2011, http://abclocal.go.com/kabc/story?section=news/local/los_angeles&id=7880152.

[39] See http://www.huduser.org/portal/picture2008/index.html.

[40] See id.

[41] See id.

1  194,222 Section 8 voucher holders were black and 24% Latino in 2008.[42]   Of the

2  5,076,510 people using Section 8 vouchers nationally, 42% were black and 17%

3  Latino.[43]   Lancaster's and Palmdale's efforts to exclude Section 8 participants from

4  elsewhere in the County or other parts of the country likewise are targeted primarily

5  against blacks and Latinos.

6  **I.     LANCASTER AND PALMDALE'S WAR TO EXCLUDE SECTION 8**

7         **PARTICIPANTS FROM THEIR COMMUNITIES**

8         31.     All of Lancaster's and Palmdale's actions targeting Section 8

9  participants for discrimination and exclusion have been part of an ongoing policy or

10  practice with origins in activities as early as 2004 that have expanded greatly since

11  2008, continuing in full force to the present day.

12         **A.     Unduly Aggressive Investigations and Disproportionate Results**

13         32.     In 2004, Lancaster and Palmdale began to focus undue law enforcement

14  attention on Section 8 participants.   Lancaster established its "Lancaster Community

15  Appreciation Project" ("LAN-CAP") police team to target multi-family rental

16  properties.   As a later Lancaster city newsletter explained, a substantial portion of

17  LAN-CAP officers' time was and is devoted to conducting "compliance checks" on

18  Section 8 tenants and encouraging landlords and managers to police their Section 8

19  tenants: "The Lancaster Sheriff's Station has a special team of officers dedicated to

20  removing the criminal element from problem apartments and other rentals in

21  Lancaster. . . . [In one year alone], over 1,500 arrests were made – three times the

22  normal apprehension rate.   They have trained over 300 property owners and

23  managers on how to spot potential problems and have performed over 200 Section 8

24  compliance checks."[44]   Palmdale has a similar program to devote particular attention

25

26  [42] See id.

27  [43] See id.

28  [44] January 2007 City of Lancaster Outlook Lite,
    http://www.cityoflancasterca.org/index.aspx?recordid=46&page=350.

1    to rental units, called the "Partners Against Crime" ("PAC") unit.  The PAC unit

2    consists of two sergeants and ten deputies.[45]  According to Palmdale's website, "[t]he

3    PAC program combines the City, Palmdale Sheriff's Station, rental property owners

4    and managers and residents into a team that focuses on keeping illegal activity out of

5    rental property . . . ."[46]

6        33.    Meetings among Lancaster, Palmdale, and HACoLA in 2004 and 2005

7    spurred Memoranda of Understanding ("MOU") to hire additional investigators to

8    work with the local sheriff's office and focus on eliminating purported Section 8

9    fraud.  In November 2004, Lancaster entered into a MOU with HACoLA and the

10   County of Los Angeles providing "for additional investigative services to address

11   criminal activity and other violations related to the [Section 8] Program administered

12   by the Housing Authority within [Lancaster] . . . ."[47]   The City paid HACoLA

13   $50,000, and the County's Fifth District matched the City's contribution, in order to

14   provide "a maximum of 2,080 hours of investigative services during the term of this

15   MOU."[48]  The term of the original MOU was twelve months.[49]

16       34.    A few months later, in February 2005, Palmdale followed suit and

17   entered into a MOU with HACoLA and the County as well – noting, in fact, in its

18   staff report that Lancaster had already done so.[50]  The original Palmdale MOU paid

19

20

21

22

23  [45] April 1, 2009 Staff Report for Palmdale City Council Meeting Agenda Item 7.1.

     [46] City of Palmdale webpage,
24   http://www.cityofpalmdale.org/departments/public_safety/pac/index.html.

25  [47] Memorandum of Understanding By and Between the Housing Authority of the County of Los
     Angeles and the City of Lancaster, dated Nov. 4, 2004.

26  [48] Id.

27  [49] See id.

28  [50] See Palmdale City Council Staff Report re: Approval of Agreement No. A-0917..., dated Feb. 14,
     200[5].

1    for twenty hours per week of investigational services.[51]  Like the Lancaster MOU, the

2    Palmdale MOU was limited to a one year term absent subsequent amendment.[52]

3         35.    Each year, the Cities and HACoLA entered into either amendments to

4    existing MOUs or new MOUs to retain and expand these enhanced investigational

5    services.  At the end of 2005, Palmdale amended its first MOU and increased its

6    commitment from an extra twenty hours of investigative services per week to thirty-

7    two.[53]  Subsequent amendments were entered into in May 2006 and March 2007.[54]  A

8    new Palmdale MOU was signed in August 2008 and renewed on July 1, 2009 and

9    May 5, 2010.[55]  In November 2010, Palmdale again increased the level of service it

10   would pay for from thirty-two hours per week to forty,[56] due to the "inordinate

11   amount of Section 8 in our community."[57]   The Palmdale City Council voted

12   unanimously to renew the MOU on June 1, 2011.[58]

13        36.    Lancaster increased its support for additional investigative services even

14   more dramatically.  The $50,000 commitment in 2004 had expanded to a $130,882

15   commitment in June 2009, when the City Council approved an amendment to

16   Lancaster's second MOU with HACoLA.[59]  The County's Fifth District continued to

17   match these funds.  The combined funds paid for 1) two part-time investigators,

18

19   [51] See Palmdale Agmt. No. A-0917, A Memorandum of Understanding By and Between the
     Housing Authority of the County of Los Angeles and the City of Palmdale For the Hiring of A

20   Section 8 Investigator to Provide Services Within the City.

     [52] See id.
21
     [53] See Palmdale City Council Staff Report re: Approval of Amendment No. 3 to Agreement No. A-

22   0917, ..., dated Mar. 5, 2007.

23   [54] See id.

     [55] See Palmdale City Council Staff Report re: Approval of Amendment No. 2 to Agreement No. A-

24   2419 ..., dated May 5, 2010.

25   [56] See Palmdale City Council Staff Report re: Approval of Amendment No. 3 to the Memorandum
     of Understanding (MOU) ..., Agreement No. A-2419, dated Nov. 3, 2010.

26   [57] Nov. 3, 2010 Palmdale City Council Meeting Video.

27   [58] June 1, 2011 Palmdale City Council Meeting Video.

     [59] See Lancaster City Council Staff Report re: Approve Amendment # 1 to the Memorandum of

28   Understanding ..., dated June 9, 2009.

2) supervision of those investigators, 3) a part-time analyst, and 4) a part-time hearing officer.[60]   The June 9, 2009 City Council staff report recommending approval of this amendment argued that "[t]he City's Rental Inspection Program and inter-agency cooperation between Code Enforcement and Housing Authority investigators has had a significant impact on reducing the number of problematic Section 8 tenants."[61]

37.   Further harassment of Section 8 residents in Lancaster came in the form of Lancaster's 2007 establishment of the Community Oriented Response and Enforcement program ("CORE") which provided an additional four deputies and a sergeant.   Each deputy is assigned to a quadrant of the city.[62]   According to Lancaster's description of the program, "[t]his team focuses primarily on ongoing and quality-of-life issues, such as loitering, graffiti, 'problem neighbors,' and emerging crime patterns in specific areas."[63]   The CORE team, like the LAN-CAP team, also participates in Section 8 compliance checks.[64]

38.   Until September 2009, HACoLA had no protocol in place governing the conduct of its investigators.   In Lancaster, these investigators were given space in the Lancaster Sheriff Station, and investigators in both cities were accompanied by deputies in multi-agency "sweeps" of Section 8 homes.[65]   At least on some occasions, the sweeps of Section 8 homes in Lancaster and Palmdale involve not only Sheriff's deputies, but also the Department of Children and Family Services, the Probation Department, and Code Enforcement officials.[66]   Investigations conducted in the Cities regularly do not comply with the substantive limitations in the investigations protocol HACoLA issued in September 2009.

---

[60] See id.

[61] Id.

[62] City of Lancaster webpage, http://www.cityoflancasterca.org/index.aspx?page=835.

[63] Id.

[64] See id.

[65] See, e.g., email from R. Nishimura, HACoLA, to M. Badrakhan, HACoLA, re: FW: Lancaster Section 8 Compliance Checks, dated Dec. 11, 2008.

[66] See, e.g., id.

