1    Catherine E. Lhamon (SBN 192751)
     clhamon@publiccounsel.org
2    PUBLIC COUNSEL LAW CENTER
     610 South Ardmore Avenue
3    Los Angeles, California 90005
     T: (213) 385-2977  F: (213) 385-9089
4

5    Neal S. Dudovitz (SBN 68848)
     ndudovitz@nls-la.org
6    NEIGHBORHOOD LEGAL SERVICES
7    OF LOS ANGELES COUNTY
     13327 Van Nuys Boulevard
8    Pacoima, California 91331
9    T: (818) 834-7544

10

11    Attorneys for Plaintiffs
     (*see next page for additional counsel*)

FILED
CLERK, U.S. DISTRICT COURT

SEP 28 2011

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

12         IN THE UNITED STATES DISTRICT COURT

13         CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE COMMUNITY ACTION LEAGUE, a California non-profit organization; CALIFORNIA STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, a non-profit organization; SHEILA WILLIAMS, an individual; MICHELLE ROSS, an individual; and JAQUINN DAVIS, an individual, <br><br> Plaintiffs, <br><br> vs. <br><br> CITY OF LANCASTER and CITY OF PALMDALE, <br><br> Defendants. | Case No. 11-CV-4817-ODW-VBK <br> Honorable Otis D. Wright <br><br> **FIRST AMENDED COMPLAINT FOR VIOLATIONS OF:** <br><br> **(1) 42 U.S.C. § 3604(a);** <br> **(2) 42 U.S.C. § 3604(b);** <br> **(3) 42 U.S.C. § 3617;** <br> **(4) U.S. CONST. AMEND. XIV;** <br> **(5) CAL. GOV'T CODE § 12955(k);** <br> **(6) CAL. GOV'T CODE § 11135; and** <br> **(7) CAL. CONST. ART. I § 7, ART. IV § 16** <br><br> **JURY TRIAL DEMANDED** <br><br> *Original Compl. Filed: June 7, 2011* <br> *Pre-trial Conference: None Set* <br> *Trial Date: None Set* |

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1   Jennifer K. del Castillo (SBN 244816)
    jdelcastillo@publiccounsel.org
2   PUBLIC COUNSEL LAW CENTER
    610 South Ardmore Avenue
3   Los Angeles, California 90005
    T: (213) 385-2977  F: (213) 385-9089
4
5   Barbara Siegel (SBN 169209)
    barbarasiegel@nls-la.org
6   Maria E. Palomares (SBN 266206)
    MariaPalomares@nls-la.org
7   Alexander Prieto (SBN 270864)
    AlexanderPrieto@nls-la.org
8   NEIGHBORHOOD LEGAL
    SERVICES
9   OF LOS ANGELES COUNTY
    13327 Van Nuys Boulevard
10  Pacoima, California 91331
    T:  (818) 834-7544
11
12  Dorcas R. Gilmore*
13  dgilmore@naacpnet.org
    Victor L. Goode*
14  vgoode@naacpnet.org
    NATIONAL ASSOCIATION FOR
15  THE ADVANCEMENT OF
    COLORED PEOPLE
16  4805 Mount Hope Drive
    Baltimore, MD 21215
17  T:  (410) 580-5673  F: (410) 358-9350
18  *pro hac vice applications submitted
19

    Gary L. Blasi (SBN 70190)
    blasi@law.ucla.edu
    UCLA School Of Law (for
    identification purposes only)
    405 Hilgard Avenue
    Los Angeles, California 90024
    T:  (310) 206-9431  F:  (310) 206-1234

    Bill Lann Lee (SBN 108452)
    blee@lewisfeinberg.com
    Lindsay Nako (SBN 239090)
    lnako@lewisfeinberg.com
    LEWIS, FEINBERG, LEE,
    RENAKER, & JACKSON, P.C.
    476 9th Street
    Oakland, California 94607
    T: (510) 839-6824  F: (510) 839-7839

    Michael C. Small (SBN 222768)
    MSmall@akingump.com
    Kalia C. Petmecky (SBN 194094)
    kpetmecky@akingump.com
    B. Jacob Phillips (SBN 275665)
    jphillips@akingump.com
    AKIN GUMP STRAUSS HAUER &
    FELD LLP
    2029 Century Park East Suite 2400
    Los Angeles, California 90067-3010
    T: (310) 229-1000  F: (310) 229-1001

20
21
22
23
24
25
26
27
28

FIRST AMENDED COMPLAINT

1    Plaintiffs The Community Action League ("TCAL"), California State
2  Conference of the National Association for the Advancement of Colored People
3  ("NAACP"), Sheila Williams, Michelle Ross, and Jaquinn Davis (collectively,
4  "Plaintiffs") bring this action against Defendants City of Lancaster ("Lancaster") and
5  City of Palmdale ("Palmdale") (collectively, the "Cities" or "Defendants") for
6  violation of the equal protection clauses of the United States and California
7  Constitutions, the federal Fair Housing Act (42 U.S.C. §§ 3604, 3617), the California
8  Fair Employment and Housing Act (Cal. Gov't Code § 12955), and California
9  Government Code § 11135. Plaintiffs' claims are based on Defendants' intentional
10  race-based exclusion of and discrimination against black and Latino families and
11  individuals, and on the unjustified racially disparate impact of Defendants' policies
12  and practices upon them. Plaintiffs allege upon personal knowledge with respect to
13  themselves and their own acts, and upon information and belief with respect to all
14  other matters, as follows:

15                           **NATURE OF THE ACTION**

16    1.    Through this action, Plaintiffs seek to end the racial and ethnic
17  discrimination against low income black and Latino residents caused by the Cities'
18  policies and practices that target certain black and Latino families for intimidation,
19  harassment, and exclusion – specifically, those black and Latino families who
20  participate in the Section 8 Housing Choice Voucher program.

21    2.    The Section 8 Housing Choice Voucher program, commonly referred to
22  as "Section 8," is a federal program funded and administered by the U.S. Department
23  of Housing and Urban Development ("HUD") that provides rental subsidies for low
24  income families and individuals, including those who are elderly or disabled. The
25  purpose of the Section 8 program is to enable the historic victims of discrimination to
26  live in communities of their own choosing and to encourage economic and racial
27  integration.

28

3.    HUD generally delegates administration of the Section 8 program to a local housing authority.  In most of Los Angeles County, including Lancaster and Palmdale, the local housing authority is the Housing Authority of the County of Los Angeles ("HACoLA").

4.    As the name implies, housing choice is an important element of the Section 8 program.  Once a participant is approved by the local housing authority, he or she may apply for tenancy with any landlord who agrees to accept payment through a Section 8 voucher.  The landlord then receives payment from the local public housing authority for a portion of the participant's rent.  The remainder is paid by the participant.  In order to qualify for the Section 8 voucher program in 2010, a family of four in Los Angeles County was required to have an income at or below $41,400, and 75% of new admissions must have had incomes at or below $24,850.[1] Participants undergo rigorous criminal background checks and are randomly selected for credit checks to verify their income.

5.    Under the provisions of the federal program, Section 8 housing choice vouchers issued by a public housing authority may be used to obtain housing within the issuing housing authority's jurisdiction.  Lower housing costs have made Lancaster and Palmdale attractive for Section 8 participants looking to provide a better quality of life for their families.  For example, a recent review of rental listings accepting Section 8 vouchers shows that the same $1,100/month voucher that can be used to obtain a two-bedroom, one-bath apartment in Alhambra, Covina, or Inglewood, can be used to rent a three-bedroom, two-bath single-family house in Palmdale or Lancaster.[2]

6.    Approximately 3,600 primarily black and Latino families[3] (or 11,400 individuals[4]) with Section 8 vouchers have chosen to live in Lancaster or Palmdale.

---

[1] See http://www.huduser.org/portal/datasets/il/index_il2010.html.

[2] See http://www.socialserve.com/tenant/index.html?state_id=4107&rid=32066&ch=HACOLA.

[3] See HACoLA Antelope Valley Section 8 Activity Report to Michael D. Antonovich, dated Oct. 19, 2010.

2

FIRST AMENDED COMPLAINT

According to HUD's statistics for 2008, the most recent year available, 70% of Lancaster Section 8 tenants were black and 14% were Latino.[5]   Similarly, in Palmdale, 67% of Section 8 participants identified themselves as black and 18% as Latino.[6]

7.     The Cities have not welcomed these Section 8 families.   Rather, City officials have treated Section 8 participants as outsiders who have been imposed or, as one Lancaster official put it, "dumped" upon Lancaster and Palmdale.[7]   In the words of a Palmdale Council Member, the Cities fear they will be "swarm[ed]" by Section 8 participants.[8]   Thus, the Cities have targeted these black and Latino Section 8 voucher holders – and other black and Latino individuals whom the Cities' officials and residents assume to be program participants – with punitive surveillance and harassment intended to drive them from the Cities.   Moreover, the Cities have sought to discourage Section 8 voucher holders currently living elsewhere from moving into the Cities.

8.     The constant surveillance and harassment to which Section 8 participants have been subject is part of a carefully orchestrated campaign by the Cities.   As stated by Lancaster's Mayor, "[T]his City wants to limit the number of Section 8 units that are placed in this community. . . . [I]t is a problem that is crushing the community . . . and *it is time to go to war*."[9]   The only Section 8 participants who are safe from the Cities' campaign are those Section 8 participants who are elderly or have disabilities,

---

[4] See http://www.huduser.org/portal/picture2008/index.html.

[5] See id.

[6] See id.

[7] See, e.g., June 10, 2008 Lancaster City Council Minutes, June 24, 2008 Lancaster City Council Minutes. Lancaster City Council Minutes, as well as agendas, videos, and some staff reports, are available on the City of Lancaster's webpage, http://www.cityoflancasterca.org.

[8] September 19, 2007 Palmdale City Council Meeting Video.   Videos of Palmdale's City Council meetings, as well as agendas, minutes, and some staff reports, are available on the City of Palmdale's webpage: http://www.cityofpalmdale.org.

[9] June 10, 2008 Lancaster City Council Minutes (emphasis added).

FIRST AMENDED COMPLAINT

1    and who are less likely to be black or Latino.   City officials have treated these
2    individuals as "deserving" Section 8 assistance and spared them from attack.[10]

3        9.    Lancaster and Palmdale have taken a number of steps that operate
4    together in furtherance of their unlawful exclusion of and discrimination against
5    Section 8 participants.

6            a.    Unrelenting Surveillance and Investigative Activity.    Both
7        Lancaster and Palmdale have entered into annual agreements with HACoLA
8        and the County of Los Angeles to fund markedly greater levels of
9        investigations and terminations of Section 8 participants in their Cities.  These
10       City-funded investigators have engaged in extraordinarily aggressive tactics,
11       including mounting intimidating multi-agency Section 8 "sweeps" and
12       unnecessarily enlisting armed deputies to join investigators when performing
13       putative compliance checks.  Sheriff's deputies act as officers of the Cities
14       pursuant to the annual agreements.  City-funded housing investigators were
15       accompanied by Sheriff's deputies on fully 64% of their visits to Section 8
16       participants' homes in Lancaster and 71% of their visits to Section 8
17       participants' homes in Palmdale during the first nine months of 2010.[11]   In
18       contrast, in the rest of the County, law enforcement accompanied housing
19       investigators only 8% of the time.[12]   Moreover, Lancaster and Palmdale
20       investigators have recommended far more program terminations than
21       investigators in other parts of the County.  For example, according to data
22       provided to the Cities on a monthly basis, between July 2008 and June 2009,
23       approximately 1 in 12 Palmdale Section 8 tenants and 1 in 22 Lancaster
24       Section 8 tenants had their vouchers terminated for purported fraud or some

25

26   [10] June 24, 2008 Lancaster City Council Minutes.
27   [11] Data compiled from "Field Contact – Entry Reports" provided by HACoLA in response to CPRA
     request.
28   [12] Id.

4
FIRST AMENDED COMPLAINT

other program violation.[13]   In the rest of HACoLA's jurisdiction, the rate during the same period was roughly 1 in 115.[14]   In addition, in order to be able to specifically target Section 8 families, the Cities entered into agreements with HACoLA to obtain, on a monthly basis, the names and addresses of every Section 8 participant and every landlord renting to Section 8 participants in the Cities.    City officials direct several "public safety" programs that regularly work with the City-funded investigators to further harass Section 8 participants.   Lancaster operates two subprograms within its public safety department that target rental properties: LAN-CAP and CORE.   LAN-CAP polices multi-unit buildings, while CORE focuses its efforts on nuisance-type complaints.   Palmdale likewise has a subprogram focused on rental units, called PAC.

        b. <u>Putting Out The "Not-Welcome" Mat.</u>   Lancaster and Palmdale have met with HACoLA repeatedly in order to attempt to exclude Section 8 tenants from the Antelope Valley.   The Cities asked HACoLA to produce an ad campaign to dissuade voucher participants from moving to the Antelope Valley by falsely suggesting that there were no jobs, no services, and that the cost of living was high.   The Cities also asked to be present at orientation meetings for voucher participants, in order to lecture participants and "lay down the law."[15]

        c. <u>Discriminatory Use of Business License and Inspection Ordinances for Rental Properties.</u>   Lancaster and Palmdale have enacted business licensing and inspection ordinances and have used these ordinances to harass landlords who rent to Section 8 participants.   Lancaster, in particular,

---

[13] <u>See</u> HACoLA Antelope Valley Section 8 Activity Report to Michael D. Antonovich, dated July 16, 2009.

[14] <u>Id.</u>

[15] <u>See</u> email from R. Nishimura, HACoLA, to M. Badrakhan, HACoLA, dated July 15, 2009 re: FW: City of Lancaster Letter.   Letters and emails cited in this Complaint, as well as certain reports and minutes not available on the Cities' websites, were produced to attorney Blasi in response to California Public Records Act requests submitted to Lancaster, Palmdale, and HACoLA.

FIRST AMENDED COMPLAINT

goes so far as to ask registering landlords whether they will be accepting Section 8 payments, and has sought means to limit the number of licenses it gives to Section 8 landlords.  Both Cities have also directed HACoLA to send threatening letters to Section 8 landlords whose properties were not licensed, stating that the landlords must obtain licenses or risk losing their right to Section 8 payments.  Finally, both Cities have used their rental inspection ordinances as an additional means of entering Section 8 households and harassing tenants.

        d.    <u>Lancaster's Discriminatory Nuisance Ordinance.</u>    After Lancaster's mayor specifically asked the City Council to "[l]ook into a means for making it very easy for neighbors to file nuisance lawsuits with the assistance of the City against . . . Section 8 housing,"[16] Lancaster enacted a nuisance ordinance that provides enhanced penalties where there are multiple calls to the police or public safety entities for service – even where there is no actual criminal activity.

        e.    <u>Lancaster's Section 8 Commission.</u>  In 2008, Lancaster's City Council designated a "Section 8 Commission" to investigate ways for Lancaster to take over administration of Section 8 from HACoLA in order to further remove and exclude Section 8 participant families.  The Commission was later renamed the "Neighborhood Vitalization Commission," but it remains focused on removing and excluding Section 8 participants from the City.  When a consultant reported in 2008 that it was not feasible for Lancaster to take over administration of the Section 8 program, the Commission turned its attention to other means of excluding Section 8 participants.  Among these was the development of a "Good Neighbor Guide" encouraging Lancaster residents to report possible Section 8 violations by their neighbors and make

---

[16] June 10, 2008 Lancaster City Council Minutes.

FIRST AMENDED COMPLAINT

other nuisance complaints.  In 2010, the City commissioned another consultant to explore again how Lancaster could seize control of the Section 8 program and impose its own administrative rules.

10.    Officials in both Cities have spread false stereotypes about Section 8 participants in order to justify unlawful discrimination and exclusion. Notwithstanding the threshold requirement for participation in the Section 8 program that voucher holders pass rigorous criminal background checks, and the lack of any correlation between Section 8 tenants – who constitute a very small portion of the population – and crime rates, officials in both Cities have wrongly labeled their Section 8 residents as criminals in an effort to justify their surveillance and harassment.[17]

11.    Similarly, the Cities claim that large numbers of Section 8 participants have committed fraud in order to obtain assistance, and, therefore, that "cracking down" on Section 8 fraud is appropriate.[18]  Notably, even in the isolated event that a Section 8 participant receives federal assistance to which he or she was not technically eligible, there is no resulting loss to either Lancaster or Palmdale, so their intense interest in Section 8 fraud is not fiscally reasonable.

12.    Finally, Lancaster officials have propagated false stereotypes about children of Section 8 families as truants or troublemakers and their parents as indifferent to their education or wellbeing, and sought to have Section 8 families whose children miss school terminated from the program and evicted.[19]  They have done so while simultaneously acknowledging that the stereotypes underlying these efforts are without factual support.[20]

---

[17] See, e.g., February 19, 2009 Lancaster Section 8 Commission Minutes.

[18] See, e.g., June 24, 2008 Lancaster City Council Minutes; September 19, 2007 Palmdale City Council Meeting Video.

[19] See October 26, 2010 Lancaster City Council Meeting Minutes.

[20] See October 26, 2010 Lancaster City Council Meeting Video.

FIRST AMENDED COMPLAINT

13.     As detailed below, individual Plaintiffs and members of the organizational Plaintiffs have suffered from unlawful discrimination resulting in invasion of their privacy and public humiliation in front of their neighbors.  They have been both intimidated and demonized in an attempt to drive them from their homes.  In addition, the Cities have sent each individual and organizational Plaintiff the unmistakable – and unlawful – message that black and Latino residents in Lancaster and Palmdale are unwelcome and should be excluded.  The Cities' actions have forced Section 8 participants to choose between holding onto a better home for their families and fleeing hostilities of the Cities' unrelenting war.

14.     The Cities' conduct constitutes a pattern or practice of intentional discrimination and has an unjustified disparate impact in violation of both federal and state law.  As noted above, the vast majority of the families who receive Section 8 assistance in Los Angeles County and who bring their vouchers to Lancaster and Palmdale – and who are targeted by the Cities – are black and Latino.  As a result, the Cities' campaign to remove Section 8 participants from their Cities amounts to a knowing and deliberate attempt to re-segregate their historically virtually all-white communities.

15.     Indeed, a 2009 letter from HUD warned Lancaster that "[b]ecause the majority of voucher holders in the city of Lancaster are African-Americans," actions seeking to limit their numbers "could be found to result in an unlawful disparate impact ... under the [Fair Housing] Act."[21]  Plaintiffs echoed this warning in a pre-litigation demand to both Cities.  Neither HUD's warning nor Plaintiffs' demand has had any effect.  At the June 1, 2011 Palmdale City Council meeting, held after the City had received and reviewed Plaintiffs' pre-litigation demand, a Council Member proclaimed that the City would continue its current course of action without "waver[ing]" so "legitimately" "deserving" individuals could use the vouchers.[22]

---

[21] Letter from B. Fulton, HUD, to H. McKeon, U.S. Congress, rec'd May 5, 2009.
[22] June 1, 2011 Palmdale City Council Meeting Video.

8

FIRST AMENDED COMPLAINT

16.     Since the filing of Plaintiffs' original Complaint, Lancaster officials have been particularly adamant that they will not end their war against their Section 8 residents. Lancaster's Mayor has reiterated bluntly: "I am at war with Section 8."[23]

17.     Both Cities have refused to renounce the discriminatory effects of their actions and to commit to changing their treatment of Section 8 residents. Accordingly, Plaintiffs request that the Court enjoin their discrimination against Section 8 Housing Choice Voucher program participants and order such other relief as is just and proper.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over the subject matter of the federal claims asserted herein pursuant to 28 U.S.C. § 1331 (federal question) and 42 U.S.C. § 3613(a) (Fair Housing Act).

19.     This Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction).

20.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because Defendants reside in this judicial district and a substantial part of the events or omissions giving rise to the claim occurred in this District.

## PARTIES

21.     Plaintiff TCAL is a community organization formed in 2010 that helps low income individuals and people of color in the Antelope Valley act to fight for their civil rights and eliminate race prejudice. TCAL has black and Latino members who participate in the Section 8 voucher program in Lancaster and Palmdale, and who have been injured by the Defendants' harassment of black and Latino Section 8 tenants. TCAL's mission is to empower, improve, and advance the economic, political, and social conditions of the residents of the Antelope Valley. To fulfill its

---

[23] Gene Maddaus, "Public Counsel Sues Lancaster And Palmdale Over 'War' On Section 8 Housing," LA Weekly, June 8, 2011; available at http://blogs.laweekly.com/informer/2011/06/lancaster_palmdale_section_8_d.php.

9

1   mission, TCAL serves the community in the areas of housing, public policy, youth,
2   business, and community organizing.  TCAL's Board of Directors and its members
3   are all residents of the Antelope Valley.  TCAL has been forced to dedicate extensive
4   time and resources to investigating and combating the Cities' discriminatory policies
5   and practices, including door knocking, outreach and education meetings, press
6   conferences, and public meetings.   TCAL operates a toll-free hotline where the
7   community can share their complaints about housing discrimination.  The need to
8   divert its resources to addressing the Cities' practices has frustrated TCAL's mission.
9   Because of the Cities' actions, TCAL has been unable to devote sufficient resources
10  to other areas that are critical to its mission, such as youth outreach programs and
11  programs addressing racial profiling by police in the Antelope Valley.

12          22.     Plaintiff California State Conference of the National Association for the
13  Advancement of Colored People ("NAACP") is a nonprofit, civil rights organization
14  that serves as the state-wide entity of the NAACP.  NAACP is the nation's oldest and
15  largest civil rights organization, founded in 1909 with a particular historic
16  commitment to combating exclusion and discrimination in housing.  The California
17  State Conference of the NAACP consists of local branches throughout the state,
18  including branches in and around the Antelope Valley.  The NAACP has at least one
19  member who participates in the Section 8 voucher program in the Antelope Valley,
20  and who has been injured by the Defendants' harassment of black and Latino Section
21  8 tenants.  The NAACP also has black and Latino members who participate in the
22  Section 8 voucher program in California, and whose housing choices have been
23  limited as a result of the Defendants' exclusion of black and Latino Section 8 tenants
24  from their Cities.

25          23.     The NAACP's mission is to ensure the political, educational, social, and
26  economic equality of all persons and eliminate race prejudice.   As part of this
27  mission, the State Conferences and branches are dedicated to ensuring compliance
28  with laws designed to prevent housing discrimination.  Branches within the California

10

State Conference have worked to counter the effects of the defendants' discriminatory conduct. Working with other community organizations, the Antelope Valley Branch has engaged in outreach and education programs designed to counter the effects of the Cities' discriminatory conduct, and other branches have provided counseling services to help low-income families, including those who use Section 8 vouchers, locate affordable housing. The exclusion and discrimination challenged in this action have impaired the NAACP's ability to refer Section 8 recipients to Lancaster and Palmdale to find homes. The Cities' discriminatory practices have therefore frustrated the NAACP's mission, and hindered the NAACP's efforts to help Section 8 participants locate affordable housing. In order to investigate and counteract the Cities' exclusion and discrimination, the NAACP has diverted resources from other efforts.

24.    Plaintiff Sheila Williams is a black Section 8 participant who lived in Lancaster until mid-2010. Ms. Williams was harassed by a City-funded investigator and local Sheriff's deputies, acting as agents of Lancaster, until she made the decision to leave the Antelope Valley. In addition, Ms. Williams was a victim of Lancaster's discriminatory nuisance ordinance, which caused her landlord to turn against her. Ms. Williams also suffered from the hostile environment created by anti-Section 8 rhetoric of Palmdale and Lancaster officials. Ms. Williams continues to participate in the Section 8 program, and would likely return to the Antelope Valley if the Cities ceased engaging in exclusion and discrimination. Because of the Cities' discriminatory actions, Ms. Williams has been deprived of the equal opportunity to live in the home or city of her choosing.

25.    Plaintiff Michelle Ross is a black Section 8 participant who lived in Palmdale until shortly before the initiation of this litigation and then moved to Lancaster. Ms. Ross was harassed by a City-funded investigator and local Sheriff's deputies, acting as agents of Palmdale. Ms. Ross also suffered from the hostile environment created by anti-Section 8 rhetoric of Palmdale and Lancaster officials.

11

FIRST AMENDED COMPLAINT

1    Ms. Ross moved to Lancaster to avoid further harassment by Palmdale agents while
2    allowing her children to remain in Antelope Valley schools.  Ms. Ross would have
3    preferred to stay in her home in Palmdale in order to maintain continuity in her
4    children's schooling.  Because of the Cities' discriminatory actions, Ms. Ross has
5    been deprived of the equal opportunity to live in the home or city of her choosing.

6        26.    Plaintiff Jaquinn Davis is a black Section 8 participant who lives in
7    Lancaster.  Ms. Davis has experienced harassment from a City-funded investigator in
8    Lancaster, as detailed below.  Ms. Davis and her son live in fear that continued
9    discriminatory actions by Lancaster will force her to leave her home, and will likely
10   force her to leave the Antelope Valley.  Because of these discriminatory actions, Ms.
11   Davis has been deprived of the equal opportunity to live in the home or city of her
12   choosing.

13       27.    Defendant City of Lancaster, California, is a municipal entity located in
14   Los Angeles County.  Lancaster is located in the area of Los Angeles County
15   northeast of the City of Los Angeles known as the Antelope Valley.  It has a
16   population of approximately 157,000.[24]  Law enforcement services are provided by
17   the Los Angeles County Sheriff under contract with, and at the direction of, the City.
18   Approximately 9.3% of the housing units – or 4,843 homes – in Lancaster are
19   vacant.[25]  As of September 2010, there were 2,226 Section 8 households in
20   Lancaster.[26]

21       28.    Defendant City of Palmdale, California, is a municipal entity located in
22   Los Angeles County.  Palmdale is also located in the area of Los Angeles County
23   northeast of the City of Los Angeles known as the Antelope Valley.  It has a
24   population of approximately 153,000.[27]  Law enforcement services are provided by

---

[24] See 2010 Census Data at http://factfinder2.census.gov/faces/nav/jsf/pages/index.xhtml.
[25] Id.
[26] HACoLA Antelope Valley Section 8 Activity Report to Michael D. Antonovich, dated Oct. 19, 2010.
[27] See 2010 Census Data at http://factfinder2.census.gov/faces/nav/jsf/pages/index.xhtml.

12

FIRST AMENDED COMPLAINT

the Los Angeles County Sheriff under contract with, and at the direction of, the City. Approximately 7.7% of the housing units – or 3,592 homes – in Palmdale are vacant.[28]   As of September 2010, there were 1,416 Section 8 households in Palmdale.[29]

## **FACTS COMMON TO ALL CLAIMS**

29.   The Antelope Valley, particularly its major cities of Lancaster and Palmdale, was the site of intense racial segregation well into the 1970s and home to white supremacist groups.[30]  Prior to the advent of fair housing laws, Palmdale was recognized as a "sundown town" – that is, a town from which all blacks had to leave by sundown.[31]   The nearby community of Sun Village traces its existence to Palmdale's segregated housing policies, providing a place for blacks to live because they could not live within Palmdale itself.[32]   At the time of the 1990 Census, Lancaster's population was 73% white and Palmdale's population was 66% white.[33]

30.   A dramatic increase in the numbers of non-whites in the Antelope Valley in the 1990s was marked by a dramatic surge in the number of hate crimes, particularly attacks on black persons and families.[34]  According to a 1999 study of hate crimes across Los Angeles County, "[i]n Antelope Valley . . . the vast majority

[28] Id.

[29] HACoLA Antelope Valley Section 8 Activity Report to Michael D. Antonovich, dated Oct. 19, 2010.

[30] See Lynda Thompson Taylor, History of the Antelope Valley NAACP, undated.  Available at http://av-naacp.org/Documents/History_of_the_AVNAACP.pdf ; Karen Umemoto & Kimi Mikami, A Profile of Race-Bias Hate Crimes in Los Angeles County, UCLA Lewis Center for Regional Studies, Working Paper Series, June 1, 1999; John Sanders, AV Leaders Decry Label of Racism, Daily News – Los Angeles, Nov. 16, 1999.

[31] See http://sundown.afro.illinois.edu/sundowntownsshow.php?id=1117 (a compilation of oral histories regarding sundown towns in the United States).

[32] See Sebastian Rotella, Sun Village: Black Enclave Withers Amid Antelope Boom, L.A. Times, Aug. 27, 1989.

[33] See 1990 Official U.S. Census Data, at http://www.census.gov/main/www/cen1990.html.

[34] See Karen Umemoto & Kimi Mikami , A Profile of Race-Bias Hate Crimes in Los Angeles County, UCLA Lewis Center for Regional Studies, Working Paper Series, June 1, 1999; see also John Sanders, AV Leaders Decry Label of Racism, Daily News – Los Angeles, Nov. 16, 1999.

13

1   of [hate crime] victims are African American."[35]   In 1990, during the Palmdale

2   elections, "vote white" was spray-painted on a black woman's campaign sign.[36]   In

3   July 1997, in Palmdale, two white men and one white woman murdered a black man

4   so that one of them could earn a white supremacist tattoo.[37]   In February of 2004, two

5   black men were stabbed in two separate bars in Lancaster by the son of a mayoral

6   candidate – the attacker was quoted saying "white power."[38]   In July 2008, two

7   Palmdale homes were plastered with words offensive to Jews and blacks along with

8   "white power" and a swastika.[39]   In August of 2010, the Church of Jesus Christ of

9   Latter-day Saints in Lancaster and the First African Methodist Episcopal Church in

10  Palmdale were firebombed.[40]   Area hate crimes have also specifically targeted

11  Section 8 recipients.   In January 2011, the news reported that a Palmdale Section 8

12  participant discovered graffiti stating "I hate Section 8" and "Nigger" on her garage.[41]

13  This Section 8 participant was Plaintiff Michelle Ross.

14      31.   Although the Cities have disavowed this ugly past as mere history and

15  characterize more recent actions as those of a few disturbed individuals, the Cities'

16  officials now seek to perpetuate prior discrimination by subjecting Section 8

17  participants – who are overwhelmingly black and Latino families — to exclusion and

18  discrimination.

19

20

21  [35] Karen Umemoto & Kimi Mikami, A Profile of Race-Bias Hate Crimes in Los Angeles County, UCLA Lewis Center for Regional Studies, Working Paper Series, June 1, 1999, at 14.

22  [36] See John Chandler, Racial Scrawl on Election Poster Angers Palmdale, L.A. Times, Apr. 7, 1990.

23  [37] See Richard Fausset, 3 Charged with Hate Crimes in 1997 Killing of Black Man, L.A. Times, Jan. 28, 2004.

24  [38] See Hector Becerra, Son of Mayoral Hopeful Charged, L.A.Times, Feb. 21, 2004.

25  [39] See Leo Stallworth, Palmdale houses vandalized in "hate crime," KABC-TV July 8, 2008, http://abclocal.go.com/kabc/story?section=news/local&id=6252533.

26  [40] See Church Arsons, Ourweekly.com, Aug 31,2010, http://www.ourweekly.com/antelope-
27  valley/church-arsons .

    [41] See Leo Stallworth, "Palmdale family target of Section 8 hatred," KABC-TV Jan. 4, 2011,
28  http://abclocal.go.com/kabc/story?section=news/local/los_angeles&id=7880152.

32.     Indeed, 84% of Section 8 participants in Lancaster and 85% in Palmdale are black and Latino. [42]  According to HUD's statistics for 2008, the most recent year available, of the 7,203 individuals in Section 8 voucher holders' households in Lancaster, 70% were black and 14% were Latino.[43]  Similarly, in Palmdale, 67% of the 4,146 individuals in Section 8 voucher holder households identified themselves as black and 18% as Latino.[44]  Lancaster's and Palmdale's harassment and intimidation of Section 8 participants already living in their Cities are targeted primarily against blacks and Latinos.

33.     Across Los Angeles County and the nation, black and Latino families also make up the majority of Section 8 tenants.  In Los Angeles County, 47% of the 194,222 Section 8 voucher holders were black and 24% Latino in 2008.[45]  Of the 5,076,510 people using Section 8 vouchers nationally, 42% were black and 17% Latino.[46]  Thus, Lancaster's and Palmdale's efforts to exclude Section 8 participants from elsewhere in the County or other parts of the country likewise are targeted primarily against blacks and Latinos.

## I.    LANCASTER AND PALMDALE'S WAR TO EXCLUDE SECTION 8 PARTICIPANTS FROM THEIR COMMUNITIES

34.     All of Lancaster's and Palmdale's actions targeting Section 8 participants for discrimination and exclusion have been part of an ongoing policy or practice with origins in activities as early as 2004 that have expanded greatly since 2008.  If it were up to the Cities, they would continue in full force to the present day.[47]

---

[42] See http://www.huduser.org/portal/picture2008/index.html.

[43] See id.

[44] See id.

[45] See id.

[46] See id.

[47] In June 2011, shortly after this lawsuit was filed, the County of Los Angeles imposed a 90-day moratorium on its agreements with the Cities for additional housing investigators and staff.  The Mayors of each City appeared at the Los Angeles County Board of Supervisors meeting on June 21,

15

FIRST AMENDED COMPLAINT

A.     **Unduly Aggressive Investigations and Disproportionate Results**

35.     In 2004, Lancaster and Palmdale began to focus undue law enforcement attention on Section 8 participants.  Lancaster established its "Lancaster Community Appreciation Project" ("LAN-CAP") police team to target multi-family rental properties.  As a later Lancaster city newsletter explained, a substantial portion of LAN-CAP deputies' time was and is devoted to conducting "compliance checks" on Section 8 tenants and encouraging landlords and managers to police their Section 8 tenants:  "The Lancaster Sheriff's Station has a special team of officers dedicated to removing the criminal element from problem apartments and other rentals in Lancaster. . . .  [In one year alone], over 1,500 arrests were made – three times the normal apprehension rate.   They have trained over 300 property owners and managers on how to spot potential problems and have performed over 200 Section 8 compliance checks."[48]  Palmdale has a similar program to devote particular attention to rental units, called the "Partners Against Crime" ("PAC") unit.  The PAC unit consists of two sergeants and ten deputies.[49]  According to Palmdale's website, "[t]he PAC program combines the City, Palmdale Sheriff's Station, rental property owners and managers and residents into a team that focuses on keeping illegal activity out of rental property . . . ."[50]

36.     Meetings among Lancaster, Palmdale, and HACoLA in 2004 and 2005 spurred Memoranda of Understanding ("MOU") to hire additional housing investigators to work with the local Sheriff's office and focus on eliminating

---

2011 to oppose the moratorium.  The 90-day moratorium was extended for an additional 90 days on September 20, 2011, again over the objection of the Cities' Mayors, while the County investigates Plaintiffs' claims and Plaintiffs continue to negotiate with the County in an effort to resolve those claims without litigation.  Should the County-imposed moratorium end, the Cities have made clear that they would resume their prior course of conduct.

[48] January 2007 City of Lancaster Outlook Lite,
http://www.cityoflancasterca.org/index.aspx?recordid=46&page=350.

[49] April 1, 2009 Staff Report for Palmdale City Council Meeting Agenda Item 7.1.

[50] City of Palmdale webpage,
http://www.cityofpalmdale.org/departments/public_safety/pac/index.html.

FIRST AMENDED COMPLAINT

purported Section 8 fraud.  In November 2004, Lancaster entered into a MOU with HACoLA and the County of Los Angeles providing "for additional investigative services to address criminal activity and other violations related to the [Section 8] Program administered by the Housing Authority within [Lancaster] . . . ."[51]  The City paid HACoLA $50,000, and the County's Fifth District matched the City's contribution, in order to provide "a maximum of 2,080 hours of investigative services during the term of this MOU."[52]  The term of the original MOU was twelve months.[53]

37.    A few months later, in February 2005, Palmdale followed suit and entered into a MOU with HACoLA and the County as well – noting, in fact, in its staff report that Lancaster had already done so.[54]  The original Palmdale MOU paid for twenty hours per week of investigational services.[55]  Like the Lancaster MOU, the Palmdale MOU was limited to a one year term absent subsequent amendment.[56]

38.    Each year, the Cities and HACoLA entered into either amendments to existing MOUs or new MOUs to retain and expand these enhanced investigational services.  At the end of 2005, Palmdale amended its first MOU and increased its commitment from an extra twenty hours of investigative services per week to thirty-two.[57]  Subsequent amendments were entered into in May 2006 and March 2007.[58]  A new Palmdale MOU was signed in August 2008 and renewed on July 1, 2009 and

---

[51] Memorandum of Understanding By and Between the Housing Authority of the County of Los Angeles and the City of Lancaster, dated Nov. 4, 2004.

[52] Id.

[53] See id.

[54] See Palmdale City Council Staff Report re: Approval of Agreement No. A-0917..., dated Feb. 14, 200[5].

[55] See Palmdale Agmt. No. A-0917, A Memorandum of Understanding By and Between the Housing Authority of the County of Los Angeles and the City of Palmdale For the Hiring of A Section 8 Investigator to Provide Services Within the City.

[56] See id.

[57] See Palmdale City Council Staff Report re: Approval of Amendment No. 3 to Agreement No. A-0917, ..., dated Mar. 5, 2007.

[58] See id.

FIRST AMENDED COMPLAINT

1   May 5, 2010.[59]  In November 2010, Palmdale again increased the level of service it
2   would pay for from thirty-two hours per week to forty,[60] due to the "inordinate
3   amount of Section 8 in our community."[61]  The Palmdale City Council voted
4   unanimously to renew the MOU on June 1, 2011.[62]

5       39.   Lancaster increased its support for additional investigative services even
6   more dramatically.  The $50,000 commitment in 2004 had expanded to a $130,882
7   commitment in June 2009, when the City Council approved an amendment to
8   Lancaster's second MOU with HACoLA. [63]  The County's Fifth District continued to
9   match these funds.  The combined funds paid for 1) two part-time investigators,
10  2) supervision of those investigators, 3) a part-time analyst, and 4) a part-time hearing
11  officer. [64]  The June 9, 2009 City Council staff report recommending approval of this
12  amendment argued that "[t]he City's Rental Inspection Program and inter-agency
13  cooperation between Code Enforcement and Housing Authority investigators has had
14  a significant impact on reducing the number of problematic Section 8 tenants." [65]

15      40.   Further harassment of Section 8 residents in Lancaster came in the form
16  of Lancaster's 2007 establishment of the Community Oriented Response and
17  Enforcement program ("CORE") which provided an additional four deputies and a
18  sergeant.   Each deputy is assigned to a quadrant of the city.[66]   According to
19  Lancaster's description of the program, "[t]his team focuses primarily on ongoing and
20  quality-of-life issues, such as loitering, graffiti, 'problem neighbors,' and emerging

21  [59] See Palmdale City Council Staff Report re: Approval of Amendment No. 2 to Agreement No. A-
22  2419 ..., dated May 5, 2010.
    [60] See Palmdale City Council Staff Report re: Approval of Amendment No. 3 to the Memorandum
23  of Understanding (MOU) ..., Agreement No. A-2419, dated Nov. 3, 2010.
24  [61] Nov. 3, 2010 Palmdale City Council Meeting Video.
    [62] June 1, 2011 Palmdale City Council Meeting Video.
25  [63] See Lancaster City Council Staff Report re: Approve Amendment # 1 to the Memorandum of
26  Understanding ..., dated June 9, 2009.
    [64] See id.
27  [65] Id.
28  [66] City of Lancaster webpage, http://www.cityoflancasterca.org/index.aspx?page=835.

18

FIRST AMENDED COMPLAINT

1   crime patterns in specific areas."[67]   The CORE team, like the LAN-CAP team, also
2   participates in Section 8 compliance checks.[68]

3       41.   Until September 2009, HACoLA had only a cursory protocol in place
4   governing the conduct of housing investigators, requiring little more than that the
5   housing investigator request consent to enter whenever he or she was conducting a
6   compliance check or investigation.   In September 2009, HACoLA issued a new
7   protocol but, as discussed below, the Cities confirmed that it was only binding when
8   HACoLA was the "lead agency" in an investigation.[69]   In Lancaster, the City-funded
9   investigators were given space in the Lancaster Sheriff's Station, and investigators in
10  both Cities accompanied deputies in multi-agency "sweeps" of Section 8 homes.[70]
11  On some occasions, the sweeps of Section 8 homes in Lancaster and Palmdale
12  involve not only Sheriff's deputies, but also the Department of Child and Family
13  Services, the Probation Department, and Code Enforcement officials.[71]   In any event,
14  the protocol did little to address the aggressive tactics favored by Lancaster and
15  Palmdale investigators.   For example, the protocol requires investigators to get
16  independent consent from tenants to conduct a search even where Sheriff's deputies
17  are already inside a home.  Investigators have stated to Section 8 tenants who decline
18  that such consent is irrelevant, because they will simply review everything Sheriff's
19  deputies find.   The City-funded investigators appear to have unlimited access to
20  Sheriff's department records.[72]

21      42.   The intense law enforcement scrutiny and constant suspicion of Section
22  8 tenants simply by virtue of their participation in the Section 8 program has resulted

23  [67] Id.
24  [68] See id.
25  [69] See attachment to email from B. Lindsay, HACoLA, to M. Badrakhan, HACoLA, dated Mar. 31, 2009 re: "5thDistrictMtg.notes.32509."
26  [70] See, e.g., email from R. Nishimura, HACoLA, to M. Badrakhan, HACoLA, re: FW: Lancaster Section 8 Compliance Checks, dated Dec. 11, 2008.
27  [71] See, e.g., id.
28  [72] See, e.g., "City of Palmdale Section 8 Investigations Monthly Reports," June 2005-Sept 2010.

FIRST AMENDED COMPLAINT

1   in unwarranted harassment of participants and their families.  Lancaster and Palmdale
2   were aware of the disproportionate effect of their actions on the Section 8 participants
3   in their Cities and of the unusually aggressive tactics used by City-funded
4   investigators, often in conjunction with Sheriff's deputies acting as officers of the
5   Cities.  Despite knowledge of these improper activities, the Cities continued their
6   support.

7        43.    According to data provided by HACoLA, between 2006 and 2010, the
8   odds that a Section 8 participant would be subjected to an investigation were
9   approximately 2.6 times higher in Lancaster than in the rest of County and
10  approximately 3.2 times higher in Palmdale than in the rest of County.[73]  Many of
11  these investigations have been marked by excessively aggressive tactics, such as the
12  presence of multiple armed Sheriff's deputies with guns drawn and unnecessary
13  hand-cuffing of household members.  As noted above, according to data provided by
14  HACoLA, in the first nine months of 2010, Sheriff's deputies accompanied
15  investigators on approximately 71% of their visits to homes in Palmdale and 64% of
16  their visits to homes in Lancaster, while in the rest of the County, law enforcement
17  participated only 8% of the time.[74]  Lancaster and Palmdale investigators conducting
18  home visits during this period were also four times more likely to determine that a
19  household was not in compliance with Section 8 rules than investigators in other parts
20  of the County.[75]  Palmdale's most recent investigator, Gary Brody, has been
21  particularly aggressive, taking as many as fifteen armed officers with him on
22  purported "compliance checks" and threatening Section 8 voucher holders or their
23  families with search warrants and arrest if they do not consent to searches of their
24  homes.  Moreover, Brody has demonstrated in the past that he had access to minors'

25
26  [73] Data provided by HACoLA in response to California Public Records Act request.
27  [74] Field Contract Entry Reports provided by HACoLA in response to California Public Records Act request.
28  [75] Id.

1  school and juvenile records – which he should not – and used these records to target
2  the children in Section 8 households.   Indeed, Brody's own reports to Palmdale
3  reference discussions with school deputies and reviews of booking records to find
4  juvenile arrests in Section 8 homes.   Brody and his predecessors apparently made
5  monthly reports to Palmdale, providing details of how they spent their time and
6  summaries of "noteworthy" incidents.[76]   The Palmdale City Council has met with
7  Brody to discuss his work and lauded it as "incredible."[77]   Indeed, Palmdale has
8  praised their investigator's "unmatched" "productivity."[78]    Brody has trained
9  Lancaster investigators in his tactics.

10      44.   HACoLA's "Antelope Valley Section 8 Activity Reports" – which the
11  Cities received on a monthly basis and which included comparative and year-to-date
12  data for the fiscal year – plainly demonstrated that investigators in Lancaster and
13  Palmdale took a much different approach to Section 8 tenants than those in other
14  parts of HACoLA's jurisdiction.   According to the reports:

15          a.      Between July 2008 and June 2009, investigators in Lancaster
16      opened 239 investigations, and proposed terminations in 98 (41%) of those
17      investigations, deeming only 37 (15%) of the claims against the Section 8
18      tenants unfounded.[79]   During the same period in Palmdale, investigators
19      opened 166 investigations, proposed termination for 96 tenants (58%), and
20      deemed 11 (7%) unfounded.[80]   In the rest of the County, with nearly 17,000
21      Section 8 families, 670 investigations were opened, of which 183 (27%)
22      resulted in proposed terminations and 207 (31%) were deemed unfounded.[81]

23  [76] See "City of Palmdale Section 8 Investigations Monthly Reports," June 2005-Sept 2010,
24  produced by Palmdale in response to a California Public Records Act request.
    [77] November 3, 2010 Palmdale City Council Meeting Video.
25  [78] November 3, 2010 Palmdale City Council Meeting Video.
26  [79] See HACoLA Antelope Valley Section 8 Activity Report to Michael D. Antonovich, dated July
27  16, 2009.
    [80] See id.
28  [81] See id.

FIRST AMENDED COMPLAINT

As a result of these aggressive tactics, as noted above, one in 22 Lancaster Section 8 participants and one in 12 Palmdale Section 8 participants had their vouchers' terminated, while the rate in the rest of HACoLA's jurisdiction was one in 115.[82]

b.    Between July 2009 and June 2010, the number of proposed terminations dropped significantly – indeed, despite opening nearly 350 investigations in Lancaster and Palmdale, investigators only issued field terminations for 23 tenants.[83]    However, investigators were still reluctant to close an investigation on the grounds that it was unfounded – instead, they left the investigations open, thereby leaving the Section 8 tenant open to further harassment.[84]    Despite the decrease in field-issued proposed terminations, Section 8 participants in Lancaster were still 4.9 times more likely to have their vouchers terminated than participants in HACoLA's jurisdiction outside the Antelope Valley, and Section 8 participants in Palmdale fared even worse – they were 7.5 times more likely to have their vouchers terminated than participants elsewhere in the County.[85]

c.    Between July 2010 and April 2011 (the most recent time period for which data was available), Lancaster had resumed more aggressive proposed termination rates, already doubling its July 2009-June 2010 total, and Palmdale's investigator had issued more than three times as many proposed terminations than he had for the prior fiscal year.[86]    Indeed, investigations in Palmdale for that period were four times more likely to end in proposed terminations than elsewhere in the County, and only half as likely to be deemed

---

[82] See id.

[83] See HACoLA Antelope Valley Section 8 Activity Report to Michael D. Antonovich, dated July 14, 2010.

[84] See id.

[85] See id.

[86] See HACoLA Antelope Valley Section 8 Activity Report for April 1-30, 2011.

FIRST AMENDED COMPLAINT

unfounded.[87]   Section 8 participants in both Cities continued to be roughly 2.4 times more likely to be subject to an investigation than Section 8 participants elsewhere in HACoLA's jurisdiction.[88]

45.   Likewise apparent from information available to the Cities are the differences in how investigations are initiated in the Antelope Valley and how they are initiated elsewhere.  In the rest of the County, particularly in recent years, the majority of investigations are prompted by "complaints" – usually calls to HACoLA's fraud hotline.  At a June 2011 Lancaster City Council meeting with HACoLA representatives, HACoLA characterized its investigations as "complaint driven."[89]  In the rest of the County, this characterization is accurate: between July 2010 and April 2011, HACoLA's fraud hotline referred 592 calls for further investigation - this accounted for roughly 93% of the 632 investigations opened during that period.[90]  During the same period in Lancaster, however, only 51 fraud hotline calls were referred for further investigation, yet 194 investigations were opened.[91]  Similarly, only 26 calls were referred to investigators in Palmdale, yet Palmdale's investigator opened 120 investigations.[92]  Investigator Brody's reports to Palmdale suggest that many of his investigations were opened in response to prompts from Palmdale Sheriff's deputies.[93]

46.   Overall, between 2006 and 2010, the odds that an investigation would result in a recommendation that the participant's voucher be terminated were over 4 times higher in Lancaster than in the rest of County and almost 6 times higher in

---

[87] See id.

[88] See id.

[89] Video of June 22, 2011 Lancaster City Council Special Joint Meeting.

[90] HACoLA Antelope Valley Section 8 Activity Report for April 1-30, 2011.

[91] Id.

[92] Id.

[93] See "City of Palmdale Section 8 Investigations Monthly Reports," June 2005-Sept 2010, produced by Palmdale in response to a California Public Records Act request.

23

FIRST AMENDED COMPLAINT

1  Palmdale than in the rest of County.[94]  Indeed, between July 1, 2006 and November 6,
2  2010, of the 1173 "proposed field terminations" of Section 8 participants in the entire
3  HACoLA area, a quarter (26%) were generated in Lancaster and a third (33%) in
4  Palmdale, for a total of 59% of all terminations in Los Angeles County – even though
5  Palmdale and Lancaster residents comprise only 17% of the County's Section 8
6  households.[95]

7       47.    Not all terminations proposed by City-funded investigators are actually
8  imposed by HACoLA – indeed, Lancaster officials have complained that "[t]he
9  transfer of termination decisions from the Investigative Division in the Antelope
10 Valley to [HACoLA Headquarters in] Santa Fe Springs has led to a decrease in
11 terminations."[96]  In proposed terminations, the most commonly invoked rule pertains
12 to obtaining HACoLA approval for any change in the persons living in the unit,
13 generally referred to as an "unauthorized tenancy."  According to HUD reports on
14 Section 8 terminations in Lancaster between January 2007 and September 2010, 57%
15 were based at least in part on an "unauthorized tenancy." [97]  However, the presence of
16 an unauthorized tenant is not readily determined in a single visit – or even multiple
17 visits – by an investigator, because HACoLA regulations only deem someone an
18 unauthorized tenant if they stay in a residence more than thirty consecutive days or
19 more than sixty total days in one year.[98]  Thus, unsurprisingly, HACoLA records
20 reflect that many terminations proposed on these grounds are patently unwarranted
21 and only serve to harass the Section 8 participants.  For example:

22       a.    In June 2009, a Palmdale tenant received a notice of proposed
23            termination alleging the tenant had unauthorized subjects (the tenant's daughter
24            and granddaughter) residing in her unit.  The tenant was a stage 4 lung cancer

---

[94] Data provided by HACoLA in response to California Public Records Act request.
[95] Data provided by HACoLA in response to California Public Records Act request.
[96] May 4, 2010 Lancaster Neighborhood Vitalization Commission Minutes.
[97] Data provided by HACoLA in response to California Public Records Act request.
[98] See HACoLA Administrative Plan Section 6.8.8.

24

FIRST AMENDED COMPLAINT

patient whose tumors had spread to her brain and who therefore required 24-hour monitoring.  She admitted to have asked her daughter to stay the night sometimes so she would not be alone.  Nevertheless, the investigator insisted on recommending termination.  An administrative hearing officer overturned the proposed termination finding the termination was unwarranted.[99]

b.      In July 2009, a tenant living in Palmdale received a notice of proposed termination solely because the investigators were informed that an unauthorized tenant had listed the tenant's Section 8 unit as his place of residence on police records.  The investigator failed to acquire, or even seek, any additional corroborating evidence.  Despite this and the participant's assertions that the unauthorized tenant did not actually reside at the unit, the investigator recommended termination.  The proposed termination had to be overturned at an administrative hearing for lack of evidence.[100]

c.      In August 2009, a Palmdale tenant received a notice of proposed termination because an investigator alleged that an unauthorized tenant – the tenant's spouse – was residing in the tenant's Section 8 unit and that the spouse was engaged in criminal activity.  In actuality, the tenant and the spouse had been separated for years and the tenant had a restraining order against the spouse because she was the victim of domestic violence.  The proposed termination was withdrawn after the tenant contacted HACoLA to dispute the proposed termination.[101]

48.     In short, over the last five years, both the number of investigations and the number of proposed and completed voucher terminations in the Antelope Valley have been disproportionate when compared to the rest of HACoLA's jurisdiction.  As

---

[99] See HACoLA Hearing Summaries, provided by HACoLA in response to California Public Records Act request.

[100] See id.

[101] See id.

FIRST AMENDED COMPLAINT

1    demonstrated further by the accounts of the individual plaintiffs below, the sheer
2    number of investigations to which Section 8 participants are subject, and the
3    likelihood that they will be subject to one in the future, serve to intimidate Section 8
4    participants in Lancaster and Palmdale.    That intimidation is heightened by the
5    aggressive tactics employed by City-funded investigators and Sheriff's deputies, and
6    by the disproportionate number of terminations proposed and completed in the Cities.
7    These are the predictable consequences of the Cities' decisions to fund investigators
8    to conduct aggressive investigations in the Cities and to direct sections of their
9    Sheriff's departments to focus scrutiny on Section 8 participants, and the Cities knew
10   that these results were being realized.

11       **B.    Business Licensing and Inspections for Rentals in Lancaster and**
12              **Palmdale**

13       49.    Both Lancaster and Palmdale have passed rental unit inspection
14   ordinances that give the Cities an additional avenue to enter the homes of Section 8
15   tenants, nominally in the interest of public safety.  In addition, both Cities have used
16   their rental business licensing ordinances to target Section 8 landlords.

17       50.    In 2004, the City of Lancaster passed Ordinance 822, which required
18   landlords renting units in multi-family buildings to obtain business licenses.  The
19   licensing program was expanded in 2007 via Ordinance 869, which required those
20   renting single-family homes to obtain business licenses as well.  These ordinances are
21   now codified in Lancaster Municipal Code Ch. 5.40.  The ordinances require that all
22   rental units be inspected on a regular basis and when any complaints are made.  These
23   inspections may "include inspections by other City departments and/or Los Angeles
24   County enforcement agencies."[102]    The City of Lancaster provides a form for
25   requesting a rental business license, which in its current iteration expressly asks
26   landlords whether they will be accepting Section 8 tenants.[103]

27   ───────────────
[102] Lancaster Muni. Code § 5.40.080(A).
28   [103] See City of Lancaster webpage, http://www.cityoflancasterca.org/index.aspx?page=527.

FIRST AMENDED COMPLAINT

51.   Similarly, in 2006, Palmdale – which already had a business license requirement in place in Palmdale Municipal Code Ch. 3.44 – passed Ordinance 1273, giving itself expanded rights to inspect rental units.  Like the Lancaster statute, the Comprehensive Residential Rental Unit inspection program, codified in Palmdale Municipal Code Ch. 8.40, requires that all rental units be registered and be inspected on a regular basis and when any complaints are made.  As with Lancaster, these inspections in Palmdale may "include inspections by other city departments and/or Los Angeles County enforcement agencies."[104]

52.   The Cities have deployed these ordinances in their war against Section 8 residents.  On October 14, 2008, Lancaster's City Manager wrote a letter to HACoLA asking that it immediately stop Section 8 payments to landlords who did not have current business licenses.[105]   After HACoLA refused, Lancaster requested that HACoLA send letters to Section 8 landlords whose properties were not licensed indicating that they must obtain licenses or they may lose their right to Section 8 payments.[106]   HACoLA agreed to do so.  At a March 25, 2009 meeting among HACoLA, Lancaster, and Palmdale, Palmdale asked that HACoLA do the same for its unlicensed landlords,[107] even though Palmdale's ordinance had traditionally not been enforced against rental complexes smaller than four units.[108]

53.   Also at the March 25, 2009 meeting, the Cities devised a plan to use the existence of the business licensing ordinances as a pretext for requesting lists of Section 8 properties.[109]   Betraying their interest in more than business licensing

---

[104] Palmdale Muni. Code § 8.40.030.

[105] See letter from M. Bozigian, Lancaster City Manager, to W. Huang, Acting Exec. Dir., HACoLA, dated Oct. 14, 2008.

[106] See email from R. Nishimura, HACoLA, to M. Badrakhan, HACoLA, dated Mar. 30, 2009 re: "Joint Cities and County Housing Authority/Section 8 Meeting."

[107] See HACoLA Memo. From C. Carrillo to N. Hickling, "Section 8 Status Report," Mar. 25, 2009.

[108] See Palmdale City Council Staff Report, "Discussion regarding Business Licensing, Rental Housing Requirements, and Section 8 Housing," Sept. 19, 2007.

[109] See email from N. Hickling, County of Los Angeles 5th Dist., to Mar. 25, 2009 meeting participants dated Mar. 27, 2009 re: Joint Cities and County Housing Authority/Section 8 Meeting.

27

FIRST AMENDED COMPLAINT

compliance, the Cities also requested a list of the approved tenants in each rental unit.[110]   Indeed, a Lancaster representative stated that she had previously received a list of Lancaster's Section 8 participants that identified whether the participants were elderly or had children.[111]   Shortly thereafter, each City sent a nearly identical public records request to HACoLA seeking a spreadsheet containing the current business license status, the property owner's name, the property owner's mailing address, and the Section 8 unit address for each Section 8 landlord in their respective jurisdictions.[112]   Beginning in May 2009, HACoLA provided lists that included not only the requested information but also the names of the Section 8 tenants.  HACoLA apparently stopped providing the lists in late 2010.

54.   Both Cities have likewise used the rental inspection ordinances as a means of entering Section 8 households without adhering to HACoLA rules regarding investigations and compliance checks.  Indeed, the Cities confirmed at the March 25, 2009 meeting that if HACoLA was not the lead agency on an inspection, its protocols would not apply.[113]

55.   The Cities have also sought to use the business licensing ordinances to exert more direct control over Section 8 landlords in order to make it impossible for Section 8 tenants to find housing.  For example, in 2007, Lancaster sought to impose a five-year moratorium on business licensing for Section 8 housing.  Council Member Ronald Smith suggested that this "would be the perfect vehicle in controlling Section 8, because when Section 8 comes up, the City already knows how many business

---

[110] See attachment to email from A. Gonzalez, HACoLA, to M. Badrakhan, HACoLA, dated Mar. 30, 2009 re: "Meeting Notes."

[111] See attachment to email from B. Lindsay, HACoLA, to M. Badrakhan, HACoLA, dated Mar. 31, 2009 re: "5thDistrictMtg.notes.32509."

[112] See letter from B. Boswell, Lancaster Finance Dir., to C. Carrillo, HACoLA Acting Exec. Dir., dated Apr. 15, 2009; letter from S. Williams, Palmdale City Manager, to C. Carrillo, HACoLA Acting Exec. Dir., dated Apr. 28, 2009.

[113] See attachment to email from B. Lindsay, HACoLA, to M. Badrakhan, HACoLA, dated Mar. 31, 2009 re: "5thDistrictMtg.notes.32509."

FIRST AMENDED COMPLAINT

1   licenses there are and that there are over 2000 vouchers in the City."[114]   Council
2   Member Sileo concurred that "if the City can use this to leverage some control on the
3   Section 8 population and exercise additional control, this would be good."[115]
4   Unsurprisingly, the City Attorney cautioned that there would be some "very serious
5   legal issues that need to be dealt with" – although the City Attorney's primary
6   concern was federal pre-emption, not fair housing.[116]   The matter was temporarily
7   dropped.

8       56.    However, in September 2008, then Vice Mayor Smith revived the
9   business licensing discussion in the City Council. In late 2008, the City wrote a letter
10  to its congressional representative, Representative Howard McKeon, seeking his
11  assistance in requesting approval from HUD to adopt an amendment to the licensing
12  ordinance that would provide that no business license would be issued to an owner
13  who proposes to rent residential property to Section 8 participants. In February 2009,
14  Vice Mayor Smith gave an update to the City on his proposal, which had transformed
15  from an outright ban on those intending to accept Section 8 vouchers to "a possible 1-
16  year moratorium on business licenses on single family homes."   Nonetheless, his
17  motive was unambiguous: *"[t]his would be a backdoor way of controlling how many*
18  *vouchers are coming into the City."[117]*   Both Vice Mayor Smith and Mayor Rex
19  Parris reiterated their desire to penalize landlords who rent to Section 8 tenants in a
20  March 2009 City Council meeting, with the Vice Mayor emphasizing the need for a
21  "restrictive ordinance" and the Mayor urging that "the City should be able to identify
22  the people who are going to profit from this; stop doing business with them; make it
23  known to the community who these people are; they are destroying the community;

24
25
─────────────────────
26  [114] July 24, 2007 Lancaster City Council Minutes.
27  [115] Id.
    [116] Id.
28  [117] February 19, 2009 Lancaster Section 8 Commission Minutes (emphasis added).

1    have the courage to identify these people and have the courage to stop doing business
2    with these individuals."[118]

3    57.    Meanwhile, Representative McKeon forwarded Lancaster's request to
4    HUD, and, on June 17, 2009, he forwarded HUD's response to Vice Mayor Smith.  In
5    its response, HUD stated that the City's actions were plainly counter to the Section 8
6    program's goals of "expanding available housing choices."[119]   The HUD response
7    continued: "It is worth noting that according to HUD's data, as of December 2008,
8    African-Americans accounted for approximately 75 percent of the city of Lancaster's
9    voucher holders . . . Because an overwhelming majority of city of Lancaster HCV
10   participants are minorities . . ., the proposed amendment will likely have a significant
11   disproportionate effect on these groups."[120]   The HUD response went on to observe
12   that "[b]ecause the majority of voucher holders in the city of Lancaster are African-
13   Americans . . ., the proposed amendment, while facially neutral, ***could be found to
14   result in an unlawful disparate impact . . . under the [Fair Housing] Act.***"[121]

15   **C.     Additional Avenues for Harassment Pursued By Lancaster**

16   58.    Lancaster has greatly escalated its focus on Section 8 since 2008.  In
17   June 2008, newly elected Mayor R. Rex Parris was adamant about the need to address
18   the Section 8 "problem" and the animus he expressed against Section 8 participants
19   was palpable: "[Mayor Parris stated t]he Section 8 housing issue needs to be dealt
20   with on a local level in an aggressive manner ***rather than becoming a dumping
21   ground for Section 8 into the community***.  He stated that six months from now, he
22   hopes to see a much different approach to Section 8 in the Antelope Valley."[122]   In
23   response to the suggestion that the City should be targeting all rentals, not just
24   Section 8, Mayor Parris was unmoved: "***Make no mistake, this City wants to limit***

---

[118] March 24, 2009 Lancaster City Council Minutes.
[119] Letter from B. Fulton, HUD, to H. McKeon, U.S. Congress, rec'd May 5, 2009.
[120] Id.
[121] Id. (emphasis added).
[122] June 10, 2008 Lancaster City Council Minutes (emphasis added).

FIRST AMENDED COMPLAINT

*the number of Section 8 units that are placed in this community*. . . . [I]t is a problem that is crushing the community. . . . [The County and HACoLA] *have been dumping Section 8 here* in a much more rapid rate in the last few months. They have totally ignored the plight of the Antelope Valley and *it is time to go to war*."[123] Notably, at the following City Council meeting, Mayor Parris clarified his intent with respect to Section 8:  "Mayor Parris stated that there will not be any obstacle for seniors and disabled people; the City is not going to do anything about law abiding Section 8 citizens."[124]  Council Member Sherry Marquez reiterated that the City "will not go after people who actually deserve Section 8 funding."[125]

59.  Lancaster's openly-expressed animus to Section 8 has continued unabated.  For example, Mayor Parris repeated his hostility to the Section 8 program in subsequent communications with HACoLA officials later in 2008, stating that "for too long, the County has treated the City of Lancaster and the Antelope Valley as a repository for Section 8."[126]  Other Council Members have echoed his sentiments.  At the newly formed Section 8 Commission meetings, Council Member Marquez complained that "[u]nfortunately, those that receive the vouchers do not stay in the City of Los Angeles; they migrate to the Antelope Valley."[127]  Adhering to the rhetoric that casts Section 8 participants as criminals, she continued:  "Many prisoners are to be paroled soon which means a number of them will be receiving Section 8 housing, therefore, Lancaster will soon be inundated with another group."[128]  In fact, individuals on parole are not eligible for Section 8 vouchers per HACoLA regulations.[129]  In a March 2009 Lancaster City Council Meeting, Mayor

---

[123] Id. (emphasis added).
[124] June 24, 2008 Lancaster City Council Minutes.
[125] Id.
[126] September 3, 2008 Lancaster City Council Minutes (emphasis added).
[127] February 19, 2009 Lancaster Section 8 Commission Minutes.
[128] Id.
[129] HACoLA Administrative Plan Section 2.8.1.

FIRST AMENDED COMPLAINT

1   Parris again proclaimed "there must be a reduction in rentals; reduction in Section 8

2   housing;" and that "he wants to see the numbers drop . . . it has been far too long that

3   this issue has gone on; [the City] must come up with numbers and evaluate if the City

4   is going in the right direction."[130]   The Lancaster City Manager "stated that *the goal*

5   *of the City is to reduce the numbers to half of what is received now*."[131]

6        60.    Consistent with these sentiments, Lancaster has deployed a number of

7   additional tactics in recent years above and beyond the intimidation and harassment

8   already described.

9        61.    Nuisance Ordinance.  In June 2008, Mayor Parris asked the City Council

10  to "[l]ook into a means for making it very easy for neighbors to file nuisance lawsuits

11  with the assistance of the City against group homes and Section 8 housing that

12  becomes a nuisance and where the owners of the property fail to protect the

13  neighbors."[132]   The City Council obliged.  On October 14, 2008, it passed Ordinance

14  908, codified in Lancaster Municipal Code Ch. 8.52, which provides that if a property

15  is the subject of five calls to law enforcement to report "nuisance activity" in a one-

16  year period, the landlord and the tenant will receive a notice of abatement with a

17  schedule of fees for future services.[133]   "Nuisance activity" is defined broadly in

18  Ordinance 908 as including "[a]nything which is injurious to health, or is indecent, or

19  offensive to the senses, or is an obstruction to the free use of property, so as to

20  interfere with the comfortable enjoyment of life or property by an entire community

21  or neighborhood, or by any considerable number of persons."[134]   Under Ordinance

22  908, the landlord is jointly and severally liable for all fees incurred, and failure to pay

23  the fees will result in the revocation of the landlord's business license.[135]   However,

24  ────────────────

25  [130] March 24, 2009 Lancaster City Council Minutes.

    [131] Id. (emphasis added).

26  [132] June 10, 2008 Lancaster City Council Minutes.

27  [133] Lancaster Muni. Code § 8.52.060.

    [134] Lancaster Muni. Code § 8.52.030.

28  [135] Lancaster Muni. Code § 8.52.070 - 8.52.080.

FIRST AMENDED COMPLAINT

1   Ordinance 908 gives the landlord an affirmative defense (against both the revocation
2   of the license and the payment of the fees): evict the tenant.[136]   In a meeting of
3   Lancaster's Section 8 Commission, Council Member Marquez heralded the newly
4   passed Nuisance Ordinance as "a great tool to help the City move forward."[137]

5       62.   Section 8 Commission.  Also in June 2008, Mayor Parris requested that
6   Council Member Marquez be appointed as the Chair of an Ad Hoc Committee to
7   appoint a "Section 8 Commission."[138]   Council Member Marquez was, like Mayor
8   Parris, newly elected, but had appeared before the City Council prior to her election
9   as a citizen concerned about the purported effect of Section 8 on the community.[139]
10  The purpose of the Section 8 Commission would be to "(1) ... look at a Joint Powers
11  Agreement to take over the Section 8 for the Antelope Valley; (2) ... look into the
12  enforcement of Section 8 in a much more aggressive manner; [and] (3) look into
13  drafting an ordinance that would limit the number of business licenses for Section 8
14  housing . . . ."[140]

15      63.   One of the first ideas put forth by the Section 8 Commission was a so-
16  called "Good Neighbor Guide," which was suggested by Council Member Marquez
17  on the grounds that "[p]eople need to get involved in calling in on such things as
18  Section 8 code violations," or as the City Manager called them, "problem renters."[141]
19  The "Good Neighbor Guide" went through several iterations, but was up on
20  Lancaster's city website by August 2009.[142]

21      64.   After formation of a regional housing authority was deemed cost-
22  prohibitive, the Section 8 Commission was renamed the "Neighborhood Vitalization

---

[136] Lancaster Muni. Code § 8.52.090.
[137] Oct. 16, 2008 Lancaster Section 8 Commission Minutes.
[138] June 10, 2008 Lancaster City Council Minutes.
[139] Sept. 26, 2006 Lancaster City Council Minutes; May 8, 2007 Lancaster City Council Minutes.
[140] June 10, 2008 Lancaster City Council Minutes.
[141] July 8, 2008 Lancaster City Council Minutes; Sept. 3, 2008 Lancaster City Council Minutes.
[142] Aug. 3, 2009 Lancaster Neighborhood Vitalization Commission Minutes.

1    Commission."  Nonetheless, its mission statement continued to reflect animus against

2    Section 8 participants:  "The Lancaster Neighborhood Vitalization Commission will

3    examine the ongoing cumulative ***negative effects of an over-abundance of publicly-***

4    ***subsidized housing***, and ***recommend policies and programs to deter the***

5    ***proliferation of subsidized housing*** until such time as the city is able to achieve fair-

6    share parity with other cities in Los Angeles County."[143]  In practice, the Commission

7    continued to have regular meetings with HACoLA and County staff and to focus

8    much of its efforts on Section 8 participants.

9         65.    For example, in July 2009, the Neighborhood Vitalization Commission

10   sent a letter to newly appointed HACoLA Executive Director Sean Rogan, purporting

11   to follow up on a campaign discussed and agreed upon at the March 25, 2009 meeting

12   to dissuade Section 8 participants from coming to the Antelope Valley.  The letter

13   asked, among other things:   "1. Where are we with the Cities of Lancaster and

14   Palmdale taking part in the orientation for new Section 8 Voucher holders at the

15   Palmdale office? Also, has a DVD been prepared that was discussed at the meeting in

16   Palmdale several months ago?  2. Where are we with the [HACoLA] doing an ad

17   campaign to let Voucher holders know that it is expensive to live in the Antelope

18   Valley and that there are very few available jobs in the area[?]"[144]  The DVD

19   referenced was apparently intended to focus on rule compliance and bases for

20   termination.[145]  Lancaster sought to "lay down the law" to Section 8 participants by

21   participating in the orientation process.[146]  The advertising campaign referenced was

22   an attempt to dissuade Section 8 participants from moving to the Antelope Valley due

23

24   [143] Lancaster Neighborhood Vitalization Commission Mission Statement, Feb. 2009 (emphasis
25   added).

     [144] Letter from B. Banks, Lancaster Neighborhood Vitalization Commission, to S. Rogan, HACoLA
26   Exec. Dir., dated July 7, 2009.

27   [145] See email from R. Nishimura, HACoLA, to M. Badrakhan, HACoLA, dated July 15, 2009 re:
     FW: City of Lancaster Letter.

28   [146] Id.

1    to the high costs of heating and cooling a large home as well the lack of jobs and

2    services.[147]

3         66.    In addition, the Neighborhood Vitalization Commission wanted more

4    information from HACoLA on Section 8 participants.  The July 2009 letter stated:

5    "[a]lthough [HACoLA] is currently providing a periodic activity report, members of

6    our Commission have determined that there is insufficient information contained in

7    this existing report to assess progress in a number of other areas and would appreciate

8    a monthly report that contains the following information: 1.  The number of elderly,

9    disabled and family Voucher holders in the City of Lancaster . . . ."[148]

10        67.    HACoLA's response denied some of Lancaster's requests, and made

11   clear that attempting to drive Section 8 participants away from the Antelope Valley

12   was illegal.  HACoLA's Rogan stated that Lancaster officials would be permitted to

13   participate in Section 8 orientations, but that their role would be primarily as

14   observers.[149]  Moreover, he instructed them that  "[t]he Housing Authority did not

15   agree to do an ad campaign to let Voucher holders know that it is expensive to live in

16   the Antelope Valley and that there are very few available jobs in the area.  The

17   Housing Authority indicated that both landlords and tenants can access housing

18   availability throughout the County on the socialserve.com website.  ***At the last***

19   ***meeting it was mentioned that Fair Housing laws do not allow steering program***

20   ***participants***."[150]   Rogan further refused to comply with Lancaster's request for

21   additional information on a monthly basis.[151]   However, he did provide the

22   information requested on a one-time basis, informing the Commission that the

23

24   [147] See id.

25   [148] Letter from B. Banks, Lancaster Neighborhood Vitalization Commission, to S. Rogan, HACoLA
     Exec. Dir., dated July 7, 2009.

26   [149] See letter from S. Rogan, HACoLA Exec. Dir., to B. Banks, Lancaster Neighborhood
     Vitalization Commission, dated July 21, 2009.

27   [150] Id. (emphasis added).

28   [151] See id.

FIRST AMENDED COMPLAINT

1    number of elderly in Lancaster was 332, the number of disabled was 892, and the

2    remainder was 1157.[152]

3        68.    <u>Further Demands of HACoLA.</u>    Undeterred by the Neighborhood

4    Vitalization Commission's failure to get substantial cooperation from HACoLA in

5    these efforts to make Lancaster less attractive to Section 8 tenants, Lancaster City

6    Manager Mark Bozigian wrote to Rogan again in October 2009.    In his letter,

7    Bozigian asked HACoLA to create a local preference list for Lancaster; to create a

8    more onerous pre-approval process for Section 8 applicants by requiring inspections

9    and interviews in their current residences; and to develop specific qualification

10   criteria for Lancaster applicants and landlords, including criminal background checks

11   for all household members over the age of fifteen, extended background checks, and

12   imposing a "one strike" rule for drug-related activity.[153]    Moreover, Bozigian asked

13   that "[i]f any family member is arrested, regardless of the charge, the voucher holder

14   must report the arrest to the Housing Authority, which will, in turn, report the arrest

15   to the City of Lancaster and reevaluate the qualifications of the family to participate

16   in the program."[154]    Again, HACoLA responded that it would not comply with many

17   of Lancaster's requests, and in particular that "[l]ocalities within HACoLA's

18   jurisdiction may not have separate policies, procedures or waiting lists."[155]

19       69.    In July 2010, Dorian Jenkins of HACoLA made a presentation to the

20   Lancaster City Council, and Mayor Parris reiterated his frequent claims that Section 8

21   tenants were being "dumped" in Lancaster:    "[T]here is a drastic imbalance of

22   Section 8 people being steered to the Antelope Valley ... the Housing Authority wants

23

24

25   [152] Id.

26   [153] See letter from M. Bozigian, Lancaster City Manager, to S. Rogan, HACoLA Exec. Dir., dated
     Oct. 16, 2009.

27   [154] Id.

28   [155] Letter from S. Rogan, HACoLA Exec. Dir., to M. Bozigian, Lancaster City Manager, dated
     December 2, 2009.

FIRST AMENDED COMPLAINT

these people living in Lancaster."[156]   At this same City Council meeting, Mayor Parris's racial animus became even more blatant, as he asked Mr. Jenkins: "Why is it that over 70 % of your recipients are African Americans, when your population base is probably a third African American, a third Hispanic, and a third White?"[157]  Mayor Parris has elsewhere commented that "[t]he problem with Section 8 is that it's unbalanced.  African-Americans comprise 78 percent of the recipients but are only 20 percent of the population.  That's unfair."[158]

70.   In October 2010, the City Council suggested to HACoLA that it should "requir[e] families to adhere to all rules and laws including that their children attend school" and that HACoLA could "use Lancaster as a pilot program for this."[159]  Notably, Mayor Parris conceded that he had no basis to believe that children from Section 8 families were not attending school: "That would require us first to find out, is it a problem? Maybe everybody on Section 8, all of their kids are attending school and that would be something we should know. But if it's not, why can't we have a pilot program in Lancaster to enforce that. We certainly have the network in Lancaster that is capable of providing the information."[160]  The network Mayor Parris referred to is a system of truancy ticketing and truancy sweeps under which students may be fined for being late for school, and which has itself been criticized as targeting black and Latino students.[161]  Although HACoLA has refused to accede to Lancaster's request, as late as April 2011, Lancaster was still pursuing a means to make truancy a ground for Section 8 termination, still in the complete absence of any

---

[156] July 27, 2010 Lancaster City Council Minutes.

[157] July 27, 2010 Lancaster City Council Meeting Video.

[158] Tricia Tighe, Conversations with the Mayor: the Difficult Issue of Section 8, The AV News, http://www.avnewstodayonline.com/LancasterPageConversationsSection8.html.

[159] Oct. 26, 2010 Lancaster City Council Minutes.

[160] Oct. 26, 2010 Lancaster City Council Meeting Video.

[161] See Britney M. Walker, Truancy Proving to Be a Costly Issue for Lancaster Students, Parents, Our Weekly, Mar. 10, 2011.

FIRST AMENDED COMPLAINT

1 │ factual basis for asserting that truancy by the children in Section 8 participant

2 │ families is a problem.[162]

3 │     71.   <u>Attempt to Secede from HACoLA.</u>  Most recently, Lancaster has been

4 │ considering a revised proposal to seize control of Section 8 operations from

5 │ HACoLA, which would free it to devise Section 8 regulations as draconian as

6 │ possible within the broad discretion given by HUD to local housing authorities.[163]  As

7 │ noted above, Lancaster's Section 8 Commission was originally formed to explore the

8 │ possibility of creating a local Public Housing Authority that would replace HACoLA

9 │ as the Section 8 program administrator in Lancaster.[164]  Upon review of the financial

10 │ and logistical obstacles to creating its own Public Housing Authority, the

11 │ Commission and its consultants recommended in 2009 against taking over

12 │ administration of Section 8.[165] Notably, the pertinent Commission minutes reflect that

13 │ "[t]he proposed recommendation not to take over the administration of the [Section 8]

14 │ program is not solely based on the lack of new vouchers, the cost to administer the

15 │ program, and lack of will to create a multi-jurisdictional housing authority.  The

16 │ recommendation is also based on the success of HACoLA's sustained efforts and

17 │ commitments to deter disorderly Section 8 tenants in Lancaster over the last three

18 │ years . . . ."[166]  Because HACoLA has not complied with all of Lancaster's demands

19 │ for action in the City's war on Section 8,[167] Lancaster initiated in 2010 a new study of

20 │ the feasibility of developing a local agency to manage Section 8 vouchers in

21 │

---

[162] <u>See</u> Apr. 5, 2011 Lancaster Neighborhood Vitalization Commission Agenda

[163] <u>See</u> Apr. 5, 2011 Lancaster Neighborhood Vitalization Commission Agenda; May 3, 2011 Lancaster Neighborhood Vitalization Commission Agenda.

[164] <u>See</u> Oct. 16, 2008 Lancaster Section 8 Commission Minutes; Feb. 19, 2009 Lancaster Section 8 Commission Minutes.

[165] <u>See</u> Feb. 19, 2009 Lancaster Section 8 Commission Minutes.

[166] <u>Id.</u>

[167] <u>See</u> letter from S. Rogan, HACoLA Exec. Dir., to M. Bozigian, Lancaster City Manager, dated December 2, 2009; letter from S. Rogan, HACoLA Exec. Dir., to B. Banks, Lancaster Neighborhood Vitalization Commission, dated July 21, 2009.

FIRST AMENDED COMPLAINT

Lancaster, culminating in a consultant's report that was presented to the Neighborhood Vitalization Commission in April 2011.[168]   The consultant's report advised that "[i]f Lancaster believes and documents that HACoLA cannot properly manage and administer the program for the city, we do recommend that Lancaster submit an application to the State of California and HUD through the local field office to establish the Lancaster [Public Housing Authority]."[169]   At its May 3, 2011 meeting, the Neighborhood Vitalization Commission proposed to do just that.[170]

## II.   SECTION 8 PARTICIPANTS MUST CHOOSE BETWEEN A BETTER HOME FOR THEIR FAMILIES AND FLEEING MUNICIPAL INTIMIDATION AND HARASSMENT

72.   As a result of the Cities' discriminatory harassment of Section 8 participants, Section 8 families in the Antelope Valley live in constant fear that they or their families will draw attention to themselves and become a target for attack.  In the cases of Plaintiffs Sheila Williams, Michelle Ross, and Jaquinn Davis, those fears were borne out.  Ms. Williams, Ms. Ross, and Ms. Davis all came to the Antelope Valley to find a better place to raise their children.  Instead, they suffered harassment by City-funded investigators and, in the cases of Ms. Williams and Ms. Ross, humiliation in front of a community turned hostile as a result of the Cities' anti-Section 8 rhetoric.

73.   Sheila Williams is a black single mother and a participant in the Section 8 Housing Choice Voucher program.  She lived in Lancaster, California for about ten years with her four youngest children.  While living in Lancaster, she worked as a preschool teacher.  Her children attended the local schools and earned excellent grades.

---

[168] See MFR Report: Feasibility Assessment for Development of a Local Public Housing Authority for the City of Lancaster, dated March 22, 2011.
[169] Id.
[170] See May 3, 2011 Lancaster Neighborhood Vitalization Commission Agenda.

FIRST AMENDED COMPLAINT

74.     While living in the Antelope Valley, Ms. Williams was always careful to avoid telling anyone that she used Section 8 to help pay her rent, particularly in the last few years.  Comments by Mayor Parris and others in the City government about their desire to reduce the number of Section 8 participants in Lancaster made Ms. Williams fear that she might lose her Section 8 voucher if she drew attention to herself.  She also feared being branded with the stereotypes that Mayor Parris and others ascribed to Section 8.  Her fears were heightened as she heard from friends that many Section 8 families in Lancaster were having their vouchers terminated.

75.     In October 2009, Ms. Williams' fears were realized.  Sheriff's deputies came to her home one day while she was at work, allegedly responding to a call about a potential burglary.  There was no burglary; Ms. Williams' son and his friends were at the home.  Rather than leaving once it was apparent that Ms. Williams' home was not being burglarized, the Sheriff's deputies determined that the home was a Section 8 unit and contacted one of the City-funded housing investigators for Lancaster, Allen Mullins.  Investigator Mullins arrived, and together with the deputies, searched the entire home.   The deputies also reported Ms. Williams to the Department of Children and Family Services and to Lancaster Code Enforcement.  Ms. Williams's son called her at work to tell her about the deputies' and investigator's search.  She came home immediately but the deputies and investigator had already left by the time she arrived.

76.     A few weeks later, Ms. Williams received a notice of proposed termination of her Section 8 voucher – which she challenged at an informal hearing and won.  The Department of Children and Family Services took no action against her.  However, the damage from the investigation had already been done.

77.     The investigation itself, and the months of worrying about losing her voucher or, worse, her children, understandably took a toll on Ms. Williams.  Moreover, because of the Sheriff's deputies' and investigator's search of her home, her neighbors discovered that her family was part of the Section 8 program.

Formerly friendly neighbors became hostile to her and her children, embracing the negative image of Section 8 participants painted by Mayor Parris and the City. Adding to Ms. Williams' discomfort, a marked Lancaster City car, with what appeared to be a HACoLA staff person in it, began driving past her home at least two to three times per week. Sometimes it parked in front of her home for a period of time. Ms. Williams felt she was under constant surveillance, and the presence of the City vehicle made her family even more suspect in the eyes of her neighbors. In addition, after the investigation, Ms. Williams found that her landlord no longer wanted her as a tenant because the City was monitoring the property closely, and the landlord had apparently been fined under Lancaster's nuisance ordinance. Thus, the landlord began sitting outside of Ms. Williams' home and monitoring Ms. Williams' family.

78.     After several months of this treatment, Ms. Williams decided she had to leave the Antelope Valley. She feared hostility from her neighbors and she feared even more that the City or investigators would manufacture another reason to try to take away her Section 8 voucher. Without rental assistance, her family would be homeless. Thus, she left the Antelope Valley. This entailed not only leaving her home and uprooting her children from their schools, but also leaving her job.

79.     Ms. Williams continues to live in Los Angeles County and still participates in the Section 8 voucher program. She would consider moving back to Lancaster or Palmdale if she could feel safe from harassment and derision simply because she is a Section 8 participant. She had a good job in Lancaster and has been unable to find another one since.

80.     Michelle Ross is a black single mother and a participant in the Section 8 housing choice voucher program. Ms. Ross and her children lived in Palmdale for three and a half years. She and her children lived in a home that was safe and comfortable, and her children attended the local schools and were happy there. Between May 2009 and November 2010, Palmdale's Investigator Brody and local

1    Sheriff's deputies began a series of "compliance checks" (as the investigator called
2    them) or "probation sweeps" (as the deputies called them), which ultimately led Ms.
3    Ross to leave Palmdale.    Each of these checks was conducted without any
4    justification, and most involved an excessive and intimidating show of force.

5         81.    At the first compliance check/probation sweep, in May 2009,
6    investigator Brody and approximately fifteen Sheriff's deputies appeared at Ms.
7    Ross's door with their guns out of their holsters.  In the face of this show of force,
8    Ms. Ross allowed them to enter her home, fearing her Section 8 voucher would be in
9    jeopardy if she did not.  Investigator Brody and the deputies asked her who in the
10   household was on probation, and she responded that her two sons – both minors –
11   were on probation.  Investigator Brody and the deputies then proceeded to search her
12   home before they finally left.  The experience left Ms. Ross scared, because she did
13   not understand why her home was being searched or why the deputies had their guns
14   drawn.

15        82.    A few months later, in November 2009, Brody returned to Ms. Ross's
16   home, again accompanied by about fifteen armed deputies.  Ms. Ross was not there
17   when they arrived but came home shortly thereafter.  The deputies and Brody asked
18   Ms. Ross where her sons were – they were in school.  Brody and the deputies left.

19        83.    A few months after that, in February 2010, Ms. Ross received a notice of
20   proposed termination of her Section 8 voucher.  The ground for termination was her
21   alleged failure to report her sons' juvenile adjudications.  HACoLA scheduled a
22   conference at the Palmdale HACoLA office.  At the meeting, Brody showed Ms.
23   Ross that he had her sons' juvenile records, telling her that the deputies give him any
24   information he wants related to a Section 8 household.  Brody told Ms. Ross that her
25   voucher could be terminated because she had not reported the contents of her sons'
26   juvenile records to HACoLA.  He threatened Ms. Ross's 15-year-old son, telling him
27   that his brother and sister would end up on the street because of him.  The case
28   worker, however, reviewed the Section 8 program rules and determined that the

termination Brody had proposed was improper. Juvenile records are confidential and juvenile adjudications in the household are not a basis for terminating a Section 8 voucher.

84.     A few months after the meeting, in June 2010, Brody again appeared at Ms. Ross's home, again accompanied by approximately fifteen Sheriff's deputies with their guns drawn. This time, they said they were looking for Ms. Ross's eldest son, who was not living in the home and had not been living there during any of the prior checks. The deputies searched Ms. Ross's home again, and then left.

85.     What would become the final compliance check/probation sweep happened a few months later, in November 2010. Brody and about twenty Sheriff's deputies came to Ms. Ross's home while she was not there. Her son answered the door. The deputies ran into the home and searched it. Investigator Brody then apparently opened the garage and took pictures. He told Ms. Ross's son to call her, so he could speak to her on the phone. In that phone call, Brody asked Ms. Ross about two Hummer vehicles in her garage. She told him that the vehicles belonged to a friend and gave Investigator Brody the owner's information. It is Ms. Ross's understanding that HACoLA confirmed the vehicles belonged to her friend and not to Ms. Ross.

86.     Like Ms. Williams, after the searches, Ms. Ross quickly learned that many in her community embraced the Cities' stereotypes about Section 8 residents. After the last search, pictures of Ms. Ross's home and her open garage with the Hummer vehicles in it were posted on a Facebook page called "I HATE SECTION 8." The webpage identified her Section 8 status and where she lived. Comments on the webpage were full of violence and malice, and included a threat to burn her house down. Her children were taunted at school and by passers-by on her street. The taunts were blatantly racial: her children were called "dirty Section 8 niggers." Ms. Ross saw people she did not recognize stopping in front of her home and taking pictures.

FIRST AMENDED COMPLAINT

87.    On January 3, 2011, as Ms. Ross was leaving home to drop her children off at school, she was shocked to discover that "I hate Section 8 Niggers," had been graffitied on her garage, and that a window had been broken.  Ms. Ross called the Sheriff's department, but their only response was to accuse her children of breaking the window.  After the graffiti incident, attacks on her children escalated.  One day, young people drove by her home and threw what appeared to be urine at her children, again hurling the slur: "Section 8 niggers."

88.    After these incidents, Ms. Ross and her children so feared for their safety that they no longer slept in their home.  They stayed with friends while looking for another landlord to accept Ms. Ross's Section 8 voucher.  Ms. Ross had limited transportation and did not want to take her children out of their school, so she was constrained to look for housing in the Antelope Valley.

89.    Ms. Ross again found that the Cities' stigmatization of Section 8 tenants, as well as their harassment of Section 8 landlords, was having an effect.  Most landlords she approached said they would not take a Section 8 voucher.  Ms. Ross found that landlords in both Cities appeared to accept the Cities' message that most Section 8 tenants were criminals and should not be welcomed.  Ms. Ross finally found a place to rent in Lancaster.  After the filing of this lawsuit, which she originally brought under the pseudonym Judy Doe, and after her true identity was released to the Cities and the press without warning, Ms. Ross is seeking to relocate to a home outside the Antelope Valley.  If her family could stay in the Antelope Valley without fear of harassment, Ms. Ross would welcome the opportunity to do so, so that her children could take advantage of the neighborhoods and schools.

90.    Jaquinn Davis is a black single mother and a Section 8 participant.  She recently completed cosmetology school and is currently interning at a beauty salon in Los Angeles while she waits for her license.  Ms. Davis also receives assistance from the Department of Public Social Services ("DPSS").  She moved to Lancaster in April

2010 because she could not find a unit to rent in Los Angeles that would both accept Section 8 and did not have severe habitability problems.

91.    Ms. Davis has a young son who suffers from asthma.  The home they rented using her Section 8 voucher in Los Angeles was infested with mold, presenting a danger to any resident and a particularly acute danger to her asthmatic son.  She looked for another home nearby, but found nothing better.  Ms. Davis turned to the Antelope Valley in hopes of finding a clean, well-maintained home where her son's health would not be in further jeopardy.

92.    Upon moving to Lancaster, she immediately enrolled her son in the local elementary school.  Before moving to the Antelope Valley, her son was an honor roll student, and she expected he would do just as well at a new school.  However, as soon as her son began attending the local school in Lancaster, he became a target for bullies, and as a result, his grades dropped.  Ms. Davis approached the school administration, but they were of no help. At the start of the new school year, Ms. Davis decided it was in her son's best interest to pull him out of the elementary school in Lancaster and re-enroll him at his old school in Los Angeles. Free from bullying, her son's grades went back up.

93.    As a result, Ms. Davis and her son commute to Los Angeles from Lancaster Monday through Friday each week.  She and her son take the train to a train station in Los Angeles, where her mother picks up her son and takes him to school and Ms. Davis herself catches the bus to the beauty salon where she interns. This commute is long and exhausting, but Ms. Davis believes it is in the best interest of her son to have him in a school where he is not bullied and is on the honor roll, and it is in her own best interest to intern while she waits for her cosmetologist's license so that she can learn a variety of skills and get a better job once she has her license. In short, Ms. Davis is making sacrifices to help craft a better future for herself and her son, one that she hopes will allow her to support herself without government assistance.

FIRST AMENDED COMPLAINT

94.    In February 2011, the DPSS fraud unit contacted Ms. Davis and informed her that she was being investigated because DPSS did not believe she lived in Lancaster.  The fraud unit questioned how she could afford to travel back and forth from Lancaster to Los Angeles for work and for her son's schooling.  In order to prove that she was living in Lancaster and had no unreported income, the DPSS case worker asked her to provide a letter from her son's school indicating he lives in Lancaster, rent receipts, utility bills, train stubs, and a declaration.  Ms. Davis promptly submitted all these documents as requested, and responded immediately to all of DPSS's follow up questions.  Within a few weeks, she was informed that DPSS had closed its case and was satisfied that no fraud was being committed.

95.    Months later, in June 2011, Investigator Mullins appeared at Ms. Davis's home and asked for authorization to conduct a compliance check.  Ms. Davis consented, fearing she might lose her Section 8 voucher if she refused.  When Ms. Davis asked Investigator Mullins why he was conducting the compliance check, he said that DPSS had told him that she was subleasing her Section 8 unit.  Ms. Davis explained that DPSS had cleared her of any fraud months earlier, and pulled out copies of all of the documents she had sent to DPSS – documents that proved that she lived in her unit.  Investigator Mullins told her that he already had copies of all of those documents.

96.    Despite the fact that DPSS had closed its investigation, and that Investigator Mullins already had extensive documentation demonstrating that Ms. Davis lived in her home, Mullins conducted an inspection of the entire home – pulling out bureau drawers and looking through closets.  Mullins expressed surprise that Ms. Davis's home was clean and well-kept, as though he expected otherwise.  Unsurprisingly, he found no evidence that she was subletting the home.

97.    Nonetheless, in July 2011, a HACoLA staff person scheduled Ms. Davis for a counseling session.  At the session, Ms. Davis was asked to sign a copy of the Housing Authority rules.  Ms. Davis never received a clear answer as to why she was

FIRST AMENDED COMPLAINT

being "counseled," as she had broken no rules, and had never been investigated prior to moving to Lancaster.

98.     Lancaster and Palmdale officials' statements have made it clear Ms. Davis and her son are not welcome, and the baseless investigation and counseling to which she was subjected confirm that animus.  Ms. Davis fears future unwarranted harassment, and even termination of her voucher.  Without the Section 8 voucher program, she and her son would be homeless.  She thus feels forced to choose between the better housing conditions she has found in the Antelope Valley and the fear that she could end up with no home at all.

## FIRST CAUSE OF ACTION

### 42 U.S.C. § 3604(a)

### AGAINST ALL DEFENDANTS

99.     Plaintiffs repeat and incorporate by reference the allegations set forth in paragraphs 1 through 98 above.

100.   The Fair Housing Act, 42 U.S.C. § 3604(a) provides that: "It shall be unlawful . . . [t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, . . . or national origin."

101.   The Cities of Lancaster and Palmdale have violated  42 U.S.C. § 3604(a) by undertaking a series of actions expressly designed to exclude and discriminate against Section 8 participants in their Cities, including: (1) subjecting current tenants to unwarranted, constant surveillance and harassment as well as frequent invasions of their homes under the guise of investigations and compliance checks; (2) attempting to dissuade landlords from renting to Section 8 tenants and subjecting those who do to increased surveillance and harassment; and (3) attempting additional action to dissuade would-be Lancaster and Palmdale residents from moving to the Antelope Valley.

FIRST AMENDED COMPLAINT

102.   The vast majority of Section 8 participants are either black or Latino, and Section 8 has been targeted by Defendants because the vast majority of Section 8 participants are black or Latino.

103.   Defendants' actions constitute a pattern or practice of intentional exclusion and discrimination.   These actions also have an unjustified disparate impact on blacks and Latinos, who make up the vast majority of Section 8 participants in Lancaster and Palmdale, and in Los Angeles County.   Therefore, these actions otherwise make unavailable or deny, a dwelling to Plaintiffs because of race, color, or national origin in violation of 42 U.S.C. § 3604(a).

104.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have suffered irreparable harm and this harm will continue absent injunctive relief.

## SECOND CAUSE OF ACTION

### 42 U.S.C. § 3604(b)

### AGAINST ALL DEFENDANTS

105.   Plaintiffs repeat and incorporate by reference the allegations set forth in paragraphs 1 through 98 above.

106.   The Fair Housing Act, 42 U.S.C. § 3604(b) provides that: "It shall be unlawful . . . [t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, . . . or national origin."

107.   The Cities of Lancaster and Palmdale have violated 42 U.S.C. § 3604(b) by undertaking a series of actions expressly designed to exclude and discriminate against Section 8 participants in their Cities, including: (1) subjecting current tenants to unwarranted, constant surveillance and harassment as well as frequent invasions of their homes under the guise of investigations and compliance checks; (2) attempting to dissuade landlords from renting to Section 8 tenants and subjecting those who do to increased surveillance and harassment; and (3) attempting additional action to

48

1  dissuade would-be Lancaster and Palmdale residents from moving to the Antelope
2  Valley.

3    108.  The vast majority of Section 8 participants are either black or Latino,
4  and Section 8 has been targeted by Defendants because the vast majority of Section 8
5  participants are black or Latino.

6    109.  Defendants' actions constitute a pattern or practice of intentional
7  exclusion and discrimination.  These actions also have an unjustified disparate impact
8  on blacks and Latinos, who make up the vast majority of Section 8 participants in
9  Lancaster and Palmdale, and in Los Angeles County.  Therefore, these actions have
10 the effect of discriminating against Plaintiffs in the terms, conditions, or privileges of
11 sale or rental of a dwelling, or in the provision of services or facilities in connection
12 therewith because of race, color or national origin in violation of 42 U.S.C. §
13 3604(b).

14   110.  As a direct and proximate result of Defendants' unlawful conduct,
15 Plaintiffs have suffered irreparable harm and this harm will continue absent
16 injunctive relief.

17 **THIRD CAUSE OF ACTION**

18 **42 U.S.C. § 3617**

19 **AGAINST ALL DEFENDANTS**

20   111.  Plaintiffs repeat and incorporate by reference the allegations set forth in
21 paragraphs 1 through 98 above.

22   112.  The Fair Housing Act, 42 U.S.C. § 3617 provides that: "It shall be
23 unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or
24 enjoyment of, or on account of his having exercised or enjoyed, or on account of his
25 having aided or encouraged any other person in the exercise or enjoyment of, any
26 right granted or protected by section 3603, 3604, 3605, or 3606 of this title."
27 Department of Housing and Urban Development regulation 24 C.F.R. § 100.400,
28 which interprets Section 3617, provides that: "Conduct made unlawful under this

49

FIRST AMENDED COMPLAINT

section includes, but is not limited to, the following:  (1) Coercing a person, either orally, in writing, or by other means, to deny or limit the benefits provided that person in connection with the sale or rental of a dwelling or in connection with a residential real estate-related transaction because of race, color, . . . or national origin. (2) Threatening, intimidating or interfering with persons in their enjoyment of a dwelling because of the race, color, . . . or national origin of such persons, or of visitors or associates of such persons."

113.    The Cities of Lancaster and Palmdale have violated 42 U.S.C. § 3617 by undertaking a series of actions expressly designed to exclude and discriminate against Section 8 participants in their Cities, including: (1) subjecting current tenants to unwarranted, constant surveillance and harassment as well as frequent invasions of their homes under the guise of investigations and compliance checks; (2) attempting to dissuade landlords from renting to Section 8 tenants and subjecting those who do to increased surveillance and harassment; and (3) attempting additional action to dissuade would-be Lancaster and Palmdale residents from moving to the Antelope Valley.

114.    The vast majority of Section 8 participants are either black or Latino, and Section 8 has been targeted by Defendants because the vast majority of Section 8 participants are black or Latino.

115.    Defendants' actions constitute a pattern or practice of intentional exclusion and discrimination.  These actions also have an unjustified disparate impact on blacks and Latinos, who make up the vast majority of Section 8 participants in Lancaster and Palmdale, and in Los Angeles County.  Therefore, these actions have the effect of coercing, intimidating, threatening, and interfering with Plaintiffs' exercise of their Fair Housing rights because of race, color or national origin in violation of 42 U.S.C. §3617.

FIRST AMENDED COMPLAINT

116.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have suffered irreparable harm and this harm will continue absent injunctive relief.

### FOURTH CAUSE OF ACTION

### 42 U.S.C. § 1983 / U.S. CONST. AMEND. XIV

### AGAINST ALL DEFENDANTS

117.   Plaintiffs repeat and incorporate by reference the allegations set forth in paragraphs 1 through 98 above.

118.   42 U.S.C. § 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ." The Fourteenth Amendment to the United States Constitution provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws" on the basis of race or ethnicity.

119.   The Cities of Lancaster and Palmdale have violated the Equal Protection Clause of the Fourteenth Amendment by undertaking a series of actions expressly designed to exclude and discriminate against Section 8 participants in their Cities, including: (1) subjecting current tenants to unwarranted, constant surveillance and harassment as well as frequent invasions of their homes under the guise of investigations and compliance checks; (2) attempting to dissuade landlords from renting to Section 8 tenants and subjecting those who do to increased surveillance and harassment; and (3) attempting additional action to dissuade would-be Lancaster and Palmdale residents from moving to the Antelope Valley.

FIRST AMENDED COMPLAINT

120.   The vast majority of Section 8 participants are either black or Latino, and Section 8 has been targeted by Defendants because the vast majority of Section 8 participants are black or Latino.

121.   Defendants' actions constitute a pattern or practice of intentional exclusion and discrimination on the basis of race and ethnicity.   Therefore, these actions have the effect of denying Section 8 tenants within the Cities' jurisdiction the equal protection of the laws.

122.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have suffered irreparable harm and this harm will continue absent injunctive relief.

## FIFTH CAUSE OF ACTION

## CAL. GOV'T CODE § 12955(k)

## AGAINST ALL DEFENDANTS

123.   Plaintiffs repeat and incorporate by reference the allegations set forth in paragraphs 1 through 98 above.

124.   California Government Code § 12955(k) provides: "It shall be unlawful: . . . To otherwise make unavailable or deny a dwelling based on discrimination because of race, color, . . . or national origin."

125.   The Cities of Lancaster and Palmdale have violated Cal. Gov't Code § 12955(k) by undertaking a series of actions expressly designed to exclude and discriminate against Section 8 participants in their Cities, including: (1) subjecting current tenants to unwarranted, constant surveillance and harassment as well as frequent invasions of their homes under the guise of investigations and compliance checks; (2) attempting to dissuade landlords from renting to Section 8 tenants and subjecting those who do to increased surveillance and harassment; and (3) attempting additional action to dissuade would-be Lancaster and Palmdale residents from moving to the Antelope Valley.

126.   The vast majority of Section 8 participants are either black or Latino, and Section 8 has been targeted by Defendants because the vast majority of Section 8 participants are black or Latino.

127.   Defendants' actions constitute a pattern or practice of intentional exclusion and discrimination.  These actions also have an unjustified disparate impact on blacks and Latinos, who make up the vast majority of Section 8 participants in Lancaster and Palmdale, and in Los Angeles County.  Therefore, these actions have the effect of making unavailable or denying a dwelling based on discrimination because of race, color or national origin in violation of Cal. Gov't Code § 12955(k).

128.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have suffered irreparable harm and this harm will continue absent injunctive relief.

**SIXTH CAUSE OF ACTION**

**CAL. GOV'T CODE § 11135**

**AGAINST ALL DEFENDANTS**

129.   Plaintiffs repeat and incorporate by reference the allegations set forth in paragraphs 1 through 98 above.

130.   California Government Code § 11135 provides that:  "No person in the State of California shall, on the basis of race, national origin, ethnic group identification, . . . [or] color, . . . be unlawfully subjected to discrimination under, any program or activity that . . . receives any financial assistance from the state."

131.   The Cities of Lancaster and Palmdale and the County of Los Angeles receive financial assistance from the State of California.

132.   The Cities of Lancaster and Palmdale violated Cal. Gov't Code § 11135 by undertaking a series of actions expressly designed to exclude and discriminate against Section 8 participants in their Cities, including: (1) subjecting current tenants to unwarranted, constant surveillance and harassment as well as frequent invasions of their homes under the guise of investigations and compliance checks; (2) attempting

53

1  to dissuade landlords from renting to Section 8 tenants and subjecting those who do
2  to increased surveillance and harassment; and (3) attempting additional action to
3  dissuade would-be Lancaster and Palmdale residents from moving to the Antelope
4  Valley.

5      133.   The vast majority of Section 8 participants are either black or Latino,
6  and Section 8 has been targeted by Defendants because the vast majority of Section 8
7  participants are black or Latino.

8      134.   Defendants' actions constitute a pattern or practice of intentional
9  exclusion and discrimination.  These actions also have an unjustified disparate impact
10  on blacks and Latinos, who make up the vast majority of Section 8 participants in
11  Lancaster and Palmdale, and in Los Angeles County.  Therefore, these actions have
12  the effect of discriminating on the basis of race, color, ethnic group identification, or
13  national origin in violation of Cal. Gov't Code § 11135.

14      135.   As a direct and proximate result of Defendants' unlawful conduct,
15  Plaintiffs have suffered irreparable harm and this harm will continue absent
16  injunctive relief.

17  ## SEVENTH CAUSE OF ACTION
18  ## CAL. CONST. ART. I § 7, ART. IV, § 16
19  ## AGAINST ALL DEFENDANTS

20      136.   Plaintiffs repeat and incorporate by reference the allegations set forth in
21  paragraphs 1 through 98 above.

22      137.   Section 7(a) of Article I of the California Constitution provides that "[a]
23  person may not be … denied equal protection of the laws" on the basis of race or
24  ethnicity.

25      138.   Section 16(a) of Article IV of the California Constitution provides that
26  "[a]ll laws of a general nature have uniform operation."

27      139.   The Cities of Lancaster and Palmdale have violated the Equal Protection
28  Clauses of the California Constitution by undertaking a series of actions expressly

designed to exclude and discriminate against Section 8 participants in their Cities, including: (1) subjecting current tenants to unwarranted, constant surveillance and harassment as well as frequent invasions of their homes under the guise of investigations and compliance checks; (2) attempting to dissuade landlords from renting to Section 8 tenants and subjecting those who do to increased surveillance and harassment; and (3) attempting additional action to dissuade would-be Lancaster and Palmdale residents from moving to the Antelope Valley.

140.    The vast majority of Section 8 participants are either black or Latino, and Section 8 has been targeted by Defendants because the vast majority of Section 8 participants are black or Latino.

141.    Defendants' actions constitute a pattern or practice of intentional exclusion and discrimination on the basis of race and ethnicity.    Therefore, these actions have the effect of denying Section 8 tenants within the Cities' jurisdiction the equal protection of the laws.

142.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have suffered irreparable harm and this harm will continue absent injunctive relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment:

1.    Declaring that Defendants' actions seeking to exclude and discriminate against Section 8 participants or having the unjustified effect of excluding and discriminating against Section 8 participants violate state and federal law;

2.    Enjoining Defendants from taking any further actions that are designed to exclude and discriminate against Section 8 participants or that have the unjustified effect of excluding and discriminating against Section 8 participants;

3.    Declaring that Defendants' actions seeking to dissuade Section 8 participants from residing in the Cities or having the unjustified effect of dissuading Section 8 participants from residing in the Cities violate state and federal law;

4.     Enjoining Defendants from taking any further actions that are designed to dissuade Section 8 participants from residing in the Cities or that have the unjustified effect of dissuading Section 8 participants from residing in the Cities;

5.     Declaring that Defendants' actions seeking to dissuade landlords from renting to Section 8 participants in the Cities or having the unjustified effect of dissuading landlords from renting to Section 8 participants in the Cities violate state and federal law;

6.     Enjoining Defendants from taking any further actions that are designed to dissuade landlords from renting to Section 8 participants in the Cities or that have the unjustified effect of dissuading landlords from renting to Section 8 participants in the Cities;

7.     Ordering Defendants to take affirmative steps necessary to remedy the effects of their unlawful acts;

8.     Awarding Plaintiffs the costs, expenses, and attorneys' fees incurred in this action; and

9.     Awarding Plaintiffs such other and further relief as may be deemed by this Court to be just and proper.

DATED:  September 28, 2011

Catherine E. Lhamon
PUBLIC COUNSEL LAW CENTER
Attorneys for Plaintiffs

Neal S. Dudovitz
NEIGHBORHOOD LEGAL SERVICES OF
LOS ANGELES COUNTY
Attorneys for Plaintiffs

56

FIRST AMENDED COMPLAINT

| | |
|---|---|
| 1 | _Gary L. Blasi_ / JKdC |
| 2 | |
| 3 | Gary L. Blasi<br>Attorney for Plaintiffs |
| 4 | |
| 5 | _Bill Lann Lee_ / JKdC |
| 6 | Bill Lann Lee<br>LEWIS, FEINBERG, LEE, RENAKER, & |
| 7 | JACKSON, P.C.<br>Attorneys for Plaintiffs |
| 8 | |
| 9 | _Michael C. Small_ / JKdC |
| 10 | Michael C. Small<br>AKIN GUMP STRAUSS HAUER & FELD LLP |
| 11 | Attorneys for Plaintiffs |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

57

FIRST AMENDED COMPLAINT

**PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES:

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is:  2029 Century Park East, Suite 2600, Los Angeles, California 90067.  On September 28, 2011 I served the foregoing document(s) described as: **FIRST AMENDED COMPLAINT AND SUMMONS** on interested parties in this action by placing ☐ the original ☒ true copy(ies) thereof enclosed in sealed envelopes ☐ as follows: ☐ as stated on the attached mailing list:

Allison E. Burns
Stradling Yocca Carlson & Rauth
660 Newport Center Drive, Suite 1600
Newport Beach, California 92660-6422
*Counsel for Defendant City of Lancaster*

Steven Orr
Richards Watson & Gershon
355 S. Grand Ave., 40th Floor
Los Angeles, California 90071-3101
*Counsel for Defendant City of Palmdale*

☒ BY MAIL (C.C.P. § 1013(a))  I am readily familiar with the firm's practice of collection and processing correspondence for mailing with the U.S. postal service.  Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business.  The envelope was sealed and placed for collection and mailing on that date following ordinary business practices.

☒ (FEDERAL)  I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on September 28, 2011 at Los Angeles, California.

Margaretha Ayers
[Print Name Of Person Executing Proof]

[Signature]

PROOF OF SERVICE OF FIRST AMENDED COMPLAINT AND SUMMONS