Catherine E. Lhamon (SBN 192751)
clhamon@publiccounsel.org
Jennifer K. del Castillo (SBN 244816)
jdelcastillo@publiccounsel.org
PUBLIC COUNSEL LAW CENTER
610 South Ardmore Avenue
Los Angeles, California 90005
T: (213) 385-2977  F: (213) 385-9089

Neal S. Dudovitz (SBN 68848)
ndudovitz@nls-la.org
Maria E. Palomares (SBN 266206)
MariaPalomares@nls-la.org
NEIGHBORHOOD LEGAL SERVICES
OF LOS ANGELES COUNTY
13327 Van Nuys Boulevard
Pacoima, California 91331
T:  (818) 834-7544

Attorneys for Plaintiffs
(*see next page for additional counsel*)

IN THE UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE COMMUNITY ACTION LEAGUE, a California non-profit organization; CALIFORNIA STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, a non-profit organization; SHEILA WILLIAMS, an individual; MICHELLE ROSS, an individual; and JAQUINN DAVIS, an individual, <br><br> Plaintiffs, <br><br> vs. <br><br> CITY OF LANCASTER and CITY OF PALMDALE, <br><br> Defendants. | Case No.: CV-11-04817 ODW (VBKx) <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANT CITY OF LANCASTER'S MOTION TO DISMISS AND MOTION TO STRIKE** <br><br> Date: January 9, 2012 <br> Time: 1:30 p.m. <br> Courtroom: 11 |

1

Barbara Siegel (SBN 169209)
barbarasiegel@nls-la.org
Alexander Prieto (SBN 270864)
AlexanderPrieto@nls-la.org
NEIGHBORHOOD LEGAL
SERVICES
OF LOS ANGELES COUNTY
13327 Van Nuys Boulevard
Pacoima, California 91331
T:  (818) 834-7544

Dorcas R. Gilmore*
dgilmore@naacpnet.org
Victor L. Goode*
vgoode@naacpnet.org
NATIONAL ASSOCIATION FOR
THE ADVANCEMENT OF COLORED
PEOPLE
4805 Mount Hope Drive
Baltimore, MD 21215
T:  (410) 580-5673  F: (410) 358-9350
* admitted *pro hac vice*

Gary L. Blasi (SBN 70190)
blasi@law.ucla.edu
UCLA School Of Law *(for identification*
*purposes only)*
405 Hilgard Avenue
Los Angeles, California 90024
T:  (310) 206-9431  F:  (310) 206-1234

Bill Lann Lee (SBN 108452)

blee@lewisfeinberg.com
Lindsay Nako (SBN 239090)
lnako@lewisfeinberg.com
LEWIS, FEINBERG, LEE, RENAKER,
& JACKSON, P.C.
476 9th Street
Oakland, California 94607
T: (510) 839-6824  F: (510) 839-7839

Michael C. Small (SBN 222768)
MSmall@akingump.com
Kalia C. Petmecky (SBN 194094)
kpetmecky@akingump.com
Amy C. Poyer (SBN 277315)
apoyer@akingump.com
Kelsey Stapler (SBN 277859)
kstapler@akingump.com
AKIN GUMP STRAUSS HAUER &
FELD LLP
2029 Century Park East Suite 2400
Los Angeles, California 90067-3010
T: (310) 229-1000  F: (310) 229-1001

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

1

## <u>TABLE OF CONTENTS</u>

2

I.  PRELIMINARY STATEMENT ............................................................................1

3

II. FACTUAL BACKGROUND .............................................................................2

4

    A.  The Section 8 Program. ..........................................................................2

5

    B.  Plaintiffs' Factual Allegations. ...............................................................3

6

        1.  Lancaster's Discriminatory Actions...........................................3

7

        2.  Lancaster's Discriminatory Actions Against Plaintiffs. ..............4

8

III. STANDARDS ON A MOTION TO DISMISS. ................................................6

9

IV. PLAINTIFFS' ALLEGATIONS MEET ARTICLE III STANDING
    REQUIREMENTS....................................................................................7

10

    A.  Plaintiffs Have Alleged Injury-in-Fact....................................................7

11

        1.  The Individual Plaintiffs ...........................................................9

12

        2.  The Organizational Plaintiffs Have Alleged Their Own Injury As
            Well As Injury Suffered By Their Members. ..............................10

13

    B.  Plaintiffs Have Alleged Causation. .........................................................13

14

        1.  Lancaster's Vicarious Liability ...............................................14

15

        2.  Lancaster's Direct Liability.....................................................17

16

    C.  The Plaintiffs Have Alleged Redressability. ............................................18

17

V.  PLAINTIFFS STATE CLAIMS ON WHICH RELIEF CAN BE GRANTED....19

18

    A.  The Statutes Apply to Lancaster's Conduct............................................19

19

    B.  Lancaster's Conduct Reflects Both Discriminatory Intent and Effect........21

20

VI. LANCASTER'S MOTION TO STRIKE SHOULD BE DENIED. ......................24

21

VII. CONCLUSION......................................................................................25

22

23

24

25

26

27

28

PLAINTIFFS' OPP'N TO LANCASTER'S MOT. TO DISMISS AND MOT. TO STRIKE

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

**CASES**

3

4  *Comm. Concerning Cmty. Improvement v. City of Modesto,*
    583 F.3d 690 (9th Cir. 2009).............................................................20

5

6  *Committee for Immigrant Rights of Sonoma County v. County of Sonoma,*
    644 F. Supp. 2d. 1177 (N.D. Cal. 2009) .............................................13, 20

7

8  *Doe v. United States,*
    419 F.3d 1058 (9th Cir. 2005) ..........................................................7

9

10 *Flores v. Pierce,*
    617 F.2d 1386 (9th Cir. 1980) .........................................................22

11

12 *Florida State Conference of NAACP v. Browning,*
    522 F.3d 1153 (11th Cir. 2008) ......................................................12, 13

13

14 *Gallagher v. Magner,*
    619 F.3d 823 (8th Cir. 2010) .........................................................22

15

16 *Gamble v. City of Escondido,*
    104 F.3d 300 (9th Cir. 1997)..........................................................23

17

18 *Harris v. Itzhaki,*
    183 F.3d 1043 (9th Cir. 1999) .....................................................8, 18, 19

19

20 *Hawaiian Paradise Park Corp. v. Friendly Broad. Co.,*
    414 F.2d 750 (9th Cir. 1969)........................................................16, 17

21

22 *In re Gilead Sciences Securities Litigation,*
    536 F.3d 1049 (9th Cir. 2008) .........................................................7

23

24 *Inland Mediation Bd. v. City of Pomona,*
    158 F. Supp. 2d 1120 (C.D. Cal. 2001)........................................ passim

25

26 *Krottner v. Starbucks Corp.,*
    628 F.3d 1139 (9th Cir. 2010) .........................................................6

27

28 *Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ..............................................................6, 7, 13, 17

ii

*Magner v. Gallagher,*
   No. 10-1032, 2011 WL 531692 (Nov. 7, 2011)...........................................23

*McGinest v. GTE Serv. Corp.,*
   360 F.3d 1103 (9th Cir. 2004) ..................................................20, 22

*Meyer v. Holley,*
   537 U.S. 280 (2003) .............................................................14

*NAACP v. Ameriquest Mortgage Co.,*
   635 F. Supp. 2d 1096 (C. D. Cal. 2009)...........................................12

*Nat'l Fair Hous. Alliance v. A.G. Spanos Constr.,*
   542 F. Supp. 2d 1054 (N.D. Cal. 2008)............................................11

*Novick v. UNUM Life Ins. Co. of Am.,*
   570 F. Supp. 2d 1207 (C.D. Cal. 2008)............................................23

*Pfaff v. U.S. Dep't of Hous. and Urban Dev.,*
   88 F.3d 739 (9th Cir. 1996) ..................................................22, 23

*Reg'l Econ. Cmty. Action Program v. City of Middletown,*
   294 F.3d 35 (2d Cir. 2002) ......................................................22

*San Pedro Hotel Co, v. City of Los Angeles,*
   159 F.3d 470 (9th Cir. 1998)......................................................8

*Smith v. City of Cleveland Heights,*
   760 F.2d 720 (6th Cir. 1985)..................................................8, 11

*Smith v. Pacific Properties & Dev. Corp.,*
   358 F.3d 1097 (9th Cir. 2004) ............................................10, 11, 12

*Smith v. Town of Clarkton, N.C.,*
   682 F.2d 1055 (4th Cir. 1982) ...................................................22

*Summers v. Earth Island Institute,*
   555 U.S. 488 (2009) .............................................................13

*United States v. Frank,*
   956 F.2d 872 (9th Cir. 1992) ....................................................23

PLAINTIFFS' OPP'N TO LANCASTER'S MOT. TO DISMISS AND MOT. TO STRIKE

*Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.,*
    454 U.S. 464 (1982) ........................................................................................7

*Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.,*
    429 U.S. 252 (1977) ............................................................7, 20, 22, 24

*Walker v. City of Lakewood,*
    272 F.3d 1114 (9th Cir. 2001) ........................................................................19

*Warth v. Seldin,*
    422 U.S. 490 (1975) ........................................................................................6

*Weber v. Department of Veterans Affairs,*
    521 F.3d 1061 (9th Cir. 2008) ........................................................................7

*Williams v. Gerber Products Co.,*
    552 F.3d 934 (9th Cir. 2008) ........................................................................7

**STATUTES**

42 U.S.C. §§ 3604(a), 3604(b), and 3617 ........................................................................18

an Act of Congress ........................................................................................23

Section 11135 of the California Government Code ........................................................18, 20

California Government Code Section 12955(k) ........................................................19

**OTHER AUTHORITIES**

Community Action League "TCAL" ........................................................................6

1  **I.     PRELIMINARY STATEMENT**

2         With the passage of the federal Fair Housing Act in 1968, the nation committed

3  itself to ensuring that all Americans are free to live where they want, regardless of their

4  race or ethnicity.   Through an array of racially discriminatory policies and practices,

5  Defendant City of Lancaster has mounted a direct challenge to that nearly half-century-

6  old commitment.  It seeks to turn the clock back to a time when many municipalities

7  around the country placed their boundaries off limits to black people and other racial

8  minorities.  The targets of Lancaster's old-style brand of discrimination are low-income

9  black and Latino families who have chosen to live in Lancaster using rental subsidies

10 issued to them under the federal Housing Choice Voucher Program, also known as the

11 Section 8 program -- an integral part of the fabric of our fair housing laws.  In a long-

12 running campaign of intimidation, harassment, and race-baiting, Lancaster has

13 systematically sought to drive these families out of the City and discourage others from

14 moving there.  All Section 8 participants must meet strict federal eligibility

15 requirements and pass extensive background checks, rendering them more likely than

16 other citizens to be law abiding.  But in what Lancaster's Mayor has explicitly called the

17 City's "war" on Section 8, Lancaster has falsely proclaimed that anyone on Section 8 –

18 84% of whom in Lancaster are black or Latino -- is invariably a miscreant or worse, and

19 thus is not welcome in the City.  All the while, Lancaster has unabashedly spared white

20 Section 8 participants from the war on Section 8.

21        The complaint contains scores of allegations reciting Lancaster's racially

22 exclusionary goals and tactics and the harms that those actions have inflicted on account

23 of race.  In the face of those allegations, Lancaster has moved to dismiss the complaint

24 on the grounds that Plaintiffs have failed at the pleading stage to show that they have

25 Article III standing and to state claims on which relief can be granted.  But Lancaster

26 gets there by ignoring altogether vast chunks of the allegations in the complaint that

27 confirm both the Plaintiffs' standing and the merits of their claims, and by distorting

28 beyond recognition the few allegations that it chooses to address.  To take perhaps the

1

1    most glaring example of this pattern, Lancaster claims that it is not responsible for

2    Plaintiffs' injuries -- Los Angeles County is.  However, Lancaster glosses over pages of

3    allegations of discrimination in the complaint that have to do with what Lancaster, *on its*

4    *own,* has done to black and Latino families.  And as to the allegations in the complaint

5    that do relate to the joint activity of Lancaster and the County, Lancaster tries to dodge

6    the fact that it, not the County, was in the driver's seat and thus it is vicariously liable

7    for actions taken by County employees.  Compounding the problems with its motion,

8    Lancaster makes a hash out of the law of standing, misconstrues the scope of the federal

9    and state housing discrimination statutes under which the Plaintiffs have sued, and

10    misapprehends critical precedents governing proof of discriminatory intent and effect.

11    All told, Lancaster's motion to dismiss is meritless and should be denied.  So too should

12    Lancaster's motion to strike allegations in the complaint about other incidents of racial

13    discrimination in Lancaster.  Those allegations are relevant because they provide

14    important context to the noxious form of racism at issue here.

## II.    FACTUAL BACKGROUND

### A.    The Section 8 Program.

17       The Housing Choice Voucher program of the Fair Housing Act ("FHA), also

18    known as the Section 8 program, provides rental assistance to low-income families.  The

19    Section 8 program was developed to enable the historic victims of racial discrimination

20    to live in communities of their own choosing and to encourage economic and racial

21    integration.  (First Amended Complaint ("FAC") ¶ 2.)  Families eligible for the program

22    receive vouchers that subsidize their rent to private landlords willing to accept the

23    vouchers.  (*Id.* ¶ 4.)  In order to be eligible for a Section 8 voucher, a family of four in

24    2010 had to have an annual income of less than $41,000; many Section 8 participants

25    earn substantially less than that sum.  (*Id.*)  In addition to showing that their annual

26    income is at or less than the program's maximum amount, Section 8 participants must

27    undergo rigorous background checks prior to being accepted into the program.  (*Id.*)

28

1   And once accepted into the program, Section 8 participants must annually provide

2   updated income and criminal history information.  (*Id.*)

3           The Section 8 program is administered by the U.S. Department of Housing and

4   Urban Development ("HUD").  It is implemented by local public housing authorities.

5   In Los Angeles County, that entity is the Housing Authority of the County of Los

6   Angeles (the "Housing Authority" or "HACoLA").  (FAC ¶¶ 2-3.)  Section 8 vouchers

7   issued by HACoLA may be used to obtain rental housing anywhere within Los Angeles

8   County.  (*Id.* ¶ 5.)  The relatively low cost of rental housing in Lancaster, compared to

9   other locations in Los Angeles County, has made the City attractive to Section 8

10  participants.  For example, a Section 8 voucher that would cover the rent for only a

11  small apartment in other parts of Los Angeles County could be used to rent a three-

12  bedroom, single family home in Lancaster.  (*Id.*)  As of September 2010, there were

13  2,226 Section 8 households in Lancaster.  (*Id.* ¶ 27.)  According to the most recent HUD

14  statistics, 70% of Lancaster's Section 8 tenants are black and 14% are Latino.  (*Id.* ¶ 6.)

15          **B.    Plaintiffs' Factual Allegations.**

16                  **1.    Lancaster's Discriminatory Actions.**

17          The complaint alleges that, as larger numbers of black and Latino families in the

18  Section 8 program chose to live in Lancaster over the past decade, attracted by the

19  available affordable housing there, the City did not welcome them.  Instead, it

20  responded by adopting policies and practices intended to drive them out of Lancaster

21  and discouraging additional black and Latino families in the Section 8 program from

22  moving there.  (*Id.* ¶ 7.)  The complaint further alleges that these racially discriminatory

23  actions have taken multiple forms, including:

24          •   Lancaster's unrelenting surveillance and investigations of black and Latino

25              Section 8 participants, often conducted in extraordinarily aggressive

26              sweeps by armed Sheriff's deputies.  These activities, which Lancaster

27              devised, funded, and carried out for several years pursuant to recurring

28              annual agreements ("the MOUs") with HACoLA, have resulted in

proposed terminations of Section 8 participants from the program at a rate that far exceed the rates in other parts of Los Angeles County. Indeed, between July 2008 and July 2009, 1 in 22 Section 8 participants in Lancaster had their vouchers terminated for a purported program violation; in the rest of HACoLA's jurisdiction outside the Antelope Valley, the termination rate over this same period was roughly 1 out of 115.

- Lancaster's establishment of the Lancaster Community Appreciation Project ("LAN-CAP") and Community Oriented Response and Enforcement Program ("CORE"), two Lancaster initiatives through which the City harassed black and Latino Section 8 participants under the guise of law enforcement.

- Lancaster's adoption and enforcement of business and license inspection ordinances designed to discourage landlords in the City from renting property to Section 8 participants.

- Lancaster's adoption and enforcement of nuisance ordinances designed to harass Section 8 participants.

- Lancaster's formation of a special "Section 8 Commission," the sole purpose of which is to focus negative attention on Section 8.

- Lancaster's creation and maintenance of a long-running propaganda campaign in which it has branded Section 8 participants as "criminals" and declared an all-out "war" on the Section 8 program. This campaign has created an environment of open hostility towards Section 8. It is essential to Lancaster's overarching aim of ridding the City of black and Latino families who are in the Section 8 program.

(FAC ¶¶ 8-12, 35, 40.)

### 2.    Lancaster's Discriminatory Actions Against Plaintiffs.

Plaintiffs are three individuals who participate in the Section 8 program and two community-service organizations that have members in the program and assist program

PLAINTIFFS' OPP'N TO LANCASTER'S MOT. TO DISMISS AND MOT. TO STRIKE

1    participants.  Plaintiffs allege that they have been injured in violation of federal and
2    California fair housing statutes and the federal and California constitutions by
3    Lancaster's racially discriminatory actions targeting black and Latino families in
4    Lancaster (including their own) who are in the Section 8 program.

5          Plaintiff Sheila Williams alleges that she was the victim of racial harassment by a
6    Lancaster-funded housing investigator, who, along with Sheriff's deputies, searched her
7    house on the false pretense of a burglary investigation.  Additionally, Ms. Williams
8    alleges that she personally felt the impact of Lancaster's discriminatory nuisance
9    ordinance, which led her landlord to tell her that she was no longer wanted as a tenant
10   because Section 8 participants cause nuisances.  And Ms. Williams further alleges that
11   the City's oft-expressed antipathy towards Section 8 participants provoked hostility
12   towards Ms. Williams and her children on the part of her neighbors.  Ms. Williams
13   alleges that she lived in Lancaster until mid- 2010 and that she wanted to remain in
14   Lancaster, but she was forced to move due to the City's actions.  (FAC ¶¶ 24, 75-78.)

15         Plaintiff Jaquinn Davis alleges that she has lived in Lancaster since April 2010
16   and that she and her young son commute each day from Lancaster to the City of Los
17   Angeles where the son is enrolled in a public school.  (*Id.* ¶¶ 92-93.)  The Department
18   of Public Social Services ("DPSS"), which initially questioned how Ms. Davis could
19   afford to travel back and forth from Lancaster to Los Angeles, examined records
20   submitted by Ms. Davis and concluded that she was not concealing any income and thus
21   was not engaged in fraud.  (*Id.* ¶ 94.)  Nevertheless, a few months later, a Lancaster-
22   funded Section 8 investigator rummaged through Ms. Davis' house in a purported
23   Section 8 "compliance check," even though the investigator said that he was familiar
24   with the DPSS conclusion that she had not committed fraud.  (*Id.* ¶¶ 26, 90, 95-96.)  The
25   following month, Ms. Davis was summoned for a Section 8 "counseling session" for no
26   apparent or proffered reason.  Ms. Davis was not charged with breaking any Section 8
27   program eligibility rules for which "counseling" would be necessary, and, in fact, she
28   had never broken any of the rules.  (*Id.* ¶ 97.)  Together, the groundless "compliance

check" and "counseling session," combined with the general climate of hostility to Section 8 that Lancaster has instilled in the community, have led Ms. Davis to believe that she is the target of ongoing harassment by Lancaster. Ms. Davis alleges that Lancaster has made it clear to her that she and her son are not welcome in Lancaster and that Lancaster likely will go so far as to cause her to be terminated from the Section 8 program for no legitimate reason, leaving her homeless. (*Id.* ¶ 98.)

Plaintiff Michelle Ross alleges that she lives in Lancaster and that she found that some landlords in Lancaster were not willing to rent to her because of the City's constant message that Section 8 tenants are undesirable. The complaint further alleges that this message has created a hostile living environment for Ms. Ross. (*Id.* ¶¶ 25, 89.)

The Community Action League "TCAL" is a civil rights organization that advocates for the rights of low income residents and residents of color in Lancaster. The complaint alleges that black and Latino members of TCAL have been harmed by Lancaster's scheme to drive out Section 8 residents. It also alleges that Lancaster's discriminatory actions have caused TCAL to divert resources from other programs it operates, thereby impairing the organization from carrying out its mission. (*Id.* ¶ 21.)

The California State Conference of the National Association for the Advancement of Colored People ("NAACP") has a long commitment to combating racial discrimination in housing. The complaint alleges that at least one NAACP member is a Section 8 participant who has been harmed by Lancaster's actions. It also alleges that those actions have impaired the NAACP's ability to help Section 8 participants find housing in Lancaster and thereby frustrated the organization's mission. (*Id.* ¶¶ 22-23.)

## III.   STANDARDS ON A MOTION TO DISMISS.

**Standing.** The Supreme Court has long held that "[f]or purposes of ruling on a motion to dismiss for want of standing, [courts] must accept as true all material allegations of the complaint and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975). This is so because, at the pleading stage, it is presumed that "general allegations of injury resulting from the

6

defendant's conduct . . . embrace those specific facts that are necessary to support [standing]." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (internal quotations omitted).  To withstand a motion to dismiss for lack of standing, the "plaintiff need only show that the facts alleged, if proven, would confer standing." *Krottner v. Starbucks Corp.*, 628 F.3d 1139, 1141 (9th Cir. 2010).

   **Failure To State A Claim.**  To withstand a motion to dismiss for failure to state a claim, the plaintiff is not required to show that the claims asserted will succeed.  *In re Gilead Sciences Securities Litigation*, 536 F.3d 1049, 1057 (9th Cir. 2008).  Rather, the plaintiff need only plead "'enough facts to state a claim to relief that is plausible on its face.'" *Weber v. Department of Veterans Affairs*, 521 F.3d 1061, 1065 (9th Cir. 2008) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Under this standard, a motion to dismiss must be denied even if the Court doubts  the plaintiff's ability to prove the allegations or believes that recovery is unlikely.  *Id.*  This is because a "motion to dismiss is not a procedure for resolving a contest between the parties about the facts or the substantive merits of the plaintiff's case." *Williams v. Gerber Products Co.*, 552 F.3d 934, 938 (9th Cir. 2008) (internal quotations and citation omitted).  Instead, in considering a motion to dismiss, the Court must view all allegations in the complaint in the light most favorable to the plaintiff and must accept as true all material allegations, as well as any reasonable inferences to be drawn from those allegations.  *See Doe v. United States*, 419 F.3d 1058, 1062 (9th Cir. 2005).

## IV.   PLAINTIFFS' ALLEGATIONS MEET ARTICLE III STANDING REQUIREMENTS.

   Article III standing requirements are met if (1) the plaintiff has suffered an injury-in-fact, (2) that is fairly traceable to the challenged action of the defendant, and (3) the injury is likely to be redressed by a favorable decision. *Lujan*, 504 U.S. at 560.  Here, Plaintiffs have alleged sufficient facts at the pleading stage to meet these requirements.

### A.   Plaintiffs Have Alleged Injury-in-Fact.

   Injury-in-fact means "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."

1    *Lujan*, 504 U.S. at 560 (internal citations and quotations omitted). To show that an

2    injury is "concrete and particularized," Plaintiffs must allege "that [they] personally

3    ha[ve] suffered some actual or threatened injury . . . ." *Valley Forge Christian Coll. v.*

4    *Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472 (1982)

5    (internal quotation omitted).

6            Noneconomic harm stemming from racial discrimination in housing constitutes

7    injury-in-fact. *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S.

8    252, 263-64 (1977). Indeed, in housing discrimination cases, "the mere 'stigmatization'

9    that results from being labeled as a member of an inferior class of citizens has

10   repeatedly been held sufficient to confer standing." *Inland Mediation Bd. v. City of*

11   *Pomona*, 158 F. Supp. 2d 1120, 1138 (C.D. Cal. 2001); *see also Harris v. Itzhaki*, 183

12   F.3d 1043, 1053 n.4 (9th Cir. 1999) (black plaintiff who was not discriminated against

13   at time she became a resident of apartment building had standing to "allege an injury

14   from subsequent discriminatory conduct against other prospective African-American

15   tenants" because "there is an enforceable right under the FHA to live in a building, town

16   or neighborhood that is free of housing discrimination"); *Smith v. City of Cleveland*

17   *Heights,* 760 F.2d 720, 722 (6th Cir. 1985) (holding that where city's official policy was

18   designed to maintain city's racial composition at 75% white and 25% black, black

19   resident suffered injury sufficient to support standing even though policy did not

20   prevent him personally from living in city, because policy communicated message that

21   "the presence of any more members of [his] race is undesirable"). Thus, in a housing

22   discrimination case, any person "harmed by discrimination, whether or not the target of

23   the discrimination, [has standing to] sue to recover for his or her own injury." *San*

24   *Pedro Hotel Co, v. City of Los Angeles,* 159 F.3d 470, 475 (9th Cir. 1998).[1]

25           *Inland Mediation Board* is illustrative of how the injury-in-fact requirement of

26   Article III operates at the pleading stage in a housing discrimination case. There, the

27

28   _____

[1] A plaintiff who establishes injury-in-fact under FHA also establishes injury-in-fact under California's
Fair Housing and Employment Act. *Inland Mediation Board,* 158 F. Supp. 2d at 1150.

PLAINTIFFS' OPP'N TO LANCASTER'S MOT. TO DISMISS AND MOT. TO STRIKE

1    plaintiff, a black landlord, attended a meeting of an association of local landlords.  At

2    the meeting, the association's director stated that "he did not rent to Blacks, that Blacks

3    were nothing but trouble, and that if [the City] got rid of all the Blacks, the problems

4    relating to drugs, crime, and troublesome tenants would stop."  158 F. Supp. 2d at 1132.

5    The plaintiff sued under FHA and California's Fair Housing and Employment Act

6    ("FEHA").  The court held that the plaintiff had satisfied the injury-in-fact requirement

7    by pleading that, after the meeting, the plaintiff "became so emotionally distraught that

8    she felt forced to quit her job as a resident manager and move away [and thus]

9    suffer[ed] both economic and non-economic injury as a result," including the

10   stigmatization of being labeled a member of an inferior class.  *Id.* at 1138.

11        Under these precedents, the Plaintiffs have alleged concrete and particularized

12   injuries.

13        **1.    The Individual Plaintiffs**

14        Sheila Williams alleges that she was forced to move out of Lancaster because of

15   the discrimination she suffered at Lancaster's hands.  Specifically, the complaint alleges

16   that she was "harassed by a City-funded [Section 8] investigator and local Sheriff's

17   deputies" who searched her home under the false pretense of investigating a burglary.

18   (FAC ¶ 24.)  The complaint further alleges that Ms. Williams' landlord told her that she

19   was no longer wanted as a tenant because Section 8 participants cause problems for

20   landlords under Lancaster's nuisance ordinance.  (*Id.* ¶ 77.)  And the complaint alleges

21   that the City's propaganda campaign against Section 8 fomented hostility by neighbors

22   towards her.  (*Id.* ¶¶ 76-77.)    All of these actions compelled Ms. Williams to leave

23   Lancaster, even though she wanted to stay.  (*Id.* ¶¶ 78-79.)  Lancaster's contention that

24   Ms. Williams has failed to plead an actual injury because she complains only of fear of

25   harassment if she ever returns to Lancaster (Mem. at 7-8) ignores all of the allegations

26   that Ms. Williams claims caused her to leave the City.  In short, because she alleges that

27   she was driven out of Lancaster as a result of the City's discriminatory actions, Ms.

28   Williams has shown concrete and particularized injury at the pleading stage.

1    Similarly, Ms. Davis's asserted injury-in-fact is based, in part, on a bogus search
2  of her home conducted by a Lancaster-funded Section 8 investigator.    At the time of
3  the search, Lancaster's investigator was aware that DPSS recently had concluded that
4  Ms. Davis was not concealing income but he nevertheless carried out a search of the
5  premises as part of another "compliance check," and rifled through her dresser and
6  closet. (FAC ¶¶ 94-96.) A few months after the search of her house, Ms. Davis was
7  told that she needed to have a Section 8 "counseling session," even though there was
8  nothing to "counsel" Ms. Davis about because she was not charged with breaking any
9  Section 8 program eligibility rules and had not broken any.  (*Id.* ¶ 97.) Ms. Davis
10  alleges that the baseless compliance check and counseling session, on top of the general
11  environment of hostility towards Section 8 participants created by Lancaster's
12  declaration of war on Section 8, has led her to fear that Lancaster's next step will be to
13  bring about her termination from the Section 8 program, thus potentially rendering her
14  homeless. (*Id.* ¶ 98.) Lancaster argues that Ms. Davis's "fear" of what might happen to
15  her is insufficient injury. (Mem. at 9.)  But Lancaster ignores the factual basis set forth
16  in the complaint for that fear: the harassment and hostility that Lancaster visited upon
17  her, which are concrete and particularized injuries.
18        In arguing that Ms. Ross has not suffered an injury-in-fact at the hands of
19  Lancaster because she moved from Lancaster to Palmdale, (Mem. at 8), the City again
20  overlooks what the complaint actually alleges: namely, that "Ms. Ross . . . suffered from
21  the hostile environment created by anti-Section 8 rhetoric of Palmdale *and* Lancaster
22  officials," and that "landlords in *both Cities* appeared to accept the Cities' message that
23  most Section 8 tenants were criminals and should not be welcomed." (FAC ¶¶ 25, 89,
24  emphasis added.) Simply put, the injuries that Ms. Ross has suffered are attributable to
25  Lancaster too, not just Palmdale.

##       2.       The Organizational Plaintiffs Have Alleged Their Own Injury As Well As Injury Suffered By Their Members.

26
27
28        An organizational plaintiff may sue in its own right or on behalf of its members.
*Smith v. Pacific Properties & Dev. Corp.*, 358 F.3d 1097, 1101, 1105 (9th Cir. 2004).

10

With respect to suits in the organization's own right, the Article III injury-in-fact requirement is met if the organization "can demonstrate: (1) frustration of its organizational mission; and (2) diversion of its resources to combat the particular. . . discrimination in question." *Smith* 358 F.3d at 1105. Based on the allegations in the complaint, TCAL and NAACP have met that standard. TCAL's mission is to help "people of color in the Antelope Valley act to fight for their civil rights and eliminate race prejudice, [including] in the areas of housing." (FAC ¶ 21.) Lancaster's actions aimed at excluding black and Latino Section 8 participants from the City directly frustrate this mission. Additionally, "TCAL has been forced to dedicate extensive time and resources" in seeking to redress Lancaster's actions in the form of community outreach and education campaigns. (*Id.*) This has diverted TCAL's energies and funding away from other important goals of the organization. (*Id.*) The same is true for the NAACP. Its mission is "to ensure the political, educational, social, and economic equality of all persons and eliminate race prejudice," including "preventing housing discrimination." (FAC ¶ 23.) Lancaster's actions aimed at excluding black Section 8 participants from Lancaster frustrate this mission by "impair[ing] the NAACP's ability to refer Section 8 recipients to Lancaster . . . to find homes." (*Id.*) In turn, this has forced the NAACP to devote substantial efforts "to counter the effects of the [City's] discriminatory conduct" by "[w]orking with community organizations" and "engag[ing] in outreach and education programs" that have "diverted resources from other" organizational goals. (*Id.*)

Lancaster acknowledges that, at the pleading stage, allegations of frustration of purpose and diversion of resources show that an organizational plaintiff has suffered an Article III injury-in-fact. (Mem. at 11.) Lancaster claims, however, that the allegations of injury-in-fact of TCAL and NAACP are just "legal conclusions." (*Id.* at 12.) Not so. The allegations are quite detailed and explain precisely how Lancaster's actions have frustrated the organizations' missions and caused them to divert resources from other projects. *Smith* is directly on point. The organizational plaintiff in *Smith* alleged that its

PLAINTIFFS' OPP'N TO LANCASTER'S MOT. TO DISMISS AND MOT. TO STRIKE

1   mission was to "help[] eliminate discrimination against individuals with disabilities by
2   ensuring compliance with laws intended to provide access to housing [for the disabled]"
3   and that it expended resources "to monitor the violations" about which it complained
4   and to "educate the public regarding the discrimination at issue." *Smith*, 358 F.3d at
5   1101. The Ninth Circuit held that these allegations satisfied the Article III injury-in-fact
6   requirement at the pleading stage because "any violation of the FHA would . . .
7   constitute a frustration of the plaintiff's mission," and the plaintiff had "diverted its
8   scarce resources from other efforts to promote awareness-of-and compliance with
9   [disability-access-to-housing laws]." *Id.* Lancaster cites no case to the contrary, and
10  there are none. Indeed, other cases, which Lancaster ignores, confirm that the type of
11  allegations in the complaint in this case are more than sufficient to satisfy organizational
12  plaintiff standing at the pleading stage. *See Nat'l Fair Hous. Alliance v. A.G. Spanos*
13  *Constr.*, 542 F. Supp. 2d 1054, 1064-65 (N.D. Cal. 2008) (holding that organizational
14  plaintiffs satisfied Article III injury-in-fact requirement at pleading stage based on
15  allegations that defendants' actions in discouraging the disabled from living at
16  defendants' dwelling and encouraging designers and contracts to disregard FHA
17  responsibilities frustrated plaintiffs' mission and forced plaintiffs "to divert significant
18  and scarce resources to identify, investigate, and counteract" defendants'
19  discrimination); *NAACP v. Ameriquest Mortgage Co.*, 635 F. Supp. 2d 1096, 1011 (C.
20  D. Cal. 2009) (holding that allegations that defendant's "discriminatory mortgage and
21  lending policies tend to frustrate [Plaintiff's] mission, reduce contributions and divert its
22  resources, including through investigation, advocacy and counseling, and litigation
23  costs" were sufficient to establish organizational standing under the FHA).
24        With respect to suits in which it represents its members, an organizational
25  plaintiff meets the Article III injury-in-fact requirement if "(a) its members would
26  otherwise have standing to sue in their own right; (b) the interests it seeks to vindicate
27  are germane to the organization's purpose; and (c) neither the claim asserted nor the
28  relief requested requires the participation of individual members in the lawsuit." *Smith*,

PLAINTIFFS' OPP'N TO LANCASTER'S MOT. TO DISMISS AND MOT. TO STRIKE

1  358 F.3d at 1101-02.  Based on the allegations in the complaint, both TCAL and
2  NAACP have met the representational standing standard as well.
3      First, according to the complaint, both TCAL and NAACP have black and Latino
4  Section 8 members who have been injured because of Lancaster's actions. (FAC ¶¶ 21-
5  22.)  Those members would have standing to sue to challenge Lancaster's policies that
6  exclude and harass Section 8 participants on the basis of race and ethnicity and limit
7  their housing choices.  *Florida State Conference of NAACP v. Browning*, 522 F.3d 1153
8  (11th Cir. 2008), is illustrative.  At issue there was a state law requiring, as a
9  precondition for registering to vote, that a voter disclose her driver's license number or
10 the last four digits of her Social Security number on the registration application, and that
11 these numbers match the numbers for the voter contained in the state's databases.  The
12 Eleventh Circuit held that "to satisfy the requirements of associational standing, all that
13 plaintiffs need to establish is that at least one member faces a realistic danger of having
14 his or her application rejected due to mistaken mismatch." *Id.* at 1163.  The court
15 reasoned that "it is highly unlikely -- even with only a one percent chance of rejection
16 for any given individual -- that not a single member will have his or her application
17 rejected due to a mismatch." *Id.*  Similarly here, the complaint pleads detailed
18 allegations about the multifaceted efforts Lancaster uses to harass and exclude black and
19 Latino Section 8 participating that make the odds of an injury occurring to TCAL's and
20 NAACP's members real and foreseeable.  Second, the interests that TCAL and NAACP
21 seek to vindicate are germane to their organizational purposes, which include
22 "eliminat[ing] race prejudice" and "combat[ting] discrimination in housing."  (FAC ¶¶
23 21, 22.)  Third, individual member participation is not necessary here because TCAL
24 and NAACP seek injunctive and declaratory relief, not damages.  *See Committee for*
25 *Immigrant Rights of Sonoma County v. County of Sonoma*, 644 F. Supp. 2d. 1177, 1194
26 (N.D. Cal. 2009) (holding that where declaratory and injunctive relief is sought,
27 participation of individuals members is not required).
28  **B.    Plaintiffs Have Alleged Causation.**

13

1    The causation element of Article III standing requires that the injury-in-fact be

2    "fairly traceable to the challenged action of the defendant." *Summers v. Earth Island*

3    *Institute*, 555 U.S. 488, 493 (2009).  This means that the action is "not the result of the

4    independent action of some third party not before the court." *Lujan*, 504 U.S. at 560,

5    (brackets and ellipses omitted).

6        Pointing to its annual MOUs with HACoLA, Lancaster claims that the Plaintiffs'

7    injuries were caused by HACoLA, not Lancaster.  Lancaster is wrong.  First, the actions

8    of HACoLA under the MOUs may be imputed to Lancaster under settled principles of

9    vicarious liability, the application of which here establishes that Lancaster caused

10   Plaintiffs' injuries that stem from actions undertaken pursuant to the MOUs.[2]  Second,

11   Lancaster ignores the long list of its discriminatory actions set forth in the complaint

12   that have nothing whatsoever to do with the MOUs or HACoLA.  It is Lancaster, and no

13   one else, that has caused the injuries to the Plaintiffs stemming from those actions.

14       ## 1.    Lancaster's Vicarious Liability

15       The FHA provides for vicarious liability under general principles of the law of

16   agency relationships.  *Meyer v. Holley*, 537 U.S. 280, 285-86 (2003).  Vicarious liability

17   in FHA cases "may rest upon an actual agency relationship or an apparent agency

18   relationship." *Inland Mediation Bd.*, 159 F.Supp. 2d at 1139.  "Actual agency exists

19   where: (a) a principal manifests to another that the other has the authority to act on the

20   principal's behalf and subject to the principal's control; and (b) the other, or agent,

21   consents to act on his principal's behalf and subject to the principal's control." *Id.* at

22   1139-40.  Based on the allegations in the complaint, Lancaster (the principal) created an

23   actual agency relationship with HACoLA and Los Angeles County (the agents) through

24   the series of MOUs beginning in 2004 in which the City paid for and received

25   "additional investigative services" from HACoLA.  (FAC ¶ 36.)

26

27   _____

28   [2] Plaintiffs have not sued HACoLA or Los Angeles County in this action.  As the Court is aware, the Plaintiffs have been engaged in settlement discussions with both entities and expect to add them as Defendants if the settlement discussions stall.  (Dkt. ##s 29-30.)

PLAINTIFFS' OPP'N TO LANCASTER'S MOT. TO DISMISS AND MOT. TO STRIKE

1   The complaint alleges that the City sought the additional investigative services

2   from HACoLA to address supposed rampant criminal activity and other violations of

3   Section 8 eligibility rules by Section 8 voucher-holders in Lancaster, but that these

4   claims of violations were trumped up by the City in an effort to justify the removal of

5   black and Latino Section 8 participants from Lancaster. (FAC ¶ 9a.) As part of that

6   discriminatory plan, Lancaster funded under the MOUs the hiring of two investigators

7   dedicated to harassing Section 8 voucher-holders in Lancaster; supervision of those

8   investigators; an analyst for the Lancaster-related investigations; and a hearing officer to

9   preside over proceedings arising from the investigations. (*Id.* ¶ 39.) By June 2009,

10   Lancaster's original commitment of $50,000 to fund investigative activity under the

11   MOUs had expanded to over $130,000. (*Id.*) That month, a Lancaster City Council

12   staff report noted that the MOUs had achieved the City's goals of reducing the number

13   of Section 8 tenants in Lancaster. (*Id.*)

14   Lancaster was fully aware of the effect upon Section 8 voucher-holders in the

15   City because it received special "Antelope Valley Section 8 Activity Reports" from

16   HACoLA, which enabled the City to keep close watch over the progress of its assault on

17   Section 8. (FAC ¶ 44.) Indeed, those reports revealed that Lancaster's investigators

18   opened Section 8 investigations and proposed terminations of Section 8 participants

19   from the program at alarmingly higher rates than did HACoLA's regular investigators.

20   Between 2006 and 2010, "the odds that a Section 8 participant would be subjected to an

21   investigation were approximately 2.6 times higher in Lancaster than in the rest of [the]

22   County . . . ." (*Id.* ¶ 43.) In the same time period, the odds that an investigation would

23   result in a termination recommendation were over 4 times higher in Lancaster than

24   elsewhere in the County. (*Id.* ¶ 46.) Remarkably, between July 2008 and July 2009, 1

25   in 22 Section 8 participants in Lancaster had their vouchers terminated for a purported

26   program violation; in the rest of HACoLA's jurisdiction, the termination rate over this

27   same period was roughly 1 out of 115. (*Id.* ¶ 44a.)

28

---

15

PLAINTIFFS' OPP'N TO LANCASTER'S MOT. TO DISMISS AND MOT. TO STRIKE

1   Lancaster asserts that there is no actual agency relationship between Lancaster
2   and HACoLA because all Lancaster did was "provide funding to HACoLA for
3   additional investigative services." (Mem. at 10.) Lancaster again misses the mark. The
4   allegations in the complaint make plain that Lancaster entered the MOUs in furtherance
5   of its discriminatory goal of eliminating black and Latino Section 8 participants from
6   the City; that Lancaster's investigators acted in furtherance of the goal by investigating
7   and terminating Section 8 residents in Lancaster with greater frequency than other
8   HACoLA investigators; and that Lancaster carefully monitored developments by
9   scrutinizing the reports it received from HACoLA and dramatically increasing its
10  commitment to the MOU cause over time.  These allegations give rise to an inference at
11  the pleading stage that Lancaster manifested to HACoLA that HACoLA had the
12  authority to act on Lancaster's behalf and that HACoLA was subject to Lancaster's
13  control, and that HACoLA consented to this arrangement, *i.e.* that there was an actual
14  agency relationship between Lancaster and HACoLA.   Plaintiffs should be permitted to
15  proceed under an actual agency theory "unless the factual record is utterly devoid of
16  support for a finding of agency." *Inland Mediation Bd.*, 159 F. Supp. 2d at 1139.
17  Lancaster has not shown that the Plaintiffs' complaint suffers from that defect.
18      In any event, based on the allegations in the complaint, HACoLA at minimum
19  acted with apparent agency authority -- an issue that Lancaster fails to address.  The
20  existence of an apparent agency relationship turns primarily on what third parties
21  reasonably believed the relationship to be. *Inland Mediation Bd.*, 158 F. Supp. 2d at
22  1140.  In this case, the third parties are the Plaintiffs, and they reasonably believe that
23  the investigators who have been harassing and intimidating them were acting under
24  Lancaster's control and direction.   For example, a marked Lancaster City car driven by
25  a HACoLA staff person monitored Ms. Williams' home on a weekly, and sometimes
26  daily, basis.  (FAC ¶¶ 72, 73.)  Moreover, City officials proudly advertised their interest
27  and role in policing Section 8 households, stating that "[t]he Section 8 housing issue
28  needs to be dealt with on *a local level*" and "there must be a . . . reduction in Section 8

16

1  housing" with an aim to reduce the number by half.  (*Id.* ¶¶ 58, 59 (emphasis added).)

2  Thus, when Lancaster's investigators came to her home, Ms. Williams reasonably

3  believed they were acting for the City.  *See Hawaiian Paradise Park Corp. v. Friendly*

4  *Broad. Co.*, 414 F.2d 750, 756 & n.4 (9th Cir. 1969) (third party reasonably believed,

5  based on perception of relationship between defendant and attorney, that attorney had

6  authority to act on defendant's behalf in negotiations with third party).

7  **2.     Lancaster's Direct Liability**

8          Even if Lancaster were not vicariously liable for the day-to-day actions of the

9  staff hired under the MOUs, it entered into and renewed the MOUs with the express

10  purpose of increasing harassment of Section 8 participants and driving them from the

11  City, and with certainty of those results.  (FAC ¶¶ 36, 39, 44-45, 58-59.)   In addition,

12  separate and apart from its liability as result of the MOUs, Lancaster is directly liable

13  for the assorted other discriminatory actions set forth in the complaint for which

14  Lancaster is solely responsible.  Lancaster has next to nothing to say about them in its

15  motion to dismiss.

16          It is Lancaster that has instigated and directed purported "public safety" programs

17  designed to harass Section 8 participants.  LAN-CAP, operated by Lancaster, is a

18  policing team that devotes a substantial portion of its time to conducting "compliance

19  checks" on Section 8 tenants and encouraging landlords and managers to police their

20  Section 8 tenants.  (FAC ¶ 35.)  CORE, also operated by Lancaster, provided four

21  additional deputies and a sergeant, who also harassed Section 8 residents through

22  unwarranted and excessive "compliance checks" and a focus on supposed "problem

23  neighbors."  (*Id.* ¶ 40.)

24          It is Lancaster that has adopted and enforced discriminatory business license and

25  inspection ordinances for Section 8 rental properties in the City.  On its mandatory

26  business license application, Lancaster asks whether landlords will be accepting Section

27  8 payments and has attempted to use that information to limit the number of licenses

28  granted to Section 8 landlords.  (FAC ¶¶ 50, 55-56.)  Further, Lancaster routinely uses

17

1   its rental inspection ordinance as a pretext to enter the homes of Section 8 tenants and

2   harass them.  (*Id.* ¶¶ 54.)

3       It is Lancaster that passed a nuisance ordinance with the stated purpose of making

4   it "very easy for neighbors to file nuisance lawsuits with the assistance of the City

5   against . . . Section 8 housing," and which gave landlords incentives to evict their black

6   and Latino Section 8 tenants.  (FAC ¶ 61.)

7       It is Lancaster that has established a "Section 8 Commission" with the express

8   mission to identify the "negative effects of an over-abundance of publicly-subsidized

9   housing, and recommend policies and programs to deter the proliferation of subsidized

10  housing."  (FAC ¶¶ 62-64.)

11      And it is Lancaster that has declared a war on Section 8 participants who are

12  black or Latino by fabricating and spreading the claim that people who receive Section

13  8 vouchers are criminals or otherwise undesirable and should be excluded from the City.

14  (FAC ¶¶ 10-12.)

15  **C.**   **The Plaintiffs Have Alleged Redressability.**

16      To satisfy the redressability element of Article III standing, the plaintiff must

17  show that it is "likely" that "the injury will be redressed by a favorable decision."

18  *Lujan*, 504 U.S. at 561.  Here, the individual Plaintiffs' requested relief would result in

19  (a) a declaration that Lancaster's conduct violates federal and state law, and (b) an order

20  enjoining the unlawful conduct.  This relief plainly would redress Plaintiffs' injuries by

21  stopping Lancaster's discriminatory actions that have given rise to this lawsuit.

22      Lancaster's primary argument to the contrary devolves to its theory that

23  Plaintiffs' injuries were caused solely by HACoLA. (Mem. at 11-12)  For the reasons

24  stated above, however, Lancaster itself has caused injury to Plaintiffs that can be

25  redressed by a favorable decision.  Lancaster also argues that the purported "voluntary"

26  relocation of Ms. Williams renders her claims nonredressable.  (*Id.*)  But Lancaster's

27  success in harassing Ms. Williams out of town cannot foreclose relief.  Lancaster cites

28  *Harris v. Itzhaki*, but it is inapposite.  There, the plaintiff's claim for injunctive relief to

1  redress an alleged FHA violation was rendered moot by the fact that she moved to
2  another city 3000 miles away from the locus of the alleged discrimination, without any
3  indication that she wished to return.  183 F.3d at 1050.  By contrast here, Ms. Williams
4  alleges that she continues to participate in the Section 8 program -- and therefore has not
5  left the locus of Lancaster's discrimination -- and would likely use her Section 8
6  voucher to return to Lancaster if the City's discriminatory actions would cease.  (FAC ¶
7  24.)  As to Ms. Ross, Lancaster ignores that she has suffered in Lancaster from the
8  environment of hostility towards Section 8 participants that Lancaster has fostered and
9  thus a favorable decision will redress that injury.  (*Id.* ¶ 89.)

10  **V.    PLAINTIFFS STATE CLAIMS ON WHICH RELIEF CAN BE GRANTED.**
11          Plaintiffs have brought seven claims of unlawful race discrimination against
12  Lancaster: three claims under the FHA for violations of 42 U.S.C. §§ 3604(a), 3604(b),
13  and 3617; one claim under FEHA; one claim under Section 11135 of the California
14  Government Code, one claim under the equal protection clause of the federal
15  Constitution; and one claim under the equal protection clause of California's
16  Constitution.  In moving to dismiss for failure to state a claim, Lancaster argues that the
17  provisions of FHA and FEHA under which Plaintiffs have sued do not apply to its
18  conduct and that its actions did not have a discriminatory effect in violation of those
19  statutes.  Lancaster also argues that the Plaintiffs have not shown that Lancaster's
20  actions were taken with discriminatory intent, and thus Lancaster could not have
21  violated the equal protection clause of the federal and state Constitutions.  All of those
22  arguments are wrong.

23          **A.    The Statutes Apply to Lancaster's Conduct.**
24          Section 3604(a) of the FHA prohibits the refusal to sell or rent a dwelling to a
25  person on account of race, color or national origin, as well as "otherwise mak[ing]
26  unavailable or deny[ing], a dwelling" on those grounds.  California Government Code
27  Section 12955(k) mirrors the language in Section 3604(a) and is subject to the same
28  analysis.  *Walker v. City of Lakewood*, 272 F.3d 1114, 1131 n.8 (9th Cir. 2001).
Lancaster contends that these statutes are inapplicable here because the City has not

1  made housing unavailable to Ms. Williams, who left Lancaster "voluntarily," or to Ms.

2  Davis and Ms. Ross, because they "currently live in Lancaster." (Mem. at 15, 16.)

3  Lancaster's argument ignores that its actions have injured the organizational Plaintiffs

4  by discouraging members of the communities they serve from staying in or seeking

5  rental housing in Lancaster.  In addition, *Harris v. Itzhaki* disposes of Lancaster's

6  argument as to the individual Plaintiffs.  The Ninth Circuit in that case held that a black

7  plaintiff who was not discriminated against at the time she became a resident of an

8  apartment building nonetheless had an FHA claim arising from "subsequent

9  discriminatory conduct against other prospective African-American tenants" because

10 "there is an enforceable right under the FHA to live in a building, town or neighborhood

11 that is free of housing discrimination."  183 F.3d at 1053 n.4.  Likewise, Plaintiffs here

12 retain the right to live in their neighborhood free of housing discrimination.  Neither

13 their choice to remain and fight the discrimination nor a decision to leave Lancaster to

14 protect against further harassment and potential homelessness insulates Lancaster from

15 liability under Section 3604(a).

16        Lancaster fares no better with respect to Section 3604(b) of the FHA, which

17 makes it "unlawful . . . [t]o discriminate against any person in the terms, conditions, or

18 privileges of sale or rental of a dwelling, or in the provision of services or facilities in

19 connection therewith, because of race, color, . . . or national origin."  Lancaster contends

20 that Section 3604(b) is inapplicable because the City does not engage in the "sale or

21 rental" of housing.  (Mem. at 15).  Lancaster misapprehends the statute. Section 3604(b)

22 is not limited to those who are engaged in the "sale or rental" of dwellings.  It applies

23 more broadly, covering post-acquisition or post-rental discrimination in the provision of

24 housing services, and matters that are connected to, but not a part of the sale or rental

25 transaction. *See, e.g., Comm. Concerning Cmty. Improvement v. City of Modesto*, 583

26 F.3d 690, 713 (9th Cir. 2009).  According to the complaint, Lancaster has engaged in

27 racial discrimination against Section 8 participants who already have rented dwellings in

28 the City by providing racially distinct housing services -- encompassing everything from

20

1  the MOU-based surveillance and harassment of Section 8 participants to the business
2  and licensing ordinances that disfavor Section 8 landlords and their tenants.

3      Lancaster has no answer to Plaintiffs' claim under Section 3617 of the FHA,
4  which makes it unlawful to coerce, intimidate, threaten, or interfere with persons in the
5  exercise of rental property rights on account of their race or ethnicity.  Allegations of
6  race-based coercion, intimidation, threats, and interference resonate throughout the
7  complaint.

8      Equally clear is the applicability of California Government Code Section 11135,
9  which bars state-funded programs from discriminating on the basis of race or ethnicity.
10  In *Committee for Immigrant Rights of Sonoma County*, the court held that "because the
11  complaint allege[d] that Sonoma County receives state funding, and that Sonoma
12  County Sheriff's deputies have engaged in a racially-biased policy, practice and custom
13  of relying on impermissible factors such as race, color . . . to stop, detain, question . . .
14  persons who appear to be Latino, . . . plaintiffs . . . alleged sufficient facts" to withstand
15  a motion to dismiss their Section 11135 claim.  644 F. Supp. 2d. at 1207.  Likewise
16  here, Plaintiffs allege Lancaster receives "state financial assistance," and it has
17  undertaken a series of actions expressly designed to exclude and discriminate against
18  Section 8 participants on the basis of race.

19  **B.**  **Lancaster's Conduct Reflects Both Discriminatory Intent and Effect.**
20      In determining whether a municipality acted with discriminatory intent, and thus
21  violated equal protection strictures, courts examine "circumstantial and direct evidence"
22  of racial animus; the sources of this proof include (a) the discriminatory impact of the
23  government's actions; (b) the historical background and the sequence of events; and (c)
24  the legislative history, including statements made by the legislative body.  *Arlington*
25  *Heights*, 429 U.S. at 266-68.  *See McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122
26  (9th Cir. 2004) ("'Circumstantial evidence [of discrimination] is not only sufficient, but
27  may also be more certain, satisfying and persuasive than direct evidence.'") (quoting
28  *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99 (2003)).  Application of those factors here

1  belies Lancaster's contention that there is not "a single factual allegation" in the
2  complaint that it acted with discriminatory intent. (Mem. at 17.)

3      As to the discriminatory impact factor, Lancaster's policies and practices have
4  disproportionately affected black and Latino Section 8 participants.  According to the
5  most recent HUD statistics, 84% of Section 8 participants in Lancaster are black and
6  Latino. (FAC ¶ 32.)  Lancaster has targeted families, not elderly or disabled Section 8
7  participants who live in Lancaster and are more likely to be white. (*Id.* ¶ 8.)  Lancaster
8  knew full well that its policies and practices would have a racially discriminatory effect
9  because HUD told the City as much. (*Id.* ¶ 7.)

10      Next, as to the background and sequence of events, Lancaster "was the site of
11  intense racial segregation well into the 1970s." (FAC ¶ 29.)  Over the past decade, as
12  more and more black and Latino families in the Section 8 program have chosen to live
13  in or looked to relocate to Lancaster because of its relatively affordable housing
14  opportunities, the City responded with policies and practices that replicated its past
15  segregationist bent: it sought to rid the City of black and Latino families in the Section 8
16  program who had arrived and stop still others from moving there.  Even when it was
17  told by HUD that any tactics to limit the number of Section 8 participants in Lancaster
18  would violate fair housing laws, Lancaster persisted in trying to find new ways to do
19  just that. (*Id.* ¶¶ 15, 57, 59.)

20      Most telling are Lancaster's own statements.  Lancaster officials have pulled no
21  punches in their expression of animus towards Section 8 residents, the vast majority of
22  whom are black and Latino.  The City's mayor has proudly and repeatedly stated that
23  Lancaster is at "war" with Section 8 (FAC ¶¶ 8, 16), and that "the Section 8 issue needs
24  to be dealt with on a local more aggressive manner rather than becoming a dumping
25  ground for . . . Section 8 [participants]." (*Id.* ¶ 58.)  City officials explicitly set a goal of
26  reducing Section 8 households in Lancaster by fifty percent.  They also boasted of the
27  use of the City's business licensing ordinance as "a backdoor way of controlling how
28  many vouchers are coming into the City." (*Id.* ¶ 56.)  Lancaster's statements need not

1    be overtly racist in order to constitute evidence of discriminatory intent. To the
2    contrary, courts have long held that thinly-veiled statements of prejudice, like
3    Lancaster's, are compelling evidence of discriminatory intent. *See, e.g., Reg'l Econ.*
4    *Cmty. Action Program v. City of Middletown*, 294 F.3d 35, 49-51 (2d Cir. 2002) (city
5    officials' statements that "the city [] over and above has done more than we probably
6    should have done," "this City has done more than its share," and "why do we have to
7    have all the treatment facilities right here in Middletown?" were evidence of animus
8    against the disabled); *Smith v. Town of Clarkton, N.C.*, 682 F.2d 1055, 1066 (4th Cir.
9    1982) (city officials' statements, including Mayor's expression of concern over "influx
10   of 'undesirables,'" could be interpreted as "'camouflaged' racial expressions" in the
11   context of opposition to public housing project); *Flores v. Pierce*, 617 F.2d 1386, 1390
12   (9th Cir. 1980) (city official's statement that the city was "a fine little town" and that
13   therefore city had to act to keep the town on "good level" was evidence of
14   discriminatory intent behind city's action).[3]

15           Even if discriminatory intent were not apparent, the allegations in the complaint
16   show unequivocally that Lancaster's policies and practices have had an unjustified
17   discriminatory effect on people of color in violation of the FHA and FEHA.[4] To
18   establish a prima facie case of disparate impact under those statutes, a plaintiff must
19   show "(1) the occurrence of certain outwardly neutral . . . practices, and (2) a
20   significantly adverse or disproportionate impact on persons of a particular [type]
21   produced by the [defendant's] facially neutral acts or practices." *Pfaff v. U.S. Dep't of*

---

[3] As noted below (footnote 5), the Supreme Court has granted certiorari to review the Eighth Circuit's decision in *Gallagher v. Magner*, 619 F.3d 823 (8th Cir. 2010), on the issue of whether disparate impact claims are cognizable under the FHA. The Eighth Circuit in *Gallagher* also addressed allegations of discriminatory intent that were made in that case, but it considered only whether discriminatory intent could be found based on direct evidence of racial animus. *Id.* at 831-33. That analysis is incomplete under the Supreme Court's decision in *Arlington Heights* and the Ninth Circuit's decision in *McGinest* (cited above), which make clear that discriminatory intent may be demonstrated through circumstantial evidence.

[4] As Lancaster acknowledges, liability under FHA and FEHA is established through either a showing that the defendant acted with a racially discriminatory intent or that its actions had a racially discriminatory effect. (Mem. at 17.)

23

1   *Hous. and Urban Dev.*, 88 F.3d 739, 745 (9th Cir. 1996) (internal quotations and

2   citation omitted).[5]   Plaintiffs have met that standard here.  On their face, the City's

3   MOUs with HACoLA, its business and licensing and nuisance ordinances, its Section 8

4   commission, and its CORE and LAN-CAP initiatives may all appear to be race-neutral.

5   However, because these policies and practices were applied to target Section 8

6   participants, they have had a significantly adverse impact on black and Latino families,

7   who make up the vast majority of Section 8 participants in Lancaster.  Indeed, any

8   action designed to specifically target Section 8 participants for harassment and drive

9   them out of Lancaster would have a disparate impact, as the people affected are

10  necessarily primarily people of color.  This is what HUD explained to Lancaster two

11  years ago.  (FAC ¶¶ 15, 57.)[6]   Lancaster's reliance on *Gamble v. City of Escondido*, 104

12  F.3d 300 (9th Cir. 1997), is misplaced.  Unlike the Plaintiffs here, who have made

13  specific allegations of disparate impact, the plaintiff in *Gamble* offered "no statistics or

14  other proof" of impact.  *Id.* at 306.

15  **VI.    LANCASTER'S MOTION TO STRIKE SHOULD BE DENIED.**

16          In moving to strike allegations in Paragraphs 29 through 31 of the Complaint

17  regarding incidents of racial discrimination in Lancaster from the 1970s to the present

18  day, the City runs head on into the bedrock principle (which it ignores) that "[m]otions

19  to strike are not favored and should not be granted unless it is clear that the matter to be

20  stricken could have no possible bearing on the subject matter of the litigation." *Novick*

21  *v. UNUM Life Ins. Co. of Am.*, 570 F. Supp. 2d 1207, 1208 (C.D. Cal. 2008) (internal

22

23  [5] The Supreme Court has granted certiorari to review whether disparate impact claims are cognizable
    under the FHA.  *See Magner v. Gallagher*, No. 10-1032, 2011 WL 531692 (Nov. 7, 2011).  However,

24  unless and until the Supreme Court rejects or modifies disparate impact liability for FHA claims, this
    Court is bound by the Ninth Circuit decisions in *Pfaff* and other cases holding that disparate impact

25  claims are cognizable under the FHA.  *See, e.g., United States v. Frank*, 956 F.2d 872, 882 (9th Cir.
    1992) ("In the absence of an intervening Supreme Court decision or an Act of Congress that nullifies

26  Ninth Circuit precedent, we must adhere to the law of the circuit.").

27  [6] Lancaster is mistaken in claiming that this suit challenges "any action taken against Section 8
    participants in Lancaster." (Mem. at 17.)  It challenges Lancaster's unlawful racial steering of Section

28  8 participants -- as a group -- away from Lancaster.  It does not challenge lawful activities, such as
    compliance checks that conform to Section 8 program rules.

quotations omitted).  Paragraphs 29 through 31 bear on the subject matter of this litigation.  They provide important information about other forms and examples of racism in Lancaster that put into context the virulent racism in connection with the Section 8 program alleged in the complaint.  Indeed, this information is precisely the type of "historical background" evidence that the Supreme Court has held should be scrutinized to prove discriminatory intent.  *Arlington Heights,* 429 U.S. at 266-68.

## VII.   **CONCLUSION**

For the foregoing reasons, Lancaster's Motion to Dismiss and Motion to Strike should be denied.

DATED:  December 5, 2011

/S/
_____
Catherine E. Lhamon
PUBLIC COUNSEL LAW CENTER
Attorneys for Plaintiffs

/S/
_____
Neal S. Dudovitz
NEIGHBORHOOD LEGAL SERVICES OF
LOS ANGELES COUNTY
Attorneys for Plaintiffs

/S/
_____
Gary L. Blasi
Attorney for Plaintiffs

/S/
_____
Bill Lann Lee
LEWIS, FEINBERG, LEE, RENAKER, &
JACKSON, P.C.
Attorneys for Plaintiffs

/S/
_____
Michael C. Small
AKIN GUMP STRAUSS HAUER & FELD LLP
Attorneys for Plaintiffs

PLAINTIFFS' OPP'N TO LANCASTER'S MOT. TO DISMISS AND MOT. TO STRIKE