COMPLAINT

39.   The intense law enforcement scrutiny of Section 8 tenants has subjected them to constant suspicion simply by virtue of their participation in the Section 8 program, and has resulted in unwarranted harassment of Section 8 participants. According to data provided by HACoLA, between 2006 and 2010, the odds that a Section 8 participant would be subjected to an investigation were approximately 2.6 times higher in Lancaster than in the rest of County and approximately 3.2 times higher in Palmdale than in the rest of County.[67]

40.   Moreover, many of these investigations have been marked by excessively aggressive tactics, such as the presence of multiple armed sheriff's deputies with guns drawn and unnecessary hand-cuffing of household members. Palmdale's investigator, Gary Brody, has been particularly aggressive, taking as many as fifteen armed officers with him on purported "compliance checks" and threatening Section 8 voucher holders or their families with search warrants and arrest if they do not consent to searches of their homes.  Moreover, Brody has demonstrated in the past that he had access to minors' school and juvenile records – which he should not – and used these records to target the children in Section 8 households.  Indeed, Brody's own investigative reports reference discussions with school deputies and reviews of booking records to find juvenile arrests in Section 8 homes.  The Palmdale City Council has met with Brody to discuss his work and lauded it as "incredible."[68]  Brody has trained Lancaster investigators in his tactics.

41.   HACoLA's "Antelope Valley Section 8 Activity Reports" also demonstrate that investigators in Lancaster and Palmdale take a much different approach to tenants than those in other parts of HACoLA's jurisdiction, recommending termination more often than in the rest of the County and determining that fewer complaints were unfounded.  For example, between July 2008 and June 2009, fraud investigators in Lancaster opened 239 investigations, and proposed

---

[67] Data provided by HACoLA in response to California Public Records Act request.

[68] November 3, 2010 Palmdale City Council Meeting Video.

terminations in 98 (41%) of those investigations, deeming only 37 (15%) of the claims against the Section 8 tenants unfounded.[69]   During the same period in Palmdale, fraud investigators opened 166 investigations, proposed termination for 96 tenants (58%), and deemed 11 (7%) unfounded.[70]   In the rest of the County, with nearly 17,000 Section 8 families, 670 investigations were opened, of which 183 (27%) resulted in proposed terminations and 207 (31%) were deemed unfounded.[71] Between July 2009 and June 2010, the number of proposed terminations dropped significantly, but investigators were still reluctant to close an investigation on the grounds that it was unfounded.[72]   Later in 2010, Palmdale's investigators resumed their vigorous termination rates, proposing terminations in 44% of all investigations opened in July-September 2010, as opposed to a 9% rate outside of the Antelope Valley.[73]   The Cities receive the Antelope Valley Section 8 Activity Reports on a monthly basis, and the reports include fiscal year-to-date as well as monthly data. Palmdale in particular has praised their investigator's "unmatched" "productivity."[74] The Cities are the only cities in Los Angeles County that receive such reports from HACoLA.

42.   Overall, between 2006 and 2010, the odds that an investigation would result in a recommendation that the participant's voucher be terminated were over 4 times higher in Lancaster than in the rest of County and almost 6 times higher in Palmdale than in the rest of County.[75]   Indeed, between July 1, 2006 and November 6,

---

[69] See HACoLA Antelope Valley Section 8 Activity Report to Michael D. Antonovich, dated July 16, 2009.
[70] See id.
[71] See id.
[72] HACoLA Antelope Valley Section 8 Activity Report to Michael D. Antonovich, dated July 14, 2010.
[73] See HACoLA Antelope Valley Section 8 Activity Report to Michael D. Antonovich, dated October 19, 2010.
[74] November 3, 2010 Palmdale City Council Meeting Video.
[75] Data provided by HACoLA in response to California Public Records Act request.

2010, of the 1173 "proposed field terminations" of Section 8 participants in the entire HACoLA area, a quarter (26%) were generated in Lancaster and a third (33%) in Palmdale, for a total of 59% of all terminations in Los Angeles County – even though Palmdale and Lancaster residents comprise only 17% of the County's Section 8 households.[76]   Not all terminations proposed by local investigators are actually imposed by HACoLA – indeed, Lancaster officials have complained that "[t]he transfer of termination decisions from the Investigative Division in the Antelope Valley to [HACoLA Headquarters in] Santa Fe Springs has led to a decrease in terminations."[77]

43.   In proposed terminations, the most commonly invoked rule pertains to obtaining HACoLA approval for any change in the persons living in the unit, generally referred to as an "unauthorized tenancy."   According to HUD reports on Section 8 terminations in Lancaster between January 2007 and September 2010, 57% were based at least in part on an "unauthorized tenancy." [78]   However, the presence of an unauthorized tenant is not readily determined in a single visit – or even multiple visits – by an investigator, because HACoLA regulations only deem someone an unauthorized tenant if they stay in a residence more than thirty consecutive days or more than sixty total days in one year.[79]   Thus, unsurprisingly, HACoLA records reflect that many terminations proposed on these grounds are patently unwarranted and only serve to harass the Section 8 participants.   For example:

a.   In June 2009, a Palmdale tenant received a notice of proposed termination alleging the tenant had unauthorized subjects (the tenant's daughter and granddaughter) residing in her unit.   The tenant was a stage 4 cancer patient requiring 24-hour medical assistance, and asked her daughter and

---

[76] Data provided by HACoLA in response to California Public Records Act request.

[77] May 4, 2010 Lancaster Neighborhod Vitalization Commission Minutes.

[78] Data provided by HACoLA in response to California Public Records Act request.

[79] See HACoLA Administrative Plan Section 6.8.8.

1    granddaughter to stay the night sometimes so she would not be alone.

2    Nevertheless, the investigators insisted on recommending termination.    An

3    administrative hearing officer overturned the proposed termination finding the

4    termination was unwarranted.[80]

5         b.    In July 2009, a tenant living in Palmdale received a notice of

6    proposed termination solely because the investigators were informed that an

7    unauthorized tenant had listed the tenant's Section 8 unit as his place of

8    residence on police records.  The investigators failed to acquire, or even seek,

9    any additional corroborating evidence.  Despite this and the participant's

10   assertions that the unauthorized tenant did not actually reside at the unit, the

11   investigators recommended termination.  Once again, the proposed termination

12   had to be overturned at an administrative hearing for lack of evidence.[81]

13        c.    In August 2009, a Palmdale tenant received a notice of proposed

14   termination because an investigator alleged that an unauthorized tenant – the

15   tenant's spouse – was residing in the tenant's Section 8 unit and that the spouse

16   was engaged in criminal activity.  In actuality, the tenant and the spouse had

17   been separated for years and the tenant had a restraining order against the

18   spouse because she was the victim of domestic violence.  The proposed

19   termination was withdrawn after the tenant contacted HACoLA to dispute the

20   proposed termination.[82]

21   **B.    Business Licensing and Inspections for Rentals in Lancaster and**

22        **Palmdale**

23        44.    Both Lancaster and Palmdale have passed rental unit inspection

24   ordinances that give the Cities an additional avenue to enter the homes of Section 8

25

26   [80] See HACoLA Hearing Summaries, provided by HACoLA in response to California Public
     Records Act request.

27   [81] See id.

28   [82] See id.

21

COMPLAINT

1  tenants, nominally in the interest of public safety. In addition, both Cities have used
2  their rental business licensing ordinances to target Section 8 landlords.

3      45.  In 2004, the City of Lancaster passed Ordinance 822, which required
4  landlords renting units in multi-family buildings to obtain business licenses. The
5  licensing program was expanded in 2007 via Ordinance 869, which required those
6  renting single-family homes to obtain business licenses as well. These ordinances are
7  now codified in Lancaster Municipal Code Ch. 5.40. The ordinances require that all
8  rental units be inspected on a regular basis and when any complaints are made. These
9  inspections may "include inspections by other City departments and/or Los Angeles
10 County enforcement agencies."[83]  The City of Lancaster provides a form for
11 requesting a rental business license, which in its current iteration expressly asks
12 landlords whether they will be accepting Section 8 tenants.[84]

13     46.  Similarly, in 2006, Palmdale – which already had a business license
14 requirement in place in Palmdale Municipal Code Ch. 3.44 – passed Ordinance 1273,
15 giving itself expanded rights to inspect rental units. Like the Lancaster statute, the
16 Comprehensive Residential Rental Unit inspection program, codified in Palmdale
17 Municipal Code Ch. 8.40, requires that all rental units be registered and be inspected
18 on a regular basis and when any complaints are made. As with Lancaster, these
19 inspections in Palmdale may "include inspections by other city departments and/or
20 Los Angeles County enforcement agencies."[85]

21     47.  The Cities have deployed these ordinances in their war against Section 8
22 residents. On October 14, 2008, Lancaster's City Manager wrote a letter to HACoLA
23 asking that it immediately stop Section 8 payments to landlords who did not have
24 current business licenses.[86]  After HACoLA refused, Lancaster requested that

25 _____
   [83] Lancaster Muni. Code § 5.40.080(A).
26 [84] See City of Lancaster webpage, http://www.cityoflancasterca.org/index.aspx?page=527.
27 [85] Palmdale Muni. Code § 8.40.030.
   [86] See letter from M. Bozigian, Lancaster City Manager, to W. Huang, Acting Exec. Dir., HACoLA,
28 dated Oct. 14, 2008.

HACoLA send letters to Section 8 landlords whose properties were not licensed indicating that they must obtain licenses or they may lose their right to Section 8 payments.[87]   HACoLA agreed to do so.   At a March 25, 2009 meeting among HACoLA, Lancaster, and Palmdale, Palmdale asked that HACoLA do the same for its unlicensed landlords,[88] even though Palmdale's ordinance had traditionally not been enforced against rental complexes smaller than four units.[89]

48.   Also at the March 25, 2009 meeting, the Cities devised a plan to use the existence of the business licensing ordinances as a pretext for requesting lists of Section 8 properties.[90]   Betraying their interest in more than business licensing compliance, the Cities also requested a list of the approved tenants in each rental unit.[91]   Shortly thereafter, each City sent a nearly identical public records request to HACoLA seeking a spreadsheet containing the current business license status, the property owner's name, the property owner's mailing address, and the Section 8 unit address for each Section 8 landlord in their respective jurisdictions.[92]   HACoLA initially agreed to provide these lists, but ceased doing so in late 2010.

49.   Both Cities have likewise used the rental inspection ordinances as a means of entering Section 8 households without adhering to HACoLA rules regarding investigations and compliance checks.   Indeed, the Cities confirmed at the

---

[87] See email from R. Nishimura, HACoLA, to M. Badrakhan, HACoLA, dated Mar. 30, 2009 re: "Joint Cities and County Housing Authority/Section 8 Meeting."

[88] See HACoLA Memo. From C. Carrillo to N. Hickling, "Section 8 Status Report," Mar. 25, 2009.

[89] See Palmdale City Council Staff Report, "Discussion regarding Business Licensing, Rental Housing Requirements, and Section 8 Housing," Sept. 19, 2007.

[90] See email from N. Hickling, County of Los Angeles 5th Dist., to Mar. 25, 2009 meeting participants dated Mar. 27, 2009 re: Joint Cities and County Housing Authority/Section 8 Meeting.

[91] See attachment to email from A. Gonzalez, HACoLA, to M. Badrakhan, HACoLA, dated Mar. 30, 2009 re: "Meeting Notes."

[92] See letter from B. Boswell, Lancaster Finance Dir., to C. Carrillo, HACoLA Acting Exec. Dir., dated Apr. 15, 2009; letter from S. Williams, Palmdale City Manager, to C. Carrillo, HACoLA Acting Exec. Dir., dated Apr. 28, 2009.

23

1   March 25, 2009 meeting that if HACoLA was not the lead agency on an inspection,
2   its protocols would not apply.[93]

3       50.    The Cities have also sought to use the business licensing ordinances to
4   exert more direct control over Section 8 landlords in order to make it impossible for
5   Section 8 tenants to find housing.  For example, in 2007, Lancaster sought to impose
6   a five-year moratorium on business licensing for Section 8 housing.  Council Member
7   Ronald Smith suggested that this "would be the perfect vehicle in controlling Section
8   8, because when Section 8 comes up, the City already knows how many business
9   licenses there are and that there are over 2000 vouchers in the City."[94]  Council
10  Member Sileo concurred that "if the City can use this to leverage some control on the
11  Section 8 population and exercise additional control, this would be good."[95]
12  Unsurprisingly, the City Attorney cautioned that there would be some "very serious
13  legal issues that need to be dealt with" – although the City Attorney's primary
14  concern was federal pre-emption, not fair housing.[96]  The matter was temporarily
15  dropped.

16      51.    However, in September 2008, then Vice Mayor Smith revived the
17  business licensing discussion in the City Council.  In late 2008, the City wrote a letter
18  to its congressional representative, Representative Howard McKeon, seeking his
19  assistance in requesting approval from HUD to adopt an amendment to the licensing
20  ordinance that would provide that no business license would be issued to an owner
21  who proposes to rent residential property to Section 8 participants.  In February 2009,
22  Vice Mayor Smith gave an update to the City on his proposal, which had transformed
23  from an outright ban on those intending to accept Section 8 vouchers to "a possible 1-
24  year moratorium on business licenses on single family homes."  Nonetheless, his

---

[93] See attachment to email from A. Gonzalez, HACoLA, to M. Badrakhan, HACoLA, dated Mar.
30, 2009 re: "Meeting Notes."
[94] July 24, 2007 Lancaster City Council Minutes.
[95] Id.
[96] Id.

24
COMPLAINT

1  motive was unambiguous: ***"[t]his would be a backdoor way of controlling how many***
2  ***vouchers are coming into the City."[97]***   Both Vice Mayor Smith and Mayor Rex
3  Parris reiterated their desire to penalize landlords who rent to Section 8 tenants in a
4  March 2009 City Council meeting, with the Vice Mayor emphasizing the need for a
5  "restrictive ordinance" and the Mayor urging that "the City should be able to identify
6  the people who are going to profit from this; stop doing business with them; make it
7  known to the community who these people are; they are destroying the community;
8  have the courage to identify these people and have the courage to stop doing business
9  with these individuals."[98]

10      52.    Meanwhile, Representative McKeon forwarded Lancaster's request to
11  HUD, and, on June 17, 2009, he forwarded HUD's response to Vice Mayor Smith.  In
12  its response, HUD stated that the City's actions were plainly counter to the Section 8
13  program's goals of "expanding available housing choices."[99]   The HUD response
14  continued:  "It is worth noting that according to HUD's data, as of December 2008,
15  African-Americans accounted for approximately 75 percent of the city of Lancaster's
16  voucher holders . . .  Because an overwhelming majority of city of Lancaster HCV
17  participants are minorities . . ., the proposed amendment will likely have a significant
18  disproportionate effect on these groups."[100]   The HUD response went on to observe
19  that "[b]ecause the majority of voucher holders in the city of Lancaster are African-
20  Americans . . ., the proposed amendment, while facially neutral, ***could be found to***
21  ***result in an unlawful disparate impact . . . under the [Fair Housing] Act."[101]***

22      **C.    Additional Avenues for Harassment Pursued By Lancaster**
23      53.    Lancaster has greatly escalated its focus on Section 8 since 2008.  In
24  June 2008, newly elected Mayor R. Rex Parris was adamant about the need to address

---

25  [97] February 19, 2009 Lancaster Section 8 Commission Minutes (emphasis added).
26  [98] March 24, 2009 Lancaster City Council Minutes.
27  [99] Letter from B. Fulton, HUD, to H. McKeon, U.S. Congress, rec'd May 5, 2009.
    [100] Id.
28  [101] Id. (emphasis added).

1    the Section 8 "problem" and the animus he expressed against Section 8 participants

2    was palpable: "[Mayor Parris stated t]he Section 8 housing issue needs to be dealt

3    with on a local level in an aggressive manner *rather than becoming a dumping*

4    *ground for Section 8 into the community*. He stated that six months from now, he

5    hopes to see a much different approach to Section 8 in the Antelope Valley."[102]   In

6    response to the suggestion that the City should be targeting all rentals, not just

7    Section 8, Mayor Parris was unmoved: "*Make no mistake, this City wants to limit*

8    *the number of Section 8 units that are placed in this community*. . . . [I]t is a

9    problem that is crushing the community. . . . [The County and HACoLA] *have been*

10   *dumping Section 8 here* in a much more rapid rate in the last few months. They have

11   totally ignored the plight of the Antelope Valley and *it is time to go to war*."[103]

12   Notably, at the following City Council meeting, Mayor Parris clarified his intent with

13   respect to Section 8: "Mayor Parris stated that there will not be any obstacle for

14   seniors and disabled people; the City is not going to do anything about law abiding

15   Section 8 citizens."[104]   Council Member Sherry Marquez reiterated that the City "will

16   not go after people who actually deserve Section 8 funding."[105]

17          54.    Lancaster's openly-expressed animus to Section 8 has continued

18   unabated. For example, Mayor Parris repeated his hostility to the Section 8 program

19   in subsequent communications with HACoLA officials later in 2008, stating that "for

20   too long, the County has treated the City of Lancaster and the Antelope Valley as a

21   repository for Section 8."[106]   Other Council Members have echoed his sentiments. At

22   the newly formed Section 8 Commission meetings, Council Member Marquez

23   complained that "[u]nfortunately, those that receive the vouchers do not stay in the

24

---

25   [102] June 10, 2008 Lancaster City Council Minutes (emphasis added).

26   [103] Id. (emphasis added).

27   [104] June 24, 2008 Lancaster City Council Minutes.
     [105] Id.

28   [106] September 3, 2008 Lancaster City Council Minutes (emphasis added).

City of Los Angeles; they migrate to the Antelope Valley."[107]   Adhering to the rhetoric that casts Section 8 participants as criminals, she continued:   "Many prisoners are to be paroled soon which means a number of them will be receiving Section 8 housing, therefore, Lancaster will soon be inundated with another group."[108]   In fact, individuals on parole are not eligible for Section 8 vouchers per HACoLA regulations.[109]   In a March 2009 Lancaster City Council Meeting, Mayor Parris again proclaimed "there must be a reduction in rentals; reduction in Section 8 housing;" and that "he wants to see the numbers drop . . . it has been far too long that this issue has gone on; [the City] must come up with numbers and evaluate if the City is going in the right direction."[110]   The Lancaster City Manager "stated that *the goal of the City is to reduce the numbers to half of what is received now*."[111]

55.   Consistent with these sentiments, Lancaster has deployed a number of additional tactics in recent years above and beyond the intimidation and harassment already described.

56.   <u>Nuisance Ordinance.</u>  In June 2008, Mayor Parris asked the City Council to "[l]ook into a means for making it very easy for neighbors to file nuisance lawsuits with the assistance of the City against group homes and Section 8 housing that becomes a nuisance and where the owners of the property fail to protect the neighbors."[112]   The City Council obliged.  On October 14, 2008, it passed Ordinance 908, codified in Lancaster Municipal Code Ch. 8.52, which provides that if a property is the subject of five calls to law enforcement to report "nuisance activity" in a one-year period, the landlord and the tenant will receive a notice of abatement with a

---

[107] February 19, 2009 Lancaster Section 8 Commission Minutes.

[108] <u>Id.</u>

[109] HACoLA Administrative Plan Section 2.8.1.

[110] March 24, 2009 Lancaster City Council Minutes.

[111] <u>Id.</u> (emphasis added).

[112] June 10, 2008 Lancaster City Council Minutes.

COMPLAINT

1  schedule of fees for future services.[113]   "Nuisance activity" is defined broadly in

2  Ordinance 908 as including "[a]nything which is injurious to health, or is indecent, or

3  offensive to the senses, or is an obstruction to the free use of property, so as to

4  interfere with the comfortable enjoyment of life or property by an entire community

5  or neighborhood, or by any considerable number of persons."[114]   Under Ordinance

6  908, the landlord is jointly and severally liable for all fees incurred, and failure to pay

7  the fees will result in the revocation of the landlord's business license.[115]   However,

8  Ordinance 908 gives the landlord an affirmative defense (against both the revocation

9  of the license and the payment of the fees): evict the tenant.[116]   In a meeting of

10  Lancaster's Section 8 Commission, Council Member Marquez heralded the newly

11  passed Nuisance Ordinance as "a great tool to help the City move forward."[117]

12       57.   Section 8 Commission.  Also in June 2008, Mayor Parris requested that

13  Council Member Marquez be appointed as the Chair of an Ad Hoc Committee to

14  appoint a "Section 8 Commission."[118]   Council Member Marquez was, like Mayor

15  Parris, newly elected, but had appeared before the City Council prior to her election

16  as a citizen concerned about the purported effect of Section 8 on the community.[119]

17  The purpose of the Section 8 Commission would be to "(1) ... look at a Joint Powers

18  Agreement to take over the Section 8 for the Antelope Valley; (2) ... look into the

19  enforcement of Section 8 in a much more aggressive manner; [and] (3) look into

20  drafting an ordinance that would limit the number of business licenses for Section 8

21  housing . . . ."[120]

22

23  [113] Lancaster Muni. Code § 8.52.060.

24  [114] Lancaster Muni. Code § 8.52.030.

25  [115] Lancaster Muni. Code § 8.52.070 - 8.52.080.

    [116] Lancaster Muni. Code § 8.52.090.

26  [117] Oct. 16, 2008 Lancaster Section 8 Commission Minutes.

27  [118] June 10, 2008 Lancaster City Council Minutes.

    [119] Sept. 26, 2006 Lancaster City Council Minutes; May 8, 2007 Lancaster City Council Minutes.

28  [120] June 10, 2008 Lancaster City Council Minutes.

58.     One of the first ideas put forth by the Section 8 Commission was a so-called "Good Neighbor Guide," which was suggested by Council Member Marquez on the grounds that "[p]eople need to get involved in calling in on such things as Section 8 code violations," or as the City Manager called them, "problem renters."[121] The "Good Neighbor Guide" went through several iterations, but was up on Lancaster's city website by August 2009.[122]

59.     After formation of a regional housing authority was deemed cost-prohibitive, the Section 8 Commission was renamed the "Neighborhood Vitalization Commission."  Nonetheless, its mission statement continued to reflect animus against Section 8 participants:  "The Lancaster Neighborhood Vitalization Commission will examine the ongoing cumulative *negative effects of an over-abundance of publicly-subsidized housing*, and *recommend policies and programs to deter the proliferation of subsidized housing* until such time as the city is able to achieve fair-share parity with other cities in Los Angeles County."[123]  In practice, the Commission continued to have regular meetings with HACoLA and County staff and to focus much of its efforts on Section 8 participants.

60.     For example, in July 2009, the Neighborhood Vitalization Commission sent a letter to newly appointed HACoLA Executive Director Sean Rogan, purporting to follow up on a campaign discussed and agreed upon at the March 25, 2009 meeting to dissuade Section 8 participants from coming to the Antelope Valley.  The letter asked, among other things:  "1. Where are we with the Cities of Lancaster and Palmdale taking part in the orientation for new Section 8 Voucher holders at the Palmdale office? Also, has a DVD been prepared that was discussed at the meeting in Palmdale several months ago?  2. Where are we with the [HACoLA] doing an ad

---

[121] July 8, 2008 Lancaster City Council Minutes; Sept. 3, 2008 Lancaster City Council Minutes.

[122] Aug. 3, 2009 Lancaster Neighborhood Vitalization Commission Minutes.

[123] Lancaster Neighborhood Vitalization Commission Mission Statement, Feb. 2009 (emphasis added).

1    campaign to let Voucher holders know that it is expensive to live in the Antelope

2    Valley and that there are very few available jobs in the area[?]"[124]  The DVD

3    referenced was apparently intended to focus on rule compliance and bases for

4    termination.[125]  Lancaster sought to "lay down the law" to Section 8 participants by

5    participating in the orientation process.[126]  The advertising campaign referenced was

6    an attempt to dissuade Section 8 participants from moving to the Antelope Valley due

7    to the high costs of heating and cooling a large home as well the lack of jobs and

8    services.[127]

9         61.    In addition, the Neighborhood Vitalization Commission wanted more

10   information from HACoLA on Section 8 participants.  The July 2009 letter stated:

11   "[a]lthough [HACoLA] is currently providing a periodic activity report, members of

12   our Commission have determined that there is insufficient information contained in

13   this existing report to assess progress in a number of other areas and would appreciate

14   a monthly report that contains the following information:  1.  The number of elderly,

15   disabled and family Voucher holders in the City of Lancaster . . . ."[128]

16        62.    HACoLA's response denied some of Lancaster's requests, and made

17   clear that attempting to drive Section 8 participants away from the Antelope Valley

18   was illegal.  HACoLA's Rogan stated that Lancaster officials would be permitted to

19   participate in Section 8 orientations, but that their role would be primarily as

20   observers.[129]  Moreover, he instructed them that "[t]he Housing Authority did not

21

22   ———————————
[124] Letter from B. Banks, Lancaster Neighborhood Vitalization Commission, to S. Rogan, HACoLA

23   Exec. Dir., dated July 7, 2009.

[125] See email from R. Nishimura, HACoLA, to M. Badrakhan, HACoLA, dated July 15, 2009 re:

24   FW: City of Lancaster Letter.

[126] Id.

25   [127] See id.

26   [128] Letter from B. Banks, Lancaster Neighborhood Vitalization Commission, to S. Rogan, HACoLA

27   Exec. Dir., dated July 7, 2009.

[129] See letter from S. Rogan, HACoLA Exec. Dir., to B. Banks, Lancaster Neighborhood

28   Vitalization Commission, dated July 21, 2009.

COMPLAINT

1   agree to do an ad campaign to let Voucher holders know that it is expensive to live in

2   the Antelope Valley and that there are very few available jobs in the area.   The

3   Housing Authority indicated that both landlords and tenants can access housing

4   availability throughout the County on the socialserve.com website.   ***At the last***

5   ***meeting it was mentioned that Fair Housing laws do not allow steering program***

6   ***participants***."[130]   Rogan further refused to comply with Lancaster's request for

7   additional information on a monthly basis.[131]   However, he did provide the

8   information requested on a one-time basis, informing the Commission that the

9   number of elderly in Lancaster was 332, the number of disabled was 892, and the

10   remainder was 1157.[132]

11       63.   <u>Further Demands of HACoLA.</u>   Undeterred by the Neighborhood

12   Vitalization Commission's failure to get substantial cooperation from HACoLA in

13   these efforts to make Lancaster less attractive to Section 8 tenants, Lancaster City

14   Manager Mark Bozigian wrote to Rogan again in October 2009.   In his letter,

15   Bozigian asked HACoLA to create a local preference list for Lancaster; to create a

16   more onerous pre-approval process for Section 8 applicants by requiring inspections

17   and interviews in their current residences; and to develop specific qualification

18   criteria for Lancaster applicants and landlords, including criminal background checks

19   for all household members over the age of fifteen, extended background checks, and

20   imposing a "one strike" rule for drug-related activity.[133]   Moreover, Bozigian asked

21   that "[i]f any family member is arrested, regardless of the charge, the voucher holder

22   must report the arrest to the Housing Authority, which will, in turn, report the arrest

23   to the City of Lancaster and reevaluate the qualifications of the family to participate

24

25   [130] <u>Id.</u> (emphasis added).

26   [131] <u>See id.</u>

27   [132] <u>Id.</u>

28   [133] <u>See</u> letter from M. Bozigian, Lancaster City Manager, to S. Rogan, HACoLA Exec. Dir., dated
     Oct. 16, 2009.

1  in the program."[134]   Again, HACoLA responded that it would not comply with many

2  of Lancaster's requests, and in particular that "[l]ocalities within HACoLA's

3  jurisdiction may not have separate policies, procedures or waiting lists."[135]

4       64.   In July 2010, Dorian Jenkins of HACoLA made a presentation to the

5  Lancaster City Council, and Mayor Parris reiterated his frequent claims that Section 8

6  tenants were being "dumped" in Lancaster:   "[T]here is a drastic imbalance of

7  Section 8 people being steered to the Antelope Valley ... the Housing Authority wants

8  these people living in Lancaster."[136]   At this same City Council meeting, Mayor

9  Parris's racial animus became even more blatant, as he asked Mr. Jenkins:  "Why is it

10  that over 70 % of your recipients are African Americans, when your population base

11  is probably a third African American, a third Hispanic, and a third White?"[137]   Mayor

12  Parris has elsewhere commented that "[t]he problem with Section 8 is that it's

13  unbalanced.  African-Americans comprise 78 percent of the recipients but are only 20

14  percent of the population.  That's unfair."[138]

15       65.   In October 2010, the City Council suggested to HACoLA that it should

16  "requir[e] families to adhere to all rules and laws including that their children attend

17  school" and that HACoLA could "use Lancaster as a pilot program for this."[139]

18  Notably, Mayor Parris conceded that he had no basis to believe that children from

19  Section 8 families were not attending school:  "That would require us first to find out,

20  is it a problem? Maybe everybody on Section 8, all of their kids are attending school

21  and that would be something we should know. But if it's not, why can't we have a

22  pilot program in Lancaster to enforce that. We certainly have the network in

23  ─────────────
[134] Id.

24  [135] Letter from S. Rogan, HACoLA Exec. Dir., to M. Bozigian, Lancaster City Manager, dated
December 2, 2009.

25  [136] July 27, 2010 Lancaster City Council Minutes.

26  [137] July 27, 2010 Lancaster City Council Meeting Video.

27  [138] Tricia Tighe, Conversations with the Mayor: the Difficult Issue of Section 8, The AV News,
http://www.avnewstodayonline.com/LancasterPageConversationsSection8.html.

28  [139] Oct. 26, 2010 Lancaster City Council Minutes.

COMPLAINT

1  Lancaster that is capable of providing the information."[140]  The network Mayor Parris
2  referred to is a system of truancy ticketing and truancy sweeps under which students
3  may be fined for being late for school, and which has itself been criticized as
4  targeting black and Latino students.[141]   Although HACoLA has refused to accede to
5  Lancaster's request, as late as April 2011, Lancaster was still pursuing a means to
6  make truancy a ground for Section 8 termination, still in the complete absence of any
7  factual basis for asserting that truancy by the children in Section 8 participant
8  families is a problem.[142]

9       66.   <u>Attempt to Secede from HACoLA.</u>  Most recently, Lancaster has been
10  considering a revised proposal to seize control of Section 8 operations from
11  HACoLA, which would free it to devise Section 8 regulations as draconian as
12  possible within the broad discretion given by HUD to local housing authorities.[143]  As
13  noted above, Lancaster's Section 8 Commission was originally formed to explore the
14  possibility of creating a local Public Housing Authority that would replace HACoLA
15  as the Section 8 program administrator in Lancaster.[144]  Upon review of the financial
16  and logistical obstacles to creating its own Public Housing Authority, the
17  Commission and its consultants recommended in 2009 against taking over
18  administration of Section 8.[145]  Notably, the pertinent Commission minutes reflect that
19  "[t]he proposed recommendation not to take over the administration of the [Section 8]
20  program is not solely based on the lack of new vouchers, the cost to administer the
21  program, and lack of will to create a multi-jurisdictional housing authority.   The

---

22
23  [140] Oct. 26, 2010 Lancaster City Council Meeting Video.
24  [141] See Britney M. Walker, <u>Truancy Proving to Be a Costly Issue for Lancaster Students, Parents</u>,
     Our Weekly, Mar. 10, 2011.
25  [142] See Apr. 5, 2011 Lancaster Neighborhood Vitalization Commission Agenda
     [143] See Apr. 5, 2011 Lancaster Neighborhood Vitalization Commission Agenda; May 3, 2011
26  Lancaster Neighborhood Vitalization Commission Agenda.
27  [144] See Oct. 16, 2008 Lancaster Section 8 Commission Minutes; Feb. 19, 2009 Lancaster Section 8
     Commission Minutes.
28  [145] See Feb. 19, 2009 Lancaster Section 8 Commission Minutes.

1   recommendation is also based on the success of HACoLA's sustained efforts and
2   commitments to deter disorderly Section 8 tenants in Lancaster over the last three
3   years . . . ."[146]  Because HACoLA has not complied with all of Lancaster's demands
4   for action in the City's war on Section 8,[147] Lancaster initiated in 2010 a new study of
5   the feasibility of developing a local agency to manage Section 8 vouchers in
6   Lancaster, culminating in a consultant's report that was presented to the
7   Neighborhood Vitalization Commission in April 2011.[148]   The consultant's report
8   advised that "[i]f Lancaster believes and documents that HACoLA cannot properly
9   manage and administer the program for the city, we do recommend that Lancaster
10  submit an application to the State of California and HUD through the local field
11  office to establish the Lancaster [Public Housing Authority]."[149]  At its May 3, 2011
12  meeting, the Neighborhood Vitalization Commission proposed to do just that.[150]

13  **II.    SECTION 8 PARTICIPANTS MUST CHOOSE BETWEEN A BETTER**
14  **HOME FOR THEIR FAMILIES AND FLEEING MUNICIPAL**
15  **INTIMIDATION AND HARASSMENT**

16  67.    As a result of the Cities' discriminatory harassment of Section 8
17  participants, Section 8 families in the Antelope Valley live in constant fear that they
18  or their families will draw attention to themselves and become a target for attack.  In
19  the case of Plaintiffs Jane Roe and Judy Doe, those fears were borne out.  Ms. Roe
20  and Ms. Doe came to the Antelope Valley to find a better place to raise their children.
21  Instead, they suffered harassment by City-funded investigators and humiliation in
22  front of a community turned hostile by City rhetoric.  Ms. Roe ultimately decided that

23  ---
[146] Id.
24  [147] See letter from S. Rogan, HACoLA Exec. Dir., to M. Bozigian, Lancaster City Manager, dated
25  December 2, 2009; letter from S. Rogan, HACoLA Exec. Dir., to B. Banks, Lancaster
    Neighborhood Vitalization Commission, dated July 21, 2009.
26  [148] See MFR Report: Feasibility Assessment for Development of a Local Public Housing Authority
27  for the City of Lancaster, dated March 22, 2011.
    [149] Id.
28  [150] See May 3, 2011 Lancaster Neighborhood Vitalization Commission Agenda.

COMPLAINT

1   the fear she lived with – both for her own wellbeing and, more importantly, for that of

2   her children – outweighed the benefit of remaining in her Antelope Valley home.

3       68.   Plaintiff Jane Roe lived in Lancaster for roughly ten years while working

4   as a preschool teacher and receiving rental assistance from the Section 8 program.

5   She and her four youngest children lived in a home that was safe and comfortable,

6   and her children attended the local schools and got excellent grades.

7       69.   While living in the Antelope Valley, Ms. Roe was always careful to

8   avoid telling anyone that she used Section 8 to help her pay her rent, particularly in

9   the last few years.  Comments by Mayor Parris and others in the City government

10  about their desire to reduce the number of Section 8 participants in Lancaster made

11  Ms. Roe fear that she might lose her Section 8 voucher if she drew attention to

12  herself, and made her fear being branded with the stereotypes that Mayor Parris and

13  others ascribed to Section 8.  Her fears were only heightened as she heard from

14  friends that many Section 8 families in Lancaster were having their vouchers

15  terminated.

16      70.   In late 2009, Ms. Roe's fears were realized.  Sheriff's deputies came to

17  her home one day while she was at work, apparently responding to a call about a

18  potential burglary.  There was no burglary.  Rather than leaving once it was apparent

19  that Ms. Roe's home was not being burglarized, the Sheriff's deputies determined

20  that the home was a Section 8 unit and contacted HACoLA.  A HACoLA investigator

21  paid for by the City arrived, and together with the deputies, searched the entire home.

22  The deputies also apparently reported Ms. Roe to the Department of Children and

23  Family Services and to Lancaster Code Enforcement.   Ms. Roe's son was

24  understandably frightened and called her at work.  She came home immediately but

25  the deputies and investigators had already left by the time she arrived.

26      71.   A few weeks later, Ms. Roe received a notice of proposed termination of

27  her Section 8 voucher – which she challenged before HACoLA and won.   The

28

35

COMPLAINT

1    Department of Children and Family Services took no action against her.  However,
2    the damage from the investigation had already been done.

3          72.    Because of the deputies and investigator's search of her home, her
4    neighbors discovered that her family was part of the Section 8 program.  Formerly
5    friendly neighbors became hostile to her and her children, embracing the negative
6    image of Section 8 participants painted by Mayor Parris and the City.  Adding to Ms.
7    Roe's discomfort, a marked Lancaster City car, with an investigator in it, began
8    driving past her home at least two or three times per week.  Sometimes it parked in
9    front of her home for a period of time.  Ms. Roe felt she was under constant
10   surveillance, and the presence of the City vehicle made her family even more suspect
11   in the eyes of her neighbors.  Moreover, after the investigation, Ms. Roe found that
12   her landlord no longer wanted her as a tenant.  Her landlord had also noticed that the
13   City was monitoring the property, and the landlord had apparently been fined under
14   Lancaster's nuisance ordinance.  Thus, the landlord began sitting outside of Ms.
15   Roe's home and monitoring Ms. Roe's family.

16         73.    After several months of this treatment, Ms. Roe decided she had to leave
17   the Antelope Valley.  She feared hostility from her neighbors and she feared even
18   more that the City or investigators would manufacture another reason to try to take
19   away her Section 8 voucher.  Without rental assistance, her family would be
20   homeless.  Thus, she moved.  This required not only leaving her home and uprooting
21   her children from their schools, but also leaving her job.  She has not been able to
22   find work since leaving the Antelope Valley.

23         74.    Originally, Ms. Roe had moved to Lancaster to provide a better place for
24   her family to live, and she would consider moving back if she could feel safe from
25   harassment.  However, she and her family will not be safe so long as the City
26   continues its war on Section 8.

27
28

75.   Plaintiff Judy Doe lived in Palmdale for about three and a half years. She and her children lived in a home that was safe and comfortable, and her children attended the local schools and were happy there.

76.   Beginning in 2009, Palmdale's investigator Brody and local sheriff's deputies began a series of "compliance checks" (as the investigator called them) or "probation sweeps" (as the deputies called them) which ultimately led Ms. Doe to leave Palmdale.  Each of these checks was conducted without any justification, and most involved an excessive and intimidating show of force.

77.   At the first compliance check/probation sweep, investigator Brody and approximately fifteen sheriff's deputies appeared at Ms. Doe door with their guns out of their holsters.  In the face of this show of force, Ms. Doe allowed them to enter her home, fearing her Section 8 voucher would be in jeopardy if she did not.  Investigator Brody and the deputies asked her who in the household was on probation, and she responded that her two sons – both minors – were on probation.  Investigator Brody and the deputies then proceeded to search her home before they finally left.  The experience left Ms. Doe scared, because she did not understand why her home was being searched or why the deputies had their guns drawn.

78.   A few months later, Brody returned to Ms. Doe's home, again accompanied by about fifteen armed deputies.  The deputies and Brody asked Ms. Doe where her sons were – they were in school.  Brody and the deputies left.

79.   A few months after that, Ms. Doe received a notice of proposed termination of her Section 8 voucher.  The ground for termination was her alleged failure to report her sons' juvenile adjudications.  HACoLA scheduled a conference at the Palmdale HACoLA office.  At the meeting, Brody showed Ms. Doe that he had her sons' juvenile records, telling her that the deputies give him any information he wants related to a Section 8 household.  Brody told Ms. Doe that her voucher could be terminated because she had not reported the contents of her sons' juvenile records to HACoLA.  He threatened Ms. Doe's 15-year-old son, telling him that his brother

37

COMPLAINT

1   and sister would end up on the street because of him.  The case worker, however,
2   reviewed the Section 8 program rules and determined that the termination Brody had
3   proposed was improper.   Juvenile records are supposed to be confidential and
4   juvenile adjudications in the household are not a basis for terminating a Section 8
5   voucher.

6         80.    A few months after the meeting, Brody again appeared at Ms. Doe's
7   home, again accompanied by approximately fifteen sheriffs with their guns drawn.
8   This time, they said they were looking for Ms. Doe's eldest son, who was not living
9   there and had not been living there during any of the checks.  The deputies searched
10   Ms. Doe's home again, and then left.

11         81.    What would become the final compliance check/probation sweep
12   happened a few months later.  Brody and about twenty sheriffs came to Ms. Doe's
13   home while she was not there.  Her son answered the door.  The sheriffs ran into the
14   home and searched it.

15         82.    Like Ms. Roe, after the searches, Ms. Doe quickly learned that many in
16   her community embraced the Cities' stereotypes about Section 8 residents.  After the
17   last search, information about Ms. Doe's Section 8 status was publicized on the
18   internet.   The webpage identified her Section 8 status and where she lived.
19   Comments on the webpage included a threat to burn her house down.   Her children
20   were taunted at school and by passers-by on her street.  The taunts were blatantly
21   racial:  her children were called "dirty Section 8 niggers," and her family was also
22   publicly referred to as "niggers."  Ms. Doe saw people she did not recognize stopping
23   in front of her home and taking pictures.  One day, young people drove by her home
24   and threw what appeared to be urine at her children, again hurling the slur:  "Section
25   8 niggers."  Ms. Doe understandably felt threatened by these attacks.

26         83.    After these incidents, Ms. Doe and her children feared for their safety to
27   the extent that they no longer slept in their home.  They stayed with friends while
28   looking for another landlord to accept Ms. Doe's Section 8 voucher.  Ms. Doe had

1  limited transportation and did not want to take her children out of their school, so she
2  was constrained to look for housing in the Antelope Valley.

3       84.    Ms. Doe again found that the Cities' stigmatization of Section 8 tenants,
4  as well as their harassment of Section 8 landlords, was having an effect.   Most
5  landlords she approached said they would not take a Section 8 voucher.   Ms. Doe
6  found that landlords in both Cities appeared to accept the Cities' message that most
7  Section 8 tenants were criminals and should not be welcomed.   Ms. Doe finally found
8  a place to rent in Lancaster.   However, she still hopes to leave the Antelope Valley
9  because of the atmosphere of hostility and harassment that the Cities have created
10 there.   If her family could live in the Antelope Valley without harassment, she would
11 continue living there so that her children could benefit from the good neighborhoods
12 and schools.

### FIRST CAUSE OF ACTION

### 42 U.S.C. § 3604(a)

### AGAINST ALL DEFENDANTS

16      85.    Plaintiffs repeat and incorporate by reference the allegations set forth in
17 paragraphs 1 through 82 above.

18      86.    The Fair Housing Act, 42 U.S.C. § 3604(a) provides that: "It shall be
19 unlawful . . . [t]o refuse to sell or rent after the making of a bona fide offer, or to
20 refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a
21 dwelling to any person because of race, color, . . . or national origin."

22      87.    The Cities of Lancaster and Palmdale have violated  42 U.S.C. § 3604(a)
23 by undertaking a series of actions expressly designed to exclude and discriminate
24 against Section 8 participants in their Cities, including: (1) subjecting current tenants
25 to unwarranted, constant surveillance and harassment as well as frequent invasions of
26 their homes under the guise of investigations and compliance checks; (2) attempting
27 to dissuade landlords from renting to Section 8 tenants and subjecting those who do
28 to increased surveillance and harassment; and (3) attempting additional action to

1  dissuade would-be Lancaster and Palmdale residents from moving to the Antelope
2  Valley.

3      88.    The vast majority of Section 8 participants are either black or Latino,
4  and Section 8 has been targeted by Defendants because the vast majority of Section 8
5  participants are black or Latino.

6      89.    Defendants' actions constitute a pattern or practice of intentional
7  exclusion and discrimination.  These actions also have an unjustified disparate impact
8  on blacks and Latinos, who make up the vast majority of Section 8 participants in
9  Lancaster and Palmdale, and in Los Angeles County.   Therefore, these actions
10 otherwise make unavailable or deny, a dwelling to Plaintiffs because of race, color, or
11 national origin in violation of 42 U.S.C. § 3604(a).

12     90.    As a direct and proximate result of Defendants' unlawful conduct,
13 Plaintiffs have suffered irreparable harm and this harm will continue absent
14 injunctive relief.

15                      **SECOND CAUSE OF ACTION**
16                          **42 U.S.C. § 3604(b)**
17                      **AGAINST ALL DEFENDANTS**

18     91.    Plaintiffs repeat and incorporate by reference the allegations set forth in
19 paragraphs 1 through 82 above.

20     92.    The Fair Housing Act, 42 U.S.C. § 3604(b) provides that: "It shall be
21 unlawful . . . [t]o discriminate against any person in the terms, conditions, or
22 privileges of sale or rental of a dwelling, or in the provision of services or facilities in
23 connection therewith, because of race, color, . . . or national origin."

24     93.    The Cities of Lancaster and Palmdale have violated 42 U.S.C. § 3604(b)
25 by undertaking a series of actions expressly designed to exclude and discriminate
26 against Section 8 participants in their Cities, including: (1) subjecting current tenants
27 to unwarranted, constant surveillance and harassment as well as frequent invasions of
28 their homes under the guise of investigations and compliance checks; (2) attempting

1   to dissuade landlords from renting to Section 8 tenants and subjecting those who do
2   to increased surveillance and harassment; and (3) attempting additional action to
3   dissuade would-be Lancaster and Palmdale residents from moving to the Antelope
4   Valley.

5       94.   The vast majority of Section 8 participants are either black or Latino,
6   and Section 8 has been targeted by Defendants because the vast majority of Section 8
7   participants are black or Latino.

8       95.   Defendants' actions constitute a pattern or practice of intentional
9   exclusion and discrimination. These actions also have an unjustified disparate impact
10  on blacks and Latinos, who make up the vast majority of Section 8 participants in
11  Lancaster and Palmdale, and in Los Angeles County. Therefore, these actions have
12  the effect of discriminating against Plaintiffs in the terms, conditions, or privileges of
13  sale or rental of a dwelling, or in the provision of services or facilities in connection
14  therewith because of race, color or national origin in violation of 42 U.S.C. §
15  3604(b).

16      96.   As a direct and proximate result of Defendants' unlawful conduct,
17  Plaintiffs have suffered irreparable harm and this harm will continue absent
18  injunctive relief.

19                    **THIRD CAUSE OF ACTION**
20                      **42 U.S.C. § 3617**
21                  **AGAINST ALL DEFENDANTS**

22      97.   Plaintiffs repeat and incorporate by reference the allegations set forth in
23  paragraphs 1 through 82 above.

24      98.   The Fair Housing Act, 42 U.S.C. § 3617 provides that: "It shall be
25  unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or
26  enjoyment of, or on account of his having exercised or enjoyed, or on account of his
27  having aided or encouraged any other person in the exercise or enjoyment of, any
28  right granted or protected by section 3603, 3604, 3605, or 3606 of this title."

Department of Housing and Urban Development regulation 24 C.F.R. § 100.400, which interprets Section 3617, provides that: "Conduct made unlawful under this section includes, but is not limited to, the following: (1) Coercing a person, either orally, in writing, or by other means, to deny or limit the benefits provided that person in connection with the sale or rental of a dwelling or in connection with a residential real estate-related transaction because of race, color, . . . or national origin. (2) Threatening, intimidating or interfering with persons in their enjoyment of a dwelling because of the race, color, . . . or national origin of such persons, or of visitors or associates of such persons."

99.    The Cities of Lancaster and Palmdale have violated 42 U.S.C. § 3617 by undertaking a series of actions expressly designed to exclude and discriminate against Section 8 participants in their Cities, including: (1) subjecting current tenants to unwarranted, constant surveillance and harassment as well as frequent invasions of their homes under the guise of investigations and compliance checks; (2) attempting to dissuade landlords from renting to Section 8 tenants and subjecting those who do to increased surveillance and harassment; and (3) attempting additional action to dissuade would-be Lancaster and Palmdale residents from moving to the Antelope Valley.

100.    The vast majority of Section 8 participants are either black or Latino, and Section 8 has been targeted by Defendants because the vast majority of Section 8 participants are black or Latino.

101.    Defendants' actions constitute a pattern or practice of intentional exclusion and discrimination. These actions also have an unjustified disparate impact on blacks and Latinos, who make up the vast majority of Section 8 participants in Lancaster and Palmdale, and in Los Angeles County. Therefore, these actions have the effect of coercing, intimidating, threatening, and interfering with Plaintiffs' exercise of their Fair Housing rights because of race, color or national origin in violation of 42 U.S.C. §3617.

1     102.  As a direct and proximate result of Defendants' unlawful conduct,
2  Plaintiffs have suffered irreparable harm and this harm will continue absent
3  injunctive relief.

**FOURTH CAUSE OF ACTION**

**42 U.S.C. § 1983 / U.S. CONST. AMEND. XIV**

**AGAINST ALL DEFENDANTS**

7     103.  Plaintiffs repeat and incorporate by reference the allegations set forth in
8  paragraphs 1 through 82 above.

9     104.  42 U.S.C. § 1983 provides that "[e]very person who, under color of any
10  statute, ordinance, regulation, custom, or usage, of any State or Territory or the
11  District of Columbia, subjects, or causes to be subjected, any citizen of the United
12  States or other person within the jurisdiction thereof to the deprivation of any rights,
13  privileges, or immunities secured by the Constitution and laws, shall be liable to the
14  party injured in an action at law, suit in equity, or other proper proceeding for redress
15  . . . ."  The Fourteenth Amendment to the United States Constitution provides that no
16  state shall "deny to any person within its jurisdiction the equal protection of the laws"
17  on the basis of race or ethnicity.

18     105.  The Cities of Lancaster and Palmdale have violated the Equal Protection
19  Clause of the Fourteenth Amendment by undertaking a series of actions expressly
20  designed to exclude and discriminate against Section 8 participants in their Cities,
21  including: (1) subjecting current tenants to unwarranted, constant surveillance and
22  harassment as well as frequent invasions of their homes under the guise of
23  investigations and compliance checks; (2) attempting to dissuade landlords from
24  renting to Section 8 tenants and subjecting those who do to increased surveillance and
25  harassment; and (3) attempting additional action to dissuade would-be Lancaster and
26  Palmdale residents from moving to the Antelope Valley.

27
28

43

COMPLAINT

106.   The vast majority of Section 8 participants are either black or Latino, and Section 8 has been targeted by Defendants because the vast majority of Section 8 participants are black or Latino.

107.   Defendants' actions constitute a pattern or practice of intentional exclusion and discrimination on the basis of race and ethnicity.   Therefore, these actions have the effect of denying Section 8 tenants within the Cities' jurisdiction the equal protection of the laws.

108.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have suffered irreparable harm and this harm will continue absent injunctive relief.

## FIFTH CAUSE OF ACTION
## CAL. GOV'T CODE § 12955(k)
## AGAINST ALL DEFENDANTS

109.   Plaintiffs repeat and incorporate by reference the allegations set forth in paragraphs 1 through 82 above.

110.   California Government Code § 12955(k) provides: "It shall be unlawful: . . . To otherwise make unavailable or deny a dwelling based on discrimination because of race, color, . . . or national origin."

111.   The Cities of Lancaster and Palmdale have violated Cal. Gov't Code § 12955(k) by undertaking a series of actions expressly designed to exclude and discriminate against Section 8 participants in their Cities, including: (1) subjecting current tenants to unwarranted, constant surveillance and harassment as well as frequent invasions of their homes under the guise of investigations and compliance checks; (2) attempting to dissuade landlords from renting to Section 8 tenants and subjecting those who do to increased surveillance and harassment; and (3) attempting additional action to dissuade would-be Lancaster and Palmdale residents from moving to the Antelope Valley.

112.   The vast majority of Section 8 participants are either black or Latino, and Section 8 has been targeted by Defendants because the vast majority of Section 8 participants are black or Latino.

113.   Defendants' actions constitute a pattern or practice of intentional exclusion and discrimination.  These actions also have an unjustified disparate impact on blacks and Latinos, who make up the vast majority of Section 8 participants in Lancaster and Palmdale, and in Los Angeles County.  Therefore, these actions have the effect of making unavailable or denying a dwelling based on discrimination because of race, color or national origin in violation of Cal. Gov't Code § 12955(k).

114.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have suffered irreparable harm and this harm will continue absent injunctive relief.

**SIXTH CAUSE OF ACTION**

**CAL. GOV'T CODE § 11135**

**AGAINST ALL DEFENDANTS**

115.   Plaintiffs repeat and incorporate by reference the allegations set forth in paragraphs 1 through 82 above.

116.   California Government Code § 11135 provides that:  "No person in the State of California shall, on the basis of race, national origin, ethnic group identification, . . . [or] color, . . . be unlawfully subjected to discrimination under, any program or activity that . . . receives any financial assistance from the state."

117.   The Cities of Lancaster and Palmdale and the County of Los Angeles receive financial assistance from the State of California.

118.   The Cities of Lancaster and Palmdale violated Cal. Gov't Code § 11135 by undertaking a series of actions expressly designed to exclude and discriminate against Section 8 participants in their Cities, including: (1) subjecting current tenants to unwarranted, constant surveillance and harassment as well as frequent invasions of their homes under the guise of investigations and compliance checks; (2) attempting

45

COMPLAINT

1   to dissuade landlords from renting to Section 8 tenants and subjecting those who do

2   to increased surveillance and harassment; and (3) attempting additional action to

3   dissuade would-be Lancaster and Palmdale residents from moving to the Antelope

4   Valley.

5       119.   The vast majority of Section 8 participants are either black or Latino,

6   and Section 8 has been targeted by Defendants because the vast majority of Section 8

7   participants are black or Latino.

8       120.   Defendants' actions constitute a pattern or practice of intentional

9   exclusion and discrimination.  These actions also have an unjustified disparate impact

10  on blacks and Latinos, who make up the vast majority of Section 8 participants in

11  Lancaster and Palmdale, and in Los Angeles County.  Therefore, these actions have

12  the effect of discriminating on the basis of race, color, ethnic group identification, or

13  national origin in violation of Cal. Gov't Code § 11135.

14      121.   As a direct and proximate result of Defendants' unlawful conduct,

15  Plaintiffs have suffered irreparable harm and this harm will continue absent

16  injunctive relief.

17                  **SEVENTH CAUSE OF ACTION**

18                  **CAL. CONST. ART. I § 7, ART. IV, § 16**

19                  **AGAINST ALL DEFENDANTS**

20      122.   Plaintiffs repeat and incorporate by reference the allegations set forth in

21  paragraphs 1 through 82 above.

22      123.   Section 7(a) of Article I of the California Constitution provides that "[a]

23  person may not be … denied equal protection of the laws" on the basis of race or

24  ethnicity.

25      124.   Section 16(a) of Article IV of the California Constitution provides that

26  "[a]ll laws of a general nature have uniform operation."

27      125.   The Cities of Lancaster and Palmdale have violated the Equal Protection

28  Clauses of the California Constitution by undertaking a series of actions expressly

                              46
                           COMPLAINT

designed to exclude and discriminate against Section 8 participants in their Cities, including: (1) subjecting current tenants to unwarranted, constant surveillance and harassment as well as frequent invasions of their homes under the guise of investigations and compliance checks; (2) attempting to dissuade landlords from renting to Section 8 tenants and subjecting those who do to increased surveillance and harassment; and (3) attempting additional action to dissuade would-be Lancaster and Palmdale residents from moving to the Antelope Valley.

126. The vast majority of Section 8 participants are either black or Latino, and Section 8 has been targeted by Defendants because the vast majority of Section 8 participants are black or Latino.

127. Defendants' actions constitute a pattern or practice of intentional exclusion and discrimination on the basis of race and ethnicity. Therefore, these actions have the effect of denying Section 8 tenants within the Cities' jurisdiction the equal protection of the laws.

128. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have suffered irreparable harm and this harm will continue absent injunctive relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment:

1. Declaring that Defendants' actions seeking to exclude and discriminate against Section 8 participants violate state and federal law;

2. Enjoining Defendants from taking any further actions designed to exclude and discriminate against Section 8 participants;

3. Declaring that Defendants' actions seeking to dissuade Section 8 participants from residing in the Cities violate state and federal law;

4. Enjoining Defendants from taking any further actions designed to dissuade Section 8 participants from residing in the Cities;

COMPLAINT

5. Ordering Defendants to take affirmative steps necessary to remedy the effects of their unlawful acts;

6. Awarding Plaintiffs the costs, expenses, and attorneys' fees incurred in this action; and

7. Awarding Plaintiffs such other and further relief as may be deemed by this Court to be just and proper.

DATED: June 7, 2011

_____
Catherine E. Lhamon
PUBLIC COUNSEL LAW CENTER
Attorneys for Plaintiffs

_____
Neal S. Dudovitz
NEIGHBORHOOD LEGAL SERVICES OF
LOS ANGELES COUNTY
Attorneys for Plaintiffs

_____
Gary L. Blasi
Attorney for Plaintiffs

_____
Bill Lann Lee
LEWIS, FEINBERG, LEE, RENAKER, &
JACKSON, P.C.
Attorneys for Plaintiffs

_____
Michael C. Small
AKIN GUMP STRAUSS HAUER & FELD LLP
Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Otis D. Wright II and the assigned discovery Magistrate Judge is Victor B. Kenton.

The case number on all documents filed with the Court should read as follows:

## CV11- 4817 ODW (VBKx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=======================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [X] Western Division | [ ] Southern Division | [ ] Eastern Division |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

AO 440 (Rev. 12/09)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Central District of California

THE COMMUNITY ACTION LEAGUE,

| | |
|---|---|
| _Plaintiff_ | ) ) ) |
| v. | ) ) ) |
| CITY OF LANCASTER AND CITY OF PALMDALE | ) ) ) |
| _Defendant_ See attached. | ) |

**CV11  04817 ODW VBKx**

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_

City of Palmdale
38300 Sierra Highway
Palmdale, CA 93550

City of Lancaster
44933 N. Fern Avenue
Lancaster, CA 93534

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Akin Gump Strauss Hauer & Feld, LLP
Michael Small, Esq.
Kalia C. Petmecky, Esq.
B. Jacob Phillips, Esq.
2029 Century Park East, Suite 2400, Los Angeles, CA 90067
(310) 229-1000

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

_CLERK OF COURT_

Date:  JUN - 7 2011

CHRISTOPHER POWERS

_Signature of Clerk or Deputy Clerk_

1181

AO 440 (Rev. 12/09)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❑ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify):*

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

| I (a) PLAINTIFFS  (Check box if you are representing yourself ☐ ) | DEFENDANTS |
|---|---|
| THE COMMUNITY ACTION LEAGUE, CALIFORNIA STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE; JANE ROE and JUDY DOE | CITY OF LANCASTER AND CITY OF PALMDALE |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| Michael C. Small (SBN 222768)<br>Kalia C. Petmecky (SBN 194094)<br>B. Jacob Phillips (SBN 275665)<br>AKIN GUMP STRAUSS HAUER & FELD, LLP<br>2029 Century Park East, Suite 2400<br>Los Angeles, CA 90067 | City Attorney of Palmdale<br>City Attorney of Lancaster |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff    ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant    ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only (Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding    ☐ 2 Removed from State Court    ☐ 3 Remanded from Appellate Court    ☐ 4 Reinstated or Reopened    ☐ 5 Transferred from another district (specify):    ☐ 6 Multi-District Litigation    ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☒ Yes   ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes  ☐ No       ☐ MONEY DEMANDED IN COMPLAINT: $ _____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

42 U.S.C. Section 3604(a) & (b); 42 U.S.C. Section 3617; U.S. Constitution Amendment XIV

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS<br>PERSONAL INJURY | TORTS<br>PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 540 Mandamus/Other | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | FORFEITURE/PENALTY | ☐ 820 Copyrights |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☒ 443 Housing/Accommodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | IMMIGRATION | | ☐ 640 R.R. & Truck | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | REAL PROPERTY | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety/Health | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 465 Other Immigration Actions | | ☐ 690 Other | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determination Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | | | | ☐ 871 IRS - Third Party 26 USC 7609 |
| | ☐ 245 Tort Product Liability | | | | |
| | ☐ 290 All Other Real Property | | | | |

**CV11 04817**

FOR OFFICE USE ONLY:   Case Number: _____
AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a).  IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  [x] No    [ ] Yes

If yes, list case number(s): _____

**VIII(b).  RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?  [x] No    [ ] Yes

If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**

(Check all boxes that apply)    [ ]    A. Arise from the same or closely related transactions, happenings, or events; or

[ ]    B. Call for determination of the same or substantially related or similar questions of law and fact; or

[ ]    C. For other reasons would entail substantial duplication of labor if heard by different judges; or

[ ]    D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX.  VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.

[ ]    Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.

[x]    Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.

Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties

Note: In land condemnation cases, use the location of the tract of land involved

X.  SIGNATURE OF ATTORNEY (OR PRO PER): _____    Date June 7, 2011

Notice to Counsel/Parties:  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law.  This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet.  (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |