1   Catherine E. Lhamon (SBN 192751)
    clhamon@publiccounsel.org
2   PUBLIC COUNSEL LAW CENTER
3   610 South Ardmore Avenue
    Los Angeles, California 90005
4   T: (213) 385-2977  F: (213) 385-9089

5
    Neal S. Dudovitz (SBN 68848)
6   ndudovitz@nls-la.org
7   NEIGHBORHOOD LEGAL SERVICES
    OF LOS ANGELES COUNTY
8   13327 Van Nuys Boulevard
    Pacoima, California 91331
9   T: (818) 834-7544

10

11  Attorneys for Plaintiffs
    (see next page for additional counsel)

12              IN THE UNITED STATES DISTRICT COURT

13              CENTRAL DISTRICT OF CALIFORNIA

14

15  THE COMMUNITY ACTION LEAGUE;      Case No.  11-CV-4817-ODW-VBK
    CALIFORNIA STATE CONFERENCE       Honorable Otis D. Wright
16  OF THE NATIONAL ASSOCIATION
    FOR THE ADVANCEMENT OF            **SECOND AMENDED COMPLAINT**
17  COLORED PEOPLE; SHEILA            **FOR VIOLATIONS OF:**
    WILLIAMS; MICHELLE ROSS; and
18  JAQUINN DAVIS,                    **(1) 42 U.S.C. § 3604(a);**
                                      **(2) 42 U.S.C. § 3604(b);**
19              Plaintiffs,           **(3) 42 U.S.C. § 3617;**
                                      **(4) U.S. CONST. AMEND. XIV;**
20                                    **(5) CAL. GOV'T CODE § 12955(k);**
                vs.                   **(6) CAL. GOV'T CODE § 11135;**
21                                    **and**
22  CITY OF LANCASTER; CITY OF        **(7) CAL. CONST. ART. I § 7, ART.**
    PALMDALE; HOUSING AUTHORITY       **IV § 16**
23  OF THE COUNTY OF LOS ANGELES,
    an agency of Los Angeles County; and
24  LOS ANGELES COUNTY SHERIFF'S      **JURY TRIAL DEMANDED**
25  DEPARTMANT, an agency of Los
    Angeles County,                   *Original Compl. Filed: June 7, 2011*
26                                    *Pre-trial Conference: None Set*
                                      *Trial Date: None Set*
27              Defendants.
28

────────────────────────────────────────
                SECOND AMENDED COMPLAINT

1  Jennifer K. del Castillo (SBN 244816)
   jdelcastillo@publiccounsel.org
2  PUBLIC COUNSEL LAW CENTER
   610 South Ardmore Avenue
3  Los Angeles, California 90005
   T: (213) 385-2977  F: (213) 385-9089
4
5  Maria E. Palomares (SBN 266206)
   MariaPalomares@nls-la.org
6  Alexander Prieto (SBN 270864)
7  AlexanderPrieto@nls-la.org
   NEIGHBORHOOD LEGAL
8  SERVICES
   OF LOS ANGELES COUNTY
9  13327 Van Nuys Boulevard
   Pacoima, California 91331
10 T:  (818) 834-7544
11
   Dorcas R. Gilmore*
12 dgilmore@naacpnet.org
   Victor L. Goode*
13 vgoode@naacpnet.org
   NATIONAL ASSOCIATION FOR
14 THE ADVANCEMENT OF
15 COLORED PEOPLE
   4805 Mount Hope Drive
16 Baltimore, MD 21215
   T:  (410) 580-5673  F: (410) 358-9350
17 *admitted pro hac vice
18
19 Gary L. Blasi (SBN 70190)
   blasi@law.ucla.edu
20 UCLA School Of Law (for
   identification purposes only)
21 405 Hilgard Avenue
   Los Angeles, California 90024
22 T:  (310) 206-9431  F: (310) 206-1234

   Bill Lann Lee (SBN 108452)
   blee@lewisfeinberg.com
   Lindsay Nako (SBN 239090)
   lnako@lewisfeinberg.com
   LEWIS, FEINBERG, LEE,
   RENAKER, & JACKSON, P.C.
   476 9th Street
   Oakland, California 94607
   T: (510) 839-6824  F: (510) 839-7839

   Michael C. Small (SBN 222768)
   MSmall@akingump.com
   Kalia C. Petmecky (SBN 194094)
   kpetmecky@akingump.com
   Amy C. Poyer (SBN 277315)
   apoyer@akingump.com
   Kelsey Stapler (SBN 277859)
   kstapler@akingump.com
   AKIN GUMP STRAUSS HAUER &
   FELD LLP
   2029 Century Park East, Suite 2400
   Los Angeles, California 90067-3010
   T: (310) 229-1000  F: (310) 229-1001

   Marcellus A. McRae (SBN 140308)
   mmcrae@gibsondunn.com
   Holly B. Biondo (SBN 216745)
   hbiondo@gibsondunn.com
   Tzung-lin Fu (SBN 250661)
   lfu@gibsondunn.com
   Tiaunia N. Bedell (SBN 254323)
   tbedell@gibsondunn.com
   GIBSON DUNN & CRUTCHER LLP
   333 South Grand Avenue, Suite 4700
   Los Angeles, CA 90071
   T:  (213) 229-7000  F: (213) 229-7520

23
24
25
26
27
28

SECOND AMENDED COMPLAINT

Plaintiffs The Community Action League ("TCAL"), California State Conference of the National Association for the Advancement of Colored People ("NAACP"), Sheila Williams, Michelle Ross, and Jaquinn Davis (collectively, "Plaintiffs") bring this action against Defendants City of Lancaster ("Lancaster") and City of Palmdale ("Palmdale") (collectively, the "Cities") and the Housing Authority of the County of Los Angeles ("HACoLA") and Los Angeles County Sheriff's Department ("LASD") (collectively, the "County Entities," collectively with the Cities, the "Defendants") for violation of the equal protection clauses of the United States and California Constitutions by the Cities, and the federal Fair Housing Act (42 U.S.C. §§ 3604, 3617), the California Fair Employment and Housing Act (Cal. Gov't Code § 12955), and California Government Code § 11135 by all Defendants. Plaintiffs' claims are based on the Cities' intentional race-based exclusion of and discrimination against black and Latino families and individuals, on the County Entities' participation in and facilitation of the Cities' actions, and on the unjustified racially disparate impact of Defendants' policies and practices. Plaintiffs allege upon personal knowledge with respect to themselves and their own acts, and upon information and belief with respect to all other matters, as follows:

## NATURE OF THE ACTION

1.     Through this action, Plaintiffs seek to end the racial and ethnic discrimination against low income black and Latino residents caused by the Defendants' policies and practices that target certain black and Latino families for intimidation, harassment, and exclusion – specifically, those black and Latino families who participate in the Section 8 Housing Choice Voucher program.

2.     The Section 8 Housing Choice Voucher program, commonly referred to as "Section 8," is a federal program funded and administered by the U.S. Department of Housing and Urban Development ("HUD") that provides rental subsidies for low income families and individuals, including those who are elderly or disabled. The purpose of the Section 8 program is to enable the historic victims of discrimination to

1

1   live in communities of their own choosing and to encourage economic and racial
2   integration.

3       3.      HUD generally delegates administration of the Section 8 program to a
4   local housing authority.  In most of Los Angeles County, including Lancaster and
5   Palmdale, the local housing authority is HACoLA.

6       4.      As the name implies, housing choice is an important element of the
7   Section 8 program.  Once a participant is approved by the local housing authority, he
8   or she may apply for tenancy with any landlord who agrees to accept payment
9   through a Section 8 voucher.  The landlord then receives payment from the local
10  public housing authority for a portion of the participant's rent.  The remainder is paid
11  by the participant.  In order to qualify for the Section 8 voucher program in 2010, a
12  family of four in Los Angeles County was required to have an income at or below
13  $41,400, and 75% of new admissions must have had incomes at or below $24,850.[1]
14  Participants undergo rigorous criminal background checks and are randomly selected
15  for credit checks to verify their income.

16      5.      Under the provisions of the federal program, Section 8 housing choice
17  vouchers issued by a public housing authority may be used to obtain housing within
18  the issuing housing authority's jurisdiction.  Lower housing costs have made
19  Lancaster and Palmdale attractive for Section 8 participants looking to provide a
20  better quality of life for their families.  For example, a recent review of rental listings
21  accepting Section 8 vouchers shows that the same $1,100/month voucher that can be
22  used to obtain a two-bedroom, one-bath apartment in Alhambra, Covina, or
23  Inglewood, can be used to rent a three-bedroom, two-bath single-family house in
24  Palmdale or Lancaster.[2]

[1] See http://www.huduser.org/portal/datasets/il/index_il2010.html.
[2] See http://www.socialserve.com/tenant/index.html?state_id=4107&rid=32066&ch=HACOLA.

2
SECOND AMENDED COMPLAINT

6.     Approximately 3,600 primarily black and Latino families[3] (or 11,400 individuals[4]) with Section 8 vouchers have chosen to live in Lancaster or Palmdale. According to HUD's statistics for 2008, the most recent year available, 70% of Lancaster Section 8 tenants were black and 14% were Latino.[5]   Similarly, in Palmdale, 67% of Section 8 participants identified themselves as black and 18% as Latino.[6]

7.     The Cities have not welcomed these Section 8 families.  Rather, City officials have treated Section 8 participants as outsiders who have been imposed or, as one Lancaster official put it, "dumped" upon Lancaster and Palmdale.[7]   In the words of a Palmdale Council Member, the Cities fear they will be "swarm[ed]" by Section 8 participants.[8]  Thus, the Cities have targeted these black and Latino Section 8 voucher holders – and other black and Latino individuals whom the Cities' officials and residents assume to be program participants – with punitive surveillance and harassment intended to drive them from the Cities.  Moreover, the Cities have sought to discourage Section 8 voucher holders currently living elsewhere from moving into the Cities.

8.     Instead of combating the Cities' efforts to steer Section 8 voucher holders away from their jurisdictions, the County Entities have regularly met with City officials to offer and provide assistance in the Cities' efforts.  HACoLA has facilitated the Cities' efforts by entering into agreements with them to provide extra

---

[3] See HACoLA Antelope Valley Section 8 Activity Report to Michael D. Antonovich, dated Oct. 19, 2010.

[4] See http://www.huduser.org/portal/picture2008/index.html.

[5] See id.

[6] See id.

[7] See, e.g., June 10, 2008 Lancaster City Council Minutes, June 24, 2008 Lancaster City Council Minutes. Lancaster City Council Minutes, as well as agendas, videos, and some staff reports, are available on the City of Lancaster's webpage, http://www.cityoflancasterca.org.

[8] September 19, 2007 Palmdale City Council Meeting Video.  Videos of Palmdale's City Council meetings, as well as agendas, minutes, and some staff reports, are available on the City of Palmdale's webpage:  http://www.cityofpalmdale.org.

SECOND AMENDED COMPLAINT

1  Section 8 investigators to conduct over-zealous investigations in the Cities, and has
2  supplied the Cities and the local Sheriff's Stations with lists of Section 8 households
3  so that Section 8 participants can be readily identified and targeted.  Employees of the
4  LASD, which serves as the Cities' police force, have actively participated in and
5  often initiated "compliance checks" at Section 8 tenants homes intended solely to
6  harass and intimidate Section 8 participants.

7       9.     The constant surveillance and harassment to which Section 8 participants
8  have been subject is part of a campaign orchestrated by the Cities and facilitated by
9  the County Entities.  As stated by Lancaster's Mayor, "[T]his City wants to limit the
10 number of Section 8 units that are placed in this community. . . .  [I]t is a problem
11 that is crushing the community . . . and *it is time to go to war*."[9]  The only Section 8
12 participants who are safe from Defendants' campaign are those Section 8 participants
13 who are elderly or have disabilities, and who are less likely to be black or Latino.
14 City officials have treated these individuals as "deserving" Section 8 assistance and
15 spared them from attack.[10]

16      10.    Defendants have taken a number of steps that operate together in
17 furtherance of their unlawful exclusion of and discrimination against Section 8
18 participants.

19           a.    Unrelenting Surveillance and Investigative Activity.    Both
20      Lancaster and Palmdale have entered into annual agreements with HACoLA
21      and the County of Los Angeles to fund markedly greater levels of
22      investigations and terminations of Section 8 participants in their Cities.  These
23      City-funded investigators, who are employed and nominally supervised by
24      HACoLA, have engaged in extraordinarily aggressive tactics, including
25      mounting intimidating multi-agency Section 8 "sweeps" and unnecessarily
26      enlisting armed deputies to join investigators when performing putative

---

[9] June 10, 2008 Lancaster City Council Minutes (emphasis added).
[10] June 24, 2008 Lancaster City Council Minutes.

SECOND AMENDED COMPLAINT

compliance checks.  Sheriff's deputies act as officers of the Cities pursuant to the annual agreements and are employed by LASD.  City-funded housing investigators were accompanied by Sheriff's deputies on fully 64% of their visits to Section 8 participants' homes in Lancaster and 71% of their visits to Section 8 participants' homes in Palmdale during the first nine months of 2010.[11]  In contrast, in the rest of the County, law enforcement accompanied housing investigators only 8% of the time.[12]  Moreover, Lancaster and Palmdale investigators have recommended far more program terminations than investigators in other parts of the County.  For example, according to data provided to the Cities on a monthly basis, between July 2008 and June 2009, approximately 1 in 12 Palmdale Section 8 tenants and 1 in 22 Lancaster Section 8 tenants had their vouchers terminated for purported fraud or some other program violation.[13]  In the rest of HACoLA's jurisdiction, the rate during the same period was roughly 1 in 115.[14]  In addition, in order to be able to specifically target Section 8 families, the Cities entered into agreements with HACoLA to improperly obtain, on a monthly basis, the names and addresses of every Section 8 participant and every landlord renting to Section 8 participants in the Cities.  City officials direct several "public safety" programs that regularly work with the City-funded investigators to further harass Section 8 participants.  Lancaster operates two subprograms within its public safety department and comprised of LASD employees that target rental properties:  LAN-CAP and CORE.  LAN-CAP polices multi-unit buildings, while CORE

---

[11] Data compiled from "Field Contact – Entry Reports" provided by HACoLA in response to CPRA request.

[12] Id.

[13] See HACoLA Antelope Valley Section 8 Activity Report to Michael D. Antonovich, dated July 16, 2009.

[14] Id.

SECOND AMENDED COMPLAINT

focuses its efforts on nuisance-type complaints.  Palmdale likewise has an LASD subprogram focused on rental units, called PAC.

      b.    <u>Putting Out The "Not-Welcome" Mat.</u>  Lancaster and Palmdale have met with HACoLA repeatedly in order to attempt to exclude Section 8 tenants from the Antelope Valley.  The Cities asked HACoLA to produce an ad campaign to dissuade voucher participants from moving to the Antelope Valley by falsely suggesting that there were no jobs, no services, and that the cost of living was high.  The Cities also asked to be present at orientation meetings for voucher participants, in order to lecture participants and "lay down the law."[15]

      c.    <u>Discriminatory Use of Business License and Inspection Ordinances for Rental Properties.</u>  Lancaster and Palmdale have enacted business licensing and inspection ordinances and have used these ordinances to harass landlords who rent to Section 8 participants.  Lancaster, in particular, goes so far as to ask registering landlords whether they will be accepting Section 8 payments, and has sought means to limit the number of licenses it gives to Section 8 landlords.  Both Cities have also directed HACoLA to send threatening letters to Section 8 landlords whose properties were not licensed, stating that the landlords must obtain licenses or risk losing their right to Section 8 payments.  Finally, both Cities have used their rental inspection ordinances as an additional means of entering Section 8 households and harassing tenants.

      d.    <u>Lancaster's Discriminatory Nuisance Ordinance.</u>  After Lancaster's mayor specifically asked the City Council to "[l]ook into a means for making it very easy for neighbors to file nuisance lawsuits with the

---

[15] <u>See</u> email from R. Nishimura, HACoLA, to M. Badrakhan, HACoLA, dated July 15, 2009 re: FW: City of Lancaster Letter.  Letters and emails cited in this Complaint, as well as certain reports and minutes not available on the Cities' websites, were produced to attorney Blasi in response to California Public Records Act requests submitted to Lancaster, Palmdale, and HACoLA.

6

SECOND AMENDED COMPLAINT

assistance of the City against . . . Section 8 housing,"[16] Lancaster enacted a nuisance ordinance that provides enhanced penalties where there are multiple calls to the police or public safety entities for service – even where there is no actual criminal activity.

        e.    <u>Lancaster's Section 8 Commission.</u>   In 2008, Lancaster's City Council designated a "Section 8 Commission" to investigate ways for Lancaster to take over administration of Section 8 from HACoLA in order to further remove and exclude Section 8 participant families. The Commission was later renamed the "Neighborhood Vitalization Commission," but it remains focused on removing and excluding Section 8 participants from the City. When a consultant reported in 2008 that it was not feasible for Lancaster to take over administration of the Section 8 program, the Commission turned its attention to other means of excluding Section 8 participants. Among these was the development of a "Good Neighbor Guide" encouraging Lancaster residents to report possible Section 8 violations by their neighbors and make other nuisance complaints. In 2010, the City commissioned another consultant to explore again how Lancaster could seize control of the Section 8 program and impose its own administrative rules. HACoLA has regularly made presentations to the Section 8 Commission to tell them how many investigations and voucher terminations have occurred in Lancaster – in other words, to give the City an update on the status of its efforts to drive out Section 8 participants.

11.      Officials in both Cities have spread false stereotypes about Section 8 participants in order to justify unlawful discrimination and exclusion. Notwithstanding the threshold requirement for participation in the Section 8 program that voucher holders pass rigorous criminal background checks, and the lack of any

---

[16] June 10, 2008 Lancaster City Council Minutes.

SECOND AMENDED COMPLAINT

1    correlation between Section 8 tenants – who constitute a very small portion of the

2    population – and crime rates, officials in both Cities have wrongly labeled their

3    Section 8 residents as criminals in an effort to justify their surveillance and

4    harassment.[17]

5            12.     Similarly, the Cities claim that large numbers of Section 8 participants

6    have committed fraud in order to obtain assistance, and, therefore, that "cracking

7    down" on Section 8 fraud is appropriate.[18]   Notably, even in the isolated event that a

8    Section 8 participant receives federal assistance to which he or she was not

9    technically eligible, there is no resulting loss to either Lancaster or Palmdale, so their

10   intense interest in Section 8 fraud is not fiscally reasonable.

11           13.     Finally, Lancaster officials have propagated false stereotypes about

12   children of Section 8 families as truants or troublemakers and their parents as

13   indifferent to their education or wellbeing, and sought to have Section 8 families

14   whose children miss school terminated from the program and evicted.[19]   They have

15   done so while simultaneously acknowledging that the stereotypes underlying these

16   efforts are without factual support.[20]

17           14.     As detailed below, individual Plaintiffs and members of the

18   organizational Plaintiffs have suffered from unlawful discrimination by the

19   Defendants resulting in invasion of their privacy and public humiliation in front of

20   their neighbors.   They have been both intimidated and demonized in an attempt to

21   drive them from their homes.   In addition, the Cities have sent each individual and

22   organizational Plaintiff the unmistakable – and unlawful – message that black and

23   Latino residents in Lancaster and Palmdale are unwelcome and should be excluded.

24   The Defendants' actions have forced Section 8 participants to choose between

25   _____

26   [17] See, e.g., February 19, 2009 Lancaster Section 8 Commission Minutes.

     [18] See, e.g., June 24, 2008 Lancaster City Council Minutes; September 19, 2007 Palmdale City

27   Council Meeting Video.

     [19] See October 26, 2010 Lancaster City Council Meeting Minutes.

28   [20] See October 26, 2010 Lancaster City Council Meeting Video.

SECOND AMENDED COMPLAINT

1  holding onto a better home for their families and fleeing hostilities of the Cities'
2  unrelenting war.

3          15.    The Cities' conduct constitutes a pattern or practice of intentional
4  discrimination and the conduct of all Defendants has an unjustified disparate impact
5  in violation of both federal and state law.  As noted above, the vast majority of the
6  families who receive Section 8 assistance in Los Angeles County and who bring their
7  vouchers to Lancaster and Palmdale – and who are targeted by the Cities – are black
8  and Latino.  As a result, the Cities' campaign to remove Section 8 participants from
9  their Cities amounts to a knowing and deliberate attempt to re-segregate their
10 historically virtually all-white communities, one which the County Entities have
11 facilitated.

12         16.    Indeed, a 2009 letter from HUD warned Lancaster that "[b]ecause the
13 majority of voucher holders in the city of Lancaster are African-Americans," actions
14 seeking to limit their numbers "could be found to result in an unlawful disparate
15 impact ... under the [Fair Housing] Act."[21]  Plaintiffs echoed this warning in a pre-
16 litigation demand to both Cities and to the County Entities.  Neither HUD's warning
17 nor Plaintiffs' demand has had any effect on the Cities.  At the June 1, 2011 Palmdale
18 City Council meeting, held after the City had received and reviewed Plaintiffs' pre-
19 litigation demand, a Council Member proclaimed that the City would continue its
20 current course of action without "waver[ing]" so "legitimately" "deserving"
21 individuals could use the vouchers.[22]

22         17.    Since the filing of Plaintiffs' original Complaint, Lancaster officials
23 have been particularly adamant that they will not end their war against their Section 8
24 residents.  Lancaster's Mayor has reiterated bluntly: "I am at war with Section 8."[23]

25
26 [21] Letter from B. Fulton, HUD, to H. McKeon, U.S. Congress, rec'd May 5, 2009.
    [22] June 1, 2011 Palmdale City Council Meeting Video.
27 [23] Gene Maddaus, "Public Counsel Sues Lancaster And Palmdale Over 'War' On Section 8
    Housing," LA Weekly, June 8, 2011;  available at
28 http://blogs.laweekly.com/informer/2011/06/lancaster_palmdale_section_8_d.php.

SECOND AMENDED COMPLAINT

18.    Both Cities have refused to renounce the discriminatory effects of their actions and to commit to changing their treatment of Section 8 residents. The County Entities have agreed to enter into a settlement agreement that is conditional upon this Court issuing an order enforcing it. Accordingly, Plaintiffs request that the Court enjoin future discrimination against Section 8 Housing Choice Voucher program participants and order such other relief as is just and proper.

## JURISDICTION AND VENUE

19.    This Court has jurisdiction over the subject matter of the federal claims asserted herein pursuant to 28 U.S.C. § 1331 (federal question) and 42 U.S.C. § 3613(a) (Fair Housing Act).

20.    This Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction).

21.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because Defendants reside in this judicial district and a substantial part of the events or omissions giving rise to the claim occurred in this District.

## PARTIES

22.    Plaintiff TCAL is a community organization formed in 2010 that helps low income individuals and people of color in the Antelope Valley act to fight for their civil rights and eliminate race prejudice. TCAL has black and Latino members who participate in the Section 8 voucher program in Lancaster and Palmdale, and who have been injured by the Defendants' harassment of black and Latino Section 8 tenants. TCAL's mission is to empower, improve, and advance the economic, political, and social conditions of the residents of the Antelope Valley. To fulfill its mission, TCAL serves the community in the areas of housing, public policy, youth, business, and community organizing. TCAL's Board of Directors and its members are all residents of the Antelope Valley. TCAL has been forced to dedicate extensive time and resources to investigating and combating the Defendants' discriminatory policies and practices, including door knocking, outreach and education meetings,

SECOND AMENDED COMPLAINT

1   press conferences, and public meetings.  TCAL operates a toll-free hotline where the
2   community can share their complaints about housing discrimination.  The need to
3   divert its resources to addressing the Defendants' practices has frustrated TCAL's
4   mission.  Because of the Defendants' actions, TCAL has been unable to devote
5   sufficient resources to other areas that are critical to its mission, such as youth
6   outreach programs and programs addressing racial profiling by police in the Antelope
7   Valley.

8        23.    Plaintiff California State Conference of the National Association for the
9   Advancement of Colored People ("NAACP") is a nonprofit, civil rights organization
10  that serves as the state-wide entity of the NAACP.  NAACP is the nation's oldest and
11  largest civil rights organization, founded in 1909 with a particular historic
12  commitment to combating exclusion and discrimination in housing.  The California
13  State Conference of the NAACP consists of local branches throughout the state,
14  including branches in and around the Antelope Valley.  The NAACP has at least one
15  member who participates in the Section 8 voucher program in the Antelope Valley,
16  and who has been injured by the Defendants' harassment of black and Latino Section
17  8 tenants.  The NAACP also has black and Latino members who participate in the
18  Section 8 voucher program in California, and whose housing choices have been
19  limited as a result of the Defendants' exclusion of black and Latino Section 8 tenants
20  from the Cities.

21       24.    The NAACP's mission is to ensure the political, educational, social, and
22  economic equality of all persons and eliminate race prejudice.  As part of this
23  mission, the State Conferences and branches are dedicated to ensuring compliance
24  with laws designed to prevent housing discrimination. Branches within the California
25  State Conference have worked to counter the effects of the defendants'
26  discriminatory conduct.  Working with other community organizations, the Antelope
27  Valley Branch has engaged in outreach and education programs designed to counter
28  the effects of the Defendants' discriminatory conduct, and other branches have

1    provided counseling services to help low-income families, including those who use
2    Section 8 vouchers, locate affordable housing.   The exclusion and discrimination
3    challenged in this action have impaired the NAACP's ability to refer Section 8
4    recipients to Lancaster and Palmdale to find homes.  The Defendants' discriminatory
5    practices have therefore frustrated the NAACP's mission, and hindered the NAACP's
6    efforts to help Section 8 participants locate affordable housing.   In order to
7    investigate and counteract the Defendants' exclusion and discrimination, the NAACP
8    has diverted resources from other efforts.
9        25.   Plaintiff Sheila Williams is a black Section 8 participant who lived in
10   Lancaster until mid-2010. Ms. Williams was harassed by a City-funded investigator
11   and local Sheriff's deputies, acting as agents of Lancaster, until she made the decision
12   to leave the Antelope Valley.  In addition, Ms. Williams was a victim of Lancaster's
13   discriminatory nuisance ordinance, which caused her landlord to turn against her.
14   Ms. Williams also suffered from the hostile environment created by anti-Section 8
15   rhetoric of Palmdale and Lancaster officials.  Ms. Williams continues to participate in
16   the Section 8 program administered by HACoLA, and would likely return to the
17   Antelope Valley if the Cities ceased engaging in exclusion and discrimination.
18   Because of the Defendants' discriminatory actions, Ms. Williams has been deprived
19   of the equal opportunity to live in the home or city of her choosing.
20       26.   Plaintiff Michelle Ross is a black Section 8 participant who lived in
21   Palmdale until shortly before the initiation of this litigation and then moved to
22   Lancaster.  Ms. Ross was harassed by a City-funded investigator and local Sheriff's
23   deputies, acting as agents of Palmdale.   Ms. Ross also suffered from the hostile
24   environment created by anti-Section 8 rhetoric of Palmdale and Lancaster officials.
25   Ms. Ross moved to Lancaster to avoid further harassment by Palmdale agents while
26   allowing her children to remain in Antelope Valley schools.  Ms. Ross would have
27   preferred to stay in her home in Palmdale in order to maintain continuity in her
28   children's schooling.  However, because her name became publicly associated with

1   this lawsuit without her consent, Ms. Ross felt compelled to leave the Antelope
2   Valley altogether to avoid further harassment.  Ms. Ross continues to participate in
3   the Section 8 program administered by HACoLA, and would likely return to the
4   Antelope Valley if the Cities ceased engaging in exclusion and discrimination.
5   Because of the Defendants' discriminatory actions, Ms. Ross has been deprived of the
6   equal opportunity to live in the home or city of her choosing.

7        27.    Plaintiff Jaquinn Davis is a black Section 8 participant who lives in
8   Lancaster.  Ms. Davis has experienced harassment from a City-funded investigator in
9   Lancaster, as detailed below.  Ms. Davis and her son live in fear that continued
10  discriminatory actions by Lancaster will force her to leave her home, and will likely
11  force her to leave the Antelope Valley.  Because of these discriminatory actions, Ms.
12  Davis has been deprived of the equal opportunity to live in the home or city of her
13  choosing.

14       28.    Defendant City of Lancaster, California, is a municipal entity located in
15  Los Angeles County.  Lancaster is located in the area of Los Angeles County
16  northeast of the City of Los Angeles known as the Antelope Valley.  It has a
17  population of approximately 157,000.[24]  Law enforcement services are provided by
18  the Los Angeles County Sheriff under contract with, and at the direction of, the City.
19  Approximately 9.3% of the housing units – or 4,843 homes – in Lancaster are
20  vacant.[25]   As of September 2010, there were 2,226 Section 8 households in
21  Lancaster.[26]

22       29.    Defendant City of Palmdale, California, is a municipal entity located in
23  Los Angeles County.  Palmdale is also located in the area of Los Angeles County
24  northeast of the City of Los Angeles known as the Antelope Valley.  It has a

25

26  [24] See 2010 Census Data at http://factfinder2.census.gov/faces/nav/jsf/pages/index.xhtml.
27  [25] Id.
28  [26] HACoLA Antelope Valley Section 8 Activity Report to Michael D. Antonovich, dated Oct. 19,
    2010.

13

SECOND AMENDED COMPLAINT

1   population of approximately 153,000.[27]  Law enforcement services are provided by
2   the Los Angeles County Sheriff under contract with, and at the direction of, the City.
3   Approximately 7.7% of the housing units – or 3,592 homes – in Palmdale are
4   vacant.[28]   As of September 2010, there were 1,416 Section 8 households in
5   Palmdale.[29]

6        30.   Defendant Housing Authority of the County of Los Angeles
7   ("HACoLA") serves as HUD's designee in Los Angeles County to administer both
8   the Section 8 Housing Choice Voucher and Public Housing programs.  The Section 8
9   Housing Choice Voucher program currently assists approximately 23,000 families in
10  Los Angeles County through a partnership with over 13,000 property owners.  The
11  Los Angeles County Board of Supervisors serves as the Board of Commissioners for
12  HACoLA.  The Board sets policy for the Housing Authority.  Since 2005, HACoLA
13  has entered into Memoranda of Understanding with the Cities of Lancaster and
14  Palmdale under which the Cities paid for additional housing investigators who were
15  to be employed and supervised by HACoLA.

16       31.   Defendant Los Angeles County Sheriff's Department ("LASD")
17  provides law enforcement for the unincorporated areas of Los Angeles County, as
18  well as for forty Los Angeles County cities that contract with LASD for services.
19  The Cities of Lancaster and Palmdale are among the cities that contract with LASD
20  for law enforcement.  Each City contracts for the level of service appropriate for their
21  area, choosing staffing levels on an annual basis.  The LASD staff assigned to
22  Lancaster and Palmdale work out of Sheriff's stations in those Cities.  Under the
23  contracts, Sheriff's Department personnel in the Cities are employed and supervised
24  by LASD and responsible to officials of the Cities for the conduct of their work.

25

26  [27] See 2010 Census Data at http://factfinder2.census.gov/faces/nav/jsf/pages/index.xhtml.
27  [28] Id.
28  [29] HACoLA Antelope Valley Section 8 Activity Report to Michael D. Antonovich, dated Oct. 19,
    2010.

SECOND AMENDED COMPLAINT

1

## FACTS COMMON TO ALL CLAIMS

2      32.    The Antelope Valley, particularly its major cities of Lancaster and

3    Palmdale, was the site of intense racial segregation well into the 1970s and home to

4    white supremacist groups.[30]  Prior to the advent of fair housing laws, Palmdale was

5    recognized as a "sundown town" – that is, a town from which all blacks had to leave

6    by sundown.[31]    The nearby community of Sun Village traces its existence to

7    Palmdale's segregated housing policies, providing a place for blacks to live because

8    they could not live within Palmdale itself.[32]    At the time of the 1990 Census,

9    Lancaster's population was 73% white and Palmdale's population was 66% white.[33]

10     33.    A dramatic increase in the numbers of non-whites in the Antelope Valley

11   in the 1990s was marked by a dramatic surge in the number of hate crimes,

12   particularly attacks on black persons and families.[34]   According to a 1999 study of

13   hate crimes across Los Angeles County, "[i]n Antelope Valley . . . the vast majority

14   of [hate crime] victims are African American."[35]   In 1990, during the Palmdale

15   elections, "vote white" was spray-painted on a black woman's campaign sign.[36]   In

16   July 1997, in Palmdale, two white men and one white woman murdered a black man

17

18   _____

[30] See Lynda Thompson Taylor, History of the Antelope Valley NAACP, undated.  Available at
19   http://av-naacp.org/Documents/History_of_the_AVNAACP.pdf ; Karen Umemoto & Kimi Mikami,
     A Profile of Race-Bias Hate Crimes in Los Angeles County, UCLA Lewis Center for Regional
20   Studies, Working Paper Series, June 1, 1999; John Sanders, AV Leaders Decry Label of Racism,
     Daily News – Los Angeles, Nov. 16, 1999.
21
[31] See http://sundown.afro.illinois.edu/sundowntownsshow.php?id=1117 (a compilation of oral
22   histories regarding sundown towns in the United States).

23   [32] See Sebastian Rotella, Sun Village: Black Enclave Withers Amid Antelope Boom, L.A. Times,
     Aug. 27, 1989.

24   [33] See 1990 Official U.S. Census Data, at http://www.census.gov/main/www/cen1990.html.

25   [34] See Karen Umemoto & Kimi Mikami , A Profile of Race-Bias Hate Crimes in Los Angeles
     County, UCLA Lewis Center for Regional Studies, Working Paper Series, June 1, 1999; see also
26   John Sanders, AV Leaders Decry Label of Racism, Daily News – Los Angeles, Nov. 16, 1999.

27   [35] Karen Umemoto & Kimi Mikami, A Profile of Race-Bias Hate Crimes in Los Angeles County,
     UCLA Lewis Center for Regional Studies, Working Paper Series, June 1, 1999, at 14.
28
[36] See John Chandler, Racial Scrawl on Election Poster Angers Palmdale, L.A. Times, Apr. 7, 1990.

SECOND AMENDED COMPLAINT

so that one of them could earn a white supremacist tattoo.[37]  In February of 2004, two black men were stabbed in two separate bars in Lancaster by the son of a mayoral candidate – the attacker was quoted saying "white power."[38]   In July 2008, two Palmdale homes were plastered with words offensive to Jews and blacks along with "white power" and a swastika.[39]  In August of 2010, the Church of Jesus Christ of Latter-day Saints in Lancaster and the First African Methodist Episcopal Church in Palmdale were firebombed.[40]   Area hate crimes have also specifically targeted Section 8 recipients.  In January 2011, the news reported that a Palmdale Section 8 participant discovered graffiti stating "I hate Section 8" and "Nigger" on her garage.[41] This Section 8 participant was Plaintiff Michelle Ross.

34.    Although the Cities have disavowed this ugly past as mere history and characterize more recent actions as those of a few disturbed individuals, the Cities' officials now seek to perpetuate prior discrimination by subjecting Section 8 participants – who are overwhelmingly black and Latino families — to exclusion and discrimination.

35.    Indeed, 84% of Section 8 participants in Lancaster and 85% in Palmdale are black and Latino. [42]  According to HUD's statistics for 2008, the most recent year available, of the 7,203 individuals in Section 8 voucher holders' households in Lancaster, 70% were black and 14% were Latino.[43]  Similarly, in Palmdale, 67% of the 4,146 individuals in Section 8 voucher holder households identified themselves as

---

[37] See Richard Fausset, 3 Charged with Hate Crimes in 1997 Killing of Black Man, L.A. Times, Jan. 28, 2004.

[38] See Hector Becerra, Son of Mayoral Hopeful Charged, L.A.Times, Feb. 21, 2004.

[39] See Leo Stallworth, Palmdale houses vandalized in "hate crime," KABC-TV July 8, 2008, http://abclocal.go.com/kabc/story?section=news/local&id=6252533.

[40] See Church Arsons, Ourweekly.com, Aug 31,2010, http://www.ourweekly.com/antelope-valley/church-arsons .

[41] See Leo Stallworth, "Palmdale family target of Section 8 hatred," KABC-TV Jan. 4, 2011, http://abclocal.go.com/kabc/story?section=news/local/los_angeles&id=7880152.

[42] See http://www.huduser.org/portal/picture2008/index.html.

[43] See id.

1  black and 18% as Latino.[44]  Harassment and intimidation of Section 8 participants
2  already living in Lancaster and Palmdale are targeted primarily against blacks and
3  Latinos.

4       36.    Across Los Angeles County and the nation, black and Latino families
5  also make up the majority of Section 8 tenants.  In Los Angeles County, 47% of the
6  194,222 Section 8 voucher holders were black and 24% Latino in 2008.[45]  Of the
7  5,076,510 people using Section 8 vouchers nationally, 42% were black and 17%
8  Latino.[46]  Thus, efforts in Lancaster and Palmdale to exclude Section 8 participants
9  from elsewhere in the County or other parts of the country likewise are targeted
10  primarily against blacks and Latinos.

11  **I.**    **LANCASTER AND PALMDALE'S WAR TO EXCLUDE SECTION 8**
12       **PARTICIPANTS FROM THEIR COMMUNITIES**

13       37.    All of the Defendants' actions targeting Section 8 participants for
14  discrimination and exclusion have been part of an ongoing policy or practice with
15  origins in activities as early as 2004 that have expanded greatly since 2008.  If it were
16  up to the Cities, they would continue in full force to the present day.

17       38.    In June 2011, shortly after this lawsuit was filed, the County of Los
18  Angeles imposed a 90-day moratorium on its agreements with the Cities for
19  additional housing investigators and staff.  The Mayors of each City appeared at the
20  Los Angeles County Board of Supervisors meeting on June 21, 2011 to oppose the
21  moratorium.  The 90-day moratorium was extended for an additional 90 days on
22  September 20, 2011, again over the objection of the Cities' Mayors, while the County
23  investigates Plaintiffs' claims and Plaintiffs continue to negotiate with the County in
24  an effort to resolve those claims without litigation.  Should the County-imposed

25
26  _____
27  [44] See id.
   [45] See id.
28  [46] See id.

17
SECOND AMENDED COMPLAINT

1  moratorium end, the Cities have made clear that they would resume their prior course
2  of conduct.

3  **A.    Unduly Aggressive Investigations and Disproportionate Results**

4  39.    In 2004, Lancaster and Palmdale began to focus undue law enforcement
5  attention on Section 8 participants.  Lancaster established its "Lancaster Community
6  Appreciation Project" ("LAN-CAP") police team to target multi-family rental
7  properties.  As a later Lancaster city newsletter explained, a substantial portion of
8  LAN-CAP deputies' time was and is devoted to conducting "compliance checks" on
9  Section 8 tenants and encouraging landlords and managers to police their Section 8
10  tenants:  "The Lancaster Sheriff's Station has a special team of officers dedicated to
11  removing the criminal element from problem apartments and other rentals in
12  Lancaster. . . . [In one year alone], over 1,500 arrests were made – three times the
13  normal apprehension rate.   They have trained over 300 property owners and
14  managers on how to spot potential problems and have performed over 200 Section 8
15  compliance checks."[47]  Palmdale has a similar program to devote particular attention
16  to rental units, called the "Partners Against Crime" ("PAC") unit.  The PAC unit
17  consists of two sergeants and ten deputies.[48]  According to Palmdale's website, "[t]he
18  PAC program combines the City, Palmdale Sheriff's Station, rental property owners
19  and managers and residents into a team that focuses on keeping illegal activity out of
20  rental property . . . ."[49]

21  40.    Meetings among Lancaster, Palmdale, and HACoLA in 2004 and 2005
22  spurred Memoranda of Understanding ("MOU") to hire additional housing
23  investigators to work with the local Sheriff's office and focus on eliminating
24  purported Section 8 fraud.  In November 2004, Lancaster entered into a MOU with

25  [47] January 2007 City of Lancaster Outlook Lite,
26  http://www.cityoflancasterca.org/index.aspx?recordid=46&page=350.
27  [48] April 1, 2009 Staff Report for Palmdale City Council Meeting Agenda Item 7.1.
   [49] City of Palmdale webpage,
28  http://www.cityofpalmdale.org/departments/public_safety/pac/index.html.

SECOND AMENDED COMPLAINT

1   HACoLA and the County of Los Angeles providing "for additional investigative
2   services to address criminal activity and other violations related to the [Section 8]
3   Program administered by the Housing Authority within [Lancaster] . . . ."[50]  The City
4   paid HACoLA $50,000, and the County's Fifth District matched the City's
5   contribution, in order to provide "a maximum of 2,080 hours of investigative services
6   during the term of this MOU."[51]  The term of the original MOU was twelve months.[52]

7        41.   A few months later, in February 2005, Palmdale followed suit and
8   entered into a MOU with HACoLA and the County as well – noting, in fact, in its
9   staff report that Lancaster had already done so.[53]  The original Palmdale MOU paid
10  for twenty hours per week of investigational services.[54]  Like the Lancaster MOU, the
11  Palmdale MOU was limited to a one year term absent subsequent amendment.[55]

12       42.   Each year, the Cities and HACoLA entered into either amendments to
13  existing MOUs or new MOUs to retain and expand these enhanced investigational
14  services.  At the end of 2005, Palmdale amended its first MOU and increased its
15  commitment from an extra twenty hours of investigative services per week to thirty-
16  two.[56]  Subsequent amendments were entered into in May 2006 and March 2007.[57]  A
17  new Palmdale MOU was signed in August 2008 and renewed on July 1, 2009 and
18
19
20  [50] Memorandum of Understanding By and Between the Housing Authority of the County of Los
21  Angeles and the City of Lancaster, dated Nov. 4, 2004.
    [51] Id.
22  [52] See id.
23  [53] See Palmdale City Council Staff Report re: Approval of Agreement No. A-0917 . . . , dated Feb. 14,
    200[5].
24  [54] See Palmdale Agmt. No. A-0917, A Memorandum of Understanding By and Between the
25  Housing Authority of the County of Los Angeles and the City of Palmdale For the Hiring of A
    Section 8 Investigator to Provide Services Within the City.
26  [55] See id.
27  [56] See Palmdale City Council Staff Report re: Approval of Amendment No. 3 to Agreement No. A-
    0917, . . . , dated Mar. 5, 2007.
28  [57] See id.

SECOND AMENDED COMPLAINT

1    May 5, 2010.[58]  In November 2010, Palmdale again increased the level of service it

2    would pay for from thirty-two hours per week to forty,[59] due to the "inordinate

3    amount of Section 8 in our community."[60]    The Palmdale City Council voted

4    unanimously to renew the MOU on June 1, 2011.[61]

5         43.    Lancaster increased its support for additional investigative services even

6    more dramatically.  The $50,000 commitment in 2004 had expanded to a $130,882

7    commitment in June 2009, when the City Council approved an amendment to

8    Lancaster's second MOU with HACoLA.[62]  The County's Fifth District continued to

9    match these funds.   The combined funds paid for 1) two part-time investigators,

10   2) supervision of those investigators, 3) a part-time analyst, and 4) a part-time hearing

11   officer.[63]  The June 9, 2009 City Council staff report recommending approval of this

12   amendment argued that "[t]he City's Rental Inspection Program and inter-agency

13   cooperation between Code Enforcement and Housing Authority investigators has had

14   a significant impact on reducing the number of problematic Section 8 tenants."[64]

15        44.    Further harassment of Section 8 residents in Lancaster came in the form

16   of Lancaster's 2007 establishment of the Community Oriented Response and

17   Enforcement program ("CORE") which provided an additional four deputies and a

18   sergeant.    Each deputy is assigned to a quadrant of the city.[65]    According to

19   Lancaster's description of the program, "[t]his team focuses primarily on ongoing and

20   quality-of-life issues, such as loitering, graffiti, 'problem neighbors,' and emerging

[58] See Palmdale City Council Staff Report re: Approval of Amendment No. 2 to Agreement No. A-2419 ..., dated May 5, 2010.

[59] See Palmdale City Council Staff Report re: Approval of Amendment No. 3 to the Memorandum of Understanding (MOU) ..., Agreement No. A-2419, dated Nov. 3, 2010.

[60] Nov. 3, 2010 Palmdale City Council Meeting Video.

[61] June 1, 2011 Palmdale City Council Meeting Video.

[62] See Lancaster City Council Staff Report re: Approve Amendment # 1 to the Memorandum of Understanding ..., dated June 9, 2009.

[63] See id.

[64] Id.

[65] City of Lancaster webpage, http://www.cityoflancasterca.org/index.aspx?page=835.

20

SECOND AMENDED COMPLAINT

1    crime patterns in specific areas."[66]  The CORE team, like the LAN-CAP team, also
2    participates in Section 8 compliance checks.[67]

3        45.    Until September 2009, HACoLA had only a cursory protocol in place
4    governing the conduct of housing investigators, requiring little more than that the
5    housing investigator request consent to enter whenever he or she was conducting a
6    compliance check or investigation.   In September 2009, HACoLA issued a new
7    protocol but, as discussed below, the Cities confirmed that it was only binding when
8    HACoLA was the "lead agency" in an investigation.[68]  In Lancaster, the City-funded
9    investigators were given space in the Lancaster Sheriff's Station, and investigators in
10   both Cities accompanied deputies in multi-agency "sweeps" of Section 8 homes.[69]
11   On some occasions, the sweeps of Section 8 homes in Lancaster and Palmdale
12   involve not only Sheriff's deputies, but also the Department of Child and Family
13   Services, the Probation Department, and Code Enforcement officials.[70]  In any event,
14   the protocol did little to address the aggressive tactics favored by Lancaster and
15   Palmdale investigators.   For example, the protocol requires investigators to get
16   independent consent from tenants to conduct a search even where Sheriff's deputies
17   are already inside a home.  Investigators have stated to Section 8 tenants who decline
18   that such consent is irrelevant, because they will simply review everything Sheriff's
19   deputies find.   The City-funded investigators appear to have unlimited access to
20   Sheriff's department records.[71]

21       46.    The intense law enforcement scrutiny and constant suspicion of Section
22   8 tenants simply by virtue of their participation in the Section 8 program has resulted

23   ────────────────
     [66] Id.
24   [67] See id.
25   [68] See attachment to email from B. Lindsay, HACoLA, to M. Badrakhan, HACoLA, dated Mar. 31,
     2009 re: "5thDistrictMtg.notes.32509."
26   [69] See, e.g., email from R. Nishimura, HACoLA, to M. Badrakhan, HACoLA, re: FW: Lancaster
27   Section 8 Compliance Checks, dated Dec. 11, 2008.
     [70] See, e.g., id.
28   [71] See, e.g., "City of Palmdale Section 8 Investigations Monthly Reports," June 2005-Sept 2010.

SECOND AMENDED COMPLAINT

1 | in unwarranted harassment of participants and their families.  Lancaster and Palmdale
2 | were aware of the disproportionate effect of their actions on the Section 8 participants
3 | in their Cities and of the unusually aggressive tactics used by City-funded
4 | investigators, often in conjunction with Sheriff's deputies acting as officers of the
5 | Cities.  Despite knowledge of these improper activities, the Cities continued their
6 | support.

7 |       47.    According to data provided by HACoLA, between 2006 and 2010, the
8 | odds that a Section 8 participant would be subjected to an investigation were
9 | approximately 2.6 times higher in Lancaster than in the rest of County and
10 | approximately 3.2 times higher in Palmdale than in the rest of County.[72]  Many of
11 | these investigations have been marked by excessively aggressive tactics, such as the
12 | presence of multiple armed Sheriff's deputies with guns drawn and unnecessary
13 | hand-cuffing of household members.  As noted above, according to data provided by
14 | HACoLA, in the first nine months of 2010, Sheriff's deputies accompanied
15 | investigators on approximately 71% of their visits to homes in Palmdale and 64% of
16 | their visits to homes in Lancaster, while in the rest of the County, law enforcement
17 | participated only 8% of the time.[73]  Lancaster and Palmdale investigators conducting
18 | home visits during this period were also four times more likely to determine that a
19 | household was not in compliance with Section 8 rules than investigators in other parts
20 | of the County.[74]  Palmdale's most recent investigator, Gary Brody, has been
21 | particularly aggressive, taking as many as fifteen armed officers with him on
22 | purported "compliance checks" and threatening Section 8 voucher holders or their
23 | families with search warrants and arrest if they do not consent to searches of their
24 | homes.  Moreover, Brody has demonstrated in the past that he had access to minors'

---

26 | [72] Data provided by HACoLA in response to California Public Records Act request.
27 | [73] Field Contract Entry Reports provided by HACoLA in response to California Public Records Act request.
28 | [74] Id.

1   school and juvenile records – which he should not – and used these records to target

2   the children in Section 8 households.   Indeed, Brody's own reports to Palmdale

3   reference discussions with school deputies and reviews of booking records to find

4   juvenile arrests in Section 8 homes.   Brody and his predecessors apparently made

5   monthly reports to Palmdale, providing details of how they spent their time and

6   summaries of "noteworthy" incidents.[75]   The Palmdale City Council has met with

7   Brody to discuss his work and lauded it as "incredible."[76]   Indeed, Palmdale has

8   praised their investigator's "unmatched" "productivity."[77]   Brody has trained

9   Lancaster investigators in his tactics.

10         48.   HACoLA's "Antelope Valley Section 8 Activity Reports" – which the

11   Cities received on a monthly basis and which included comparative and year-to-date

12   data for the fiscal year – plainly demonstrated that investigators in Lancaster and

13   Palmdale took a much different approach to Section 8 tenants than those in other

14   parts of HACoLA's jurisdiction.   According to the reports:

15               a.     Between July 2008 and June 2009, investigators in Lancaster

16         opened 239 investigations, and proposed terminations in 98 (41%) of those

17         investigations, deeming only 37 (15%) of the claims against the Section 8

18         tenants unfounded.[78]   During the same period in Palmdale, investigators

19         opened 166 investigations, proposed termination for 96 tenants (58%), and

20         deemed 11 (7%) unfounded.[79]   In the rest of the County, with nearly 17,000

21         Section 8 families, 670 investigations were opened, of which 183 (27%)

22         resulted in proposed terminations and 207 (31%) were deemed unfounded.[80]

[75] See "City of Palmdale Section 8 Investigations Monthly Reports," June 2005-Sept 2010, produced by Palmdale in response to a California Public Records Act request.

[76] November 3, 2010 Palmdale City Council Meeting Video.

[77] November 3, 2010 Palmdale City Council Meeting Video.

[78] See HACoLA Antelope Valley Section 8 Activity Report to Michael D. Antonovich, dated July 16, 2009.

[79] See id.

[80] See id.

SECOND AMENDED COMPLAINT

As a result of these aggressive tactics, as noted above, one in 22 Lancaster Section 8 participants and one in 12 Palmdale Section 8 participants had their vouchers' terminated, while the rate in the rest of HACoLA's jurisdiction was one in 115.[81]

b.      Between July 2009 and June 2010, the number of proposed terminations dropped significantly – indeed, despite opening nearly 350 investigations in Lancaster and Palmdale, investigators only issued field terminations for 23 tenants.[82]    However, investigators were still reluctant to close an investigation on the grounds that it was unfounded – instead, they left the investigations open, thereby leaving the Section 8 tenant open to further harassment.[83]    Despite the decrease in field-issued proposed terminations, Section 8 participants in Lancaster were still 4.9 times more likely to have their vouchers terminated than participants in HACoLA's jurisdiction outside the Antelope Valley, and Section 8 participants in Palmdale fared even worse – they were 7.5 times more likely to have their vouchers terminated than participants elsewhere in the County.[84]

c.      Between July 2010 and April 2011 (the most recent time period for which data was available), Lancaster had resumed more aggressive proposed termination rates, already doubling its July 2009-June 2010 total, and Palmdale's investigator had issued more than three times as many proposed terminations than he had for the prior fiscal year.[85]    Indeed, investigations in Palmdale for that period were four times more likely to end in proposed terminations than elsewhere in the County, and only half as likely to be deemed

---

[81] See id.

[82] See HACoLA Antelope Valley Section 8 Activity Report to Michael D. Antonovich, dated July 14, 2010.

[83] See id.

[84] See id.

[85] See HACoLA Antelope Valley Section 8 Activity Report for April 1-30, 2011.

SECOND AMENDED COMPLAINT

1    unfounded.[86]  Section 8 participants in both Cities continued to be roughly 2.4

2    times more likely to be subject to an investigation than Section 8 participants

3    elsewhere in HACoLA's jurisdiction.[87]

4         49.    Likewise apparent from information available to the Cities are the

5    differences in how investigations are initiated in the Antelope Valley and how they

6    are initiated elsewhere.  In the rest of the County, particularly in recent years, the

7    majority of investigations are prompted by "complaints" – usually calls to

8    HACoLA's fraud hotline.  At a June 2011 Lancaster City Council meeting with

9    HACoLA representatives, HACoLA characterized its investigations as "complaint

10   driven."[88]  In the rest of the County, this characterization is accurate: between July

11   2010 and April 2011, HACoLA's fraud hotline referred 592 calls for further

12   investigation - this accounted for roughly 93% of the 632 investigations opened

13   during that period.[89]  During the same period in Lancaster, however, only 51 fraud

14   hotline calls were referred for further investigation, yet 194 investigations were

15   opened.[90]  Similarly, only 26 calls were referred to investigators in Palmdale, yet

16   Palmdale's investigator opened 120 investigations.[91]  Investigator Brody's reports to

17   Palmdale suggest that many of his investigations were opened in response to prompts

18   from Palmdale Sheriff's deputies.[92]

19        50.    Overall, between 2006 and 2010, the odds that an investigation would

20   result in a recommendation that the participant's voucher be terminated were over 4

21   times higher in Lancaster than in the rest of County and almost 6 times higher in

22

23   [86] See id.

24   [87] See id.

25   [88] Video of June 22, 2011 Lancaster City Council Special Joint Meeting.
     [89] HACoLA Antelope Valley Section 8 Activity Report for April 1-30, 2011.

26   [90] Id.

27   [91] Id.

28   [92] See "City of Palmdale Section 8 Investigations Monthly Reports," June 2005-Sept 2010,
     produced by Palmdale in response to a California Public Records Act request.

25

SECOND AMENDED COMPLAINT

1  Palmdale than in the rest of County.[93]  Indeed, between July 1, 2006 and November 6,
2  2010, of the 1173 "proposed field terminations" of Section 8 participants in the entire
3  HACoLA area, a quarter (26%) were generated in Lancaster and a third (33%) in
4  Palmdale, for a total of 59% of all terminations in Los Angeles County – even though
5  Palmdale and Lancaster residents comprise only 17% of the County's Section 8
6  households.[94]

7       51.    Not all terminations proposed by City-funded investigators are actually
8  imposed by HACoLA – indeed, Lancaster officials have complained that "[t]he
9  transfer of termination decisions from the Investigative Division in the Antelope
10  Valley to [HACoLA Headquarters in] Santa Fe Springs has led to a decrease in
11  terminations."[95]  In proposed terminations, the most commonly invoked rule pertains
12  to obtaining HACoLA approval for any change in the persons living in the unit,
13  generally referred to as an "unauthorized tenancy."  According to HUD reports on
14  Section 8 terminations in Lancaster between January 2007 and September 2010, 57%
15  were based at least in part on an "unauthorized tenancy."[96]  However, the presence of
16  an unauthorized tenant is not readily determined in a single visit – or even multiple
17  visits – by an investigator, because HACoLA regulations only deem someone an
18  unauthorized tenant if they stay in a residence more than thirty consecutive days or
19  more than sixty total days in one year.[97]  Thus, unsurprisingly, HACoLA records
20  reflect that many terminations proposed on these grounds are patently unwarranted
21  and only serve to harass the Section 8 participants.  For example:

22            a.    In June 2009, a Palmdale tenant received a notice of proposed
23            termination alleging the tenant had unauthorized subjects (the tenant's daughter
24            and granddaughter) residing in her unit.  The tenant was a stage 4 lung cancer

25  [93] Data provided by HACoLA in response to California Public Records Act request.
26  [94] Data provided by HACoLA in response to California Public Records Act request.
27  [95] May 4, 2010 Lancaster Neighborhood Vitalization Commission Minutes.
28  [96] Data provided by HACoLA in response to California Public Records Act request.
   [97] See HACoLA Administrative Plan Section 6.8.8.

SECOND AMENDED COMPLAINT

patient whose tumors had spread to her brain and who therefore required 24-hour monitoring. She admitted to have asked her daughter to stay the night sometimes so she would not be alone. Nevertheless, the investigator insisted on recommending termination. An administrative hearing officer overturned the proposed termination finding the termination was unwarranted.[98]

b.    In July 2009, a tenant living in Palmdale received a notice of proposed termination solely because the investigators were informed that an unauthorized tenant had listed the tenant's Section 8 unit as his place of residence on police records. The investigator failed to acquire, or even seek, any additional corroborating evidence. Despite this and the participant's assertions that the unauthorized tenant did not actually reside at the unit, the investigator recommended termination. The proposed termination had to be overturned at an administrative hearing for lack of evidence.[99]

c.    In August 2009, a Palmdale tenant received a notice of proposed termination because an investigator alleged that an unauthorized tenant – the tenant's spouse – was residing in the tenant's Section 8 unit and that the spouse was engaged in criminal activity. In actuality, the tenant and the spouse had been separated for years and the tenant had a restraining order against the spouse because she was the victim of domestic violence. The proposed termination was withdrawn after the tenant contacted HACoLA to dispute the proposed termination.[100]

52.    In short, over the last five years, both the number of investigations and the number of proposed and completed voucher terminations in the Antelope Valley have been disproportionate when compared to the rest of HACoLA's jurisdiction. As

---

[98] See HACoLA Hearing Summaries, provided by HACoLA in response to California Public Records Act request.
[99] See id.
[100] See id.

SECOND AMENDED COMPLAINT

1   demonstrated further by the accounts of the individual plaintiffs below, the sheer
2   number of investigations to which Section 8 participants are subject, and the
3   likelihood that they will be subject to one in the future, serve to intimidate Section 8
4   participants in Lancaster and Palmdale.    That intimidation is heightened by the
5   aggressive tactics employed by City-funded investigators and Sheriff's deputies, and
6   by the disproportionate number of terminations proposed and completed in the Cities.
7   These are the predictable consequences of the Cities' decisions to fund investigators
8   to conduct aggressive investigations in the Cities and to direct sections of their
9   Sheriff's departments to focus scrutiny on Section 8 participants, and the Cities knew
10  that these results were being realized.

11       **B.    Business Licensing and Inspections for Rentals in Lancaster and**
12           **Palmdale**

13       53.    Both Lancaster and Palmdale have passed rental unit inspection
14  ordinances that give the Cities an additional avenue to enter the homes of Section 8
15  tenants, nominally in the interest of public safety.  In addition, both Cities have used
16  their rental business licensing ordinances to target Section 8 landlords.

17       54.    In 2004, the City of Lancaster passed Ordinance 822, which required
18  landlords renting units in multi-family buildings to obtain business licenses.   The
19  licensing program was expanded in 2007 via Ordinance 869, which required those
20  renting single-family homes to obtain business licenses as well.  These ordinances are
21  now codified in Lancaster Municipal Code Ch. 5.40.  The ordinances require that all
22  rental units be inspected on a regular basis and when any complaints are made.  These
23  inspections may "include inspections by other City departments and/or Los Angeles
24  County enforcement agencies."[101]    The City of Lancaster provides a form for
25  requesting a rental business license, which in its current iteration expressly asks
26  landlords whether they will be accepting Section 8 tenants.[102]

27  ───────────────
    [101] Lancaster Muni. Code § 5.40.080(A).
28  [102] See City of Lancaster webpage, http://www.cityoflancasterca.org/index.aspx?page=527.

SECOND AMENDED COMPLAINT

55.    Similarly, in 2006, Palmdale – which already had a business license requirement in place in Palmdale Municipal Code Ch. 3.44 – passed Ordinance 1273, giving itself expanded rights to inspect rental units. Like the Lancaster statute, the Comprehensive Residential Rental Unit inspection program, codified in Palmdale Municipal Code Ch. 8.40, requires that all rental units be registered and be inspected on a regular basis and when any complaints are made. As with Lancaster, these inspections in Palmdale may "include inspections by other city departments and/or Los Angeles County enforcement agencies."[103]

56.    The Cities have deployed these ordinances in their war against Section 8 residents. On October 14, 2008, Lancaster's City Manager wrote a letter to HACoLA asking that it immediately stop Section 8 payments to landlords who did not have current business licenses.[104]    After HACoLA refused, Lancaster requested that HACoLA send letters to Section 8 landlords whose properties were not licensed indicating that they must obtain licenses or they may lose their right to Section 8 payments.[105]    HACoLA agreed to do so. At a March 25, 2009 meeting among HACoLA, Lancaster, and Palmdale, Palmdale asked that HACoLA do the same for its unlicensed landlords,[106] even though Palmdale's ordinance had traditionally not been enforced against rental complexes smaller than four units.[107]

57.    Also at the March 25, 2009 meeting, the Cities devised a plan to use the existence of the business licensing ordinances as a pretext for requesting lists of Section 8 properties.[108]    Betraying their interest in more than business licensing

[103] Palmdale Muni. Code § 8.40.030.

[104] See letter from M. Bozigian, Lancaster City Manager, to W. Huang, Acting Exec. Dir., HACoLA, dated Oct. 14, 2008.

[105] See email from R. Nishimura, HACoLA, to M. Badrakhan, HACoLA, dated Mar. 30, 2009 re: "Joint Cities and County Housing Authority/Section 8 Meeting."

[106] See HACoLA Memo. From C. Carrillo to N. Hickling, "Section 8 Status Report," Mar. 25, 2009.

[107] See Palmdale City Council Staff Report, "Discussion regarding Business Licensing, Rental Housing Requirements, and Section 8 Housing," Sept. 19, 2007.

[108] See email from N. Hickling, County of Los Angeles 5th Dist., to Mar. 25, 2009 meeting participants dated Mar. 27, 2009 re: Joint Cities and County Housing Authority/Section 8 Meeting.

SECOND AMENDED COMPLAINT

compliance, the Cities also requested a list of the approved tenants in each rental unit.[109]   Indeed, a Lancaster representative stated that she had previously received a list of Lancaster's Section 8 participants that identified whether the participants were elderly or had children.[110]   Shortly thereafter, each City sent a nearly identical California Public Records Act request to HACoLA seeking a spreadsheet containing the current business license status, the property owner's name, the property owner's mailing address, and the Section 8 unit address for each Section 8 landlord in their respective jurisdictions.[111]   Beginning in May 2009, HACoLA provided lists that included not only the requested information but also the names of the Section 8 tenants. HACoLA apparently stopped providing the lists in late 2010.

58.   Both Cities have likewise used the rental inspection ordinances as a means of entering Section 8 households without adhering to HACoLA rules regarding investigations and compliance checks. Indeed, the Cities confirmed at the March 25, 2009 meeting that if HACoLA was not the lead agency on an inspection, its protocols would not apply.[112]

59.   The Cities have also sought to use the business licensing ordinances to exert more direct control over Section 8 landlords in order to make it impossible for Section 8 tenants to find housing. For example, in 2007, Lancaster sought to impose a five-year moratorium on business licensing for Section 8 housing. Council Member Ronald Smith suggested that this "would be the perfect vehicle in controlling Section 8, because when Section 8 comes up, the City already knows how many business

---

[109] See attachment to email from A. Gonzalez, HACoLA, to M. Badrakhan, HACoLA, dated Mar. 30, 2009 re: "Meeting Notes."

[110] See attachment to email from B. Lindsay, HACoLA, to M. Badrakhan, HACoLA, dated Mar. 31, 2009 re: "5thDistrictMtg.notes.32509."

[111] See letter from B. Boswell, Lancaster Finance Dir., to C. Carrillo, HACoLA Acting Exec. Dir., dated Apr. 15, 2009; letter from S. Williams, Palmdale City Manager, to C. Carrillo, HACoLA Acting Exec. Dir., dated Apr. 28, 2009.

[112] See attachment to email from B. Lindsay, HACoLA, to M. Badrakhan, HACoLA, dated Mar. 31, 2009 re: "5thDistrictMtg.notes.32509."

1   licenses there are and that there are over 2000 vouchers in the City."[113]   Council
2   Member Sileo concurred that "if the City can use this to leverage some control on the
3   Section 8 population and exercise additional control, this would be good."[114]
4   Unsurprisingly, the City Attorney cautioned that there would be some "very serious
5   legal issues that need to be dealt with" – although the City Attorney's primary
6   concern was federal pre-emption, not fair housing.[115]   The matter was temporarily
7   dropped.
8         60.   However, in September 2008, then Vice Mayor Smith revived the
9   business licensing discussion in the City Council.  In late 2008, the City wrote a letter
10  to its congressional representative, Representative Howard McKeon, seeking his
11  assistance in requesting approval from HUD to adopt an amendment to the licensing
12  ordinance that would provide that no business license would be issued to an owner
13  who proposes to rent residential property to Section 8 participants.  In February 2009,
14  Vice Mayor Smith gave an update to the City on his proposal, which had transformed
15  from an outright ban on those intending to accept Section 8 vouchers to "a possible 1-
16  year moratorium on business licenses on single family homes."   Nonetheless, his
17  motive was unambiguous: *"[t]his would be a backdoor way of controlling how many*
18  *vouchers are coming into the City."[116]*   Both Vice Mayor Smith and Mayor Rex
19  Parris reiterated their desire to penalize landlords who rent to Section 8 tenants in a
20  March 2009 City Council meeting, with the Vice Mayor emphasizing the need for a
21  "restrictive ordinance" and the Mayor urging that "the City should be able to identify
22  the people who are going to profit from this; stop doing business with them; make it
23  known to the community who these people are; they are destroying the community;

---

[113] July 24, 2007 Lancaster City Council Minutes.
[114] Id.
[115] Id.
[116] February 19, 2009 Lancaster Section 8 Commission Minutes (emphasis added).

SECOND AMENDED COMPLAINT

1   have the courage to identify these people and have the courage to stop doing business

2   with these individuals."[117]

3        61.    Meanwhile, Representative McKeon forwarded Lancaster's request to

4   HUD, and, on June 17, 2009, he forwarded HUD's response to Vice Mayor Smith.  In

5   its response, HUD stated that the City's actions were plainly counter to the Section 8

6   program's goals of "expanding available housing choices."[118]   The HUD response

7   continued:  "It is worth noting that according to HUD's data, as of December 2008,

8   African-Americans accounted for approximately 75 percent of the city of Lancaster's

9   voucher holders . . . Because an overwhelming majority of city of Lancaster HCV

10  participants are minorities . . ., the proposed amendment will likely have a significant

11  disproportionate effect on these groups."[119]   The HUD response went on to observe

12  that "[b]ecause the majority of voucher holders in the city of Lancaster are African-

13  Americans . . ., the proposed amendment, while facially neutral, *could be found to*

14  *result in an unlawful disparate impact . . . under the [Fair Housing] Act.*"[120]

15       **C.    The County Entities' Role in the Cities' Discrimination**

16       62.    HACoLA has long been aware of the animus against Section 8

17  participants in the Antelope Valley.  In 2006, Carlos Jackson, then the Executive

18  Director of HACoLA, responded to a series of questions from the City of Lancaster

19  regarding the Section 8 program.  The last question from Lancaster was:  "What do

20  you see as the problems occurring in Lancaster with the Section 8 tenants?"[121]

21  Jackson responded, essentially, that the problem was not the Section 8 tenants, but

22  Lancaster's attitude towards them:  "The majority of the Section 8 participants

23  comply with the program obligations and are law-abiding.  The public's perception,

24

25  [117] March 24, 2009 Lancaster City Council Minutes.

    [118] Letter from B. Fulton, HUD, to H. McKeon, U.S. Congress, rec'd May 5, 2009.
26
    [119] Id.
27
    [120] Id. (emphasis added).
28  [121] Letter from C. Jackson, Exec. Dir., HACoLA, to R. LaSala, City Manager, Lancaster, dated Feb.
    23, 2006.

SECOND AMENDED COMPLAINT

1   particularly in the Antelope Valley area, is of an opposite viewpoint.  The recent
2   publicity of cases of criminal activity and fraud by a few Section 8 tenants leads the
3   public to suspect that all Section 8 tenants are criminals and attempting to defraud the
4   program."[122]

5     63. Nonetheless, both HACoLA and LASD have not only complied with
6   many of the Cities' requests, but have actively assisted the Cities in their efforts to
7   drive Section 8 participants out of the Antelope Valley.  Not once in recent years has
8   HACoLA written to the Cities to warn them that their assertions that they have "too
9   many" Section 8 residents or their efforts to reduce the number of Section 8
10  participants living in the Cities were improper and discriminatory.  Instead, both
11  HACoLA and LASD have assisted the Cities in their efforts.

12    64. <u>Supervising – or Failing to Supervise – the Investigators and Sheriff's
13  Department Personnel.</u>  Under the contracts between the County Entities and the
14  Cities, the County Entities retained nominal control over the day-to-day actions of the
15  Cities' Section 8 investigators and the Sheriff's Department personnel, all of whom
16  were County employees, and thus were responsible for ensuring that these individuals
17  complied with applicable laws.  The County Entities failed, however, to ensure that
18  the Section 8 investigators and Sheriff's Department personnel did comply with
19  applicable laws.  As discussed above, the Cities largely directed the actions of the
20  investigators and Sheriff's Department personnel; to the extent the County Entities
21  exercised any control over these individuals, they did so in furtherance of the Cities'
22  discriminatory goals.

23    65. Despite knowledge that the Cities' goals were to reduce the number of
24  Section 8 participants within their borders, HACoLA repeatedly entered into MOUs
25  with the Cities for additional investigators, met with the Cities to discuss various
26  ways to further their goals, and provided the Cities with information to aid them in

27

28  [122] <u>Id.</u>

1    their efforts.   For at least five years, HACoLA provided the Cities with monthly
2    "Antelope Valley Section 8 Activity Reports," which detailed the number of Section
3    8 households in the Cities, as well as the number under investigation, the outcomes of
4    those investigations, and the number who were terminated or who left voluntarily,
5    both for the month and for the year to date.  These reports provided comparative data
6    from the rest of HACoLA's jurisdiction so that, as detailed above, the Cities could
7    see that their enhanced policing was achieving the desired results and making the
8    Antelope Valley a more hostile environment for Section 8 participants than other
9    parts of the County.  In producing these reports, HACoLA was equally able to view
10   the differences between Antelope Valley enforcement actions and those elsewhere,
11   but, despite its duty to supervise the investigators hired pursuant to the MOUs,
12   HACoLA took no steps to correct the disparity.  Indeed, as noted above, HACoLA's
13   investigations protocol contained loopholes that facilitated the Cities' efforts.

14        66.   LASD likewise ignored its responsibility to supervise and discipline its
15   Antelope Valley personnel.   As noted above, Sheriff's deputies accompanied
16   investigators to Section 8 homes far more often in the Cities than in other parts of the
17   County.  Indeed, Sheriff's deputies often invited the City-funded investigators to join
18   them when an address they would be visiting belonged to a Section 8 participant, and
19   gave City-funded investigators free access to Sheriff's Department records in order to
20   seek out possible bases to harass participants.  LASD took no action to discourage –
21   much less stop – this collaboration, despite its discriminatory motivations and effect.

22        67.   <u>Disseminating Identifying Information About Section 8 Participants.</u>  In
23   2006, the City of Lancaster asked HACoLA to provide the City with a list of the
24   households receiving Section 8 vouchers in Lancaster.  After discussion with County
25   Counsel, HACoLA properly refused to provide lists and indicated that Lancaster
26   could request information about Section 8 participants only on a case-by-case basis,
27   stating that "on the occasion when client data is needed by your staff, you may submit
28   a written request to [the Executive Director's] attention.  Please include a statement

34

SECOND AMENDED COMPLAINT

1   explaining how the information will be used and how it will be protected from further

2   dissemination."[123]   In May 2009, the City of La Mirada received a similar response to

3   its request for a Section 8 tenant list.   In an email dated May 21, 2009, HACoLA

4   Program Enforcement Supervisor Adriana Ruiz informed La Mirada's Deputy

5   District Attorney that she could not provide the information requested based on

6   "tenant confidentiality issues and the Privacy Act" as well as "HUD PIH Notice

7   2003-27 – Providing Information to Law Enforcement dated October 23, 2007."[124]

8   Ruiz attached a copy of the HUD PIH Notice to the email, noting that "[a]lthough this

9   notice expired on October 31, 2004, we are still required to comply."[125]   The attached

10  HUD PIH Notice laid out the appropriate means for evaluating requests for

11  identifying information about Section 8 participants under the federal Privacy Act,

12  requiring, among other things, individualized written requests from law enforcement

13  setting forth the circumstances justifying release of identifying information.[126]   The

14  HUD PIH Notice also stated that "[t]he Fair Housing Act prohibits discrimination

15  because of race, national origin, religion, sex, disability and familial status in most

16  housing transactions.   Therefore, when PHAs respond to inquiries from law

17  enforcement officials, the response must be made in a nondiscriminatory fashion, and

18  *all procedures must be uniformly followed.*"[127]

19        68.    However, these procedures were not being followed uniformly.   While

20  Lancaster's 2006 request and La Mirada's May 2009 request were denied, HACoLA

21  in fact regularly provided Section 8 lists to various city police departments and to the

22  Cities of Lancaster and Palmdale.   For example, in an email dated February 18, 2009

23

24  [123] Letter from C. Jackson, Exec. Dir., HACoLA, to R. LaSala, City Manager, Lancaster, dated June
    20, 2006.

25  [124] Email from A. Ruiz, Program Enforcement Supervisor, HACoLA, to C. Albanese, Deputy

26  District Attorney, La Mirada SAGE Program, dated May 21, 2009.

    [125] Id.
27  [126] See id.

28  [127] Id. (attachment) (emphasis added).

SECOND AMENDED COMPLAINT

1   – two months before the Cities submitted their Public Records Act requests –

2   HACoLA Chief Investigator Robert Nishimura provided the "Palmdale Section 8

3   List" to Kyle Bistline and Ron Maples of the Palmdale Sheriff's Station and Kelly

4   Long of Palmdale's Public Safety Department (the same individual who would later

5   sign Palmdale's Public Records Act request).[128]   Similarly, at the March 2009

6   meeting between HACoLA and the Cities, as noted above, a Lancaster representative

7   stated that she had previously received a list of Lancaster's Section 8 participants,[129]

8   which HACoLA sent to Lancaster via Supervisor Antonovich's office.[130]   Free

9   dissemination of Section 8 lists to law enforcement seemed to be common practice as

10   recently as March 2010, when Chief Investigator Nishimura emailed Section 8 lists to

11   both the Gardena and the West Covina police departments.[131]

12       69.   As discussed above, at the March 25, 2009 meeting between HACoLA

13   and the Cities, the Cities devised a plan to use the existence of the business licensing

14   ordinances as a pretext for formally requesting monthly lists of Section 8

15   properties.[132]   Betraying their interest in more than business licensing compliance, the

16   Cities also requested a list of the approved tenants in each rental unit,[133] or at the very

17

18

19   [128] See email from R. Nishimura, HACoLA, to kebistline@lasd.org, rlmaples@lasd.org,
20   klong@cityofpalmdale.org, glbrody@lasd.org, dated Feb. 18, 2009, Subject: PALMDALE
     SECTION 8 LIST, with attached MS Excel file.
21   [129] See attachment to email from B. Lindsay, HACoLA, to M. Badrakhan, HACoLA, dated Mar.
22   31, 2009 re: "5thDistrictMtg.notes.32509."
     [130] See memorandum from C. Cardillo, Acting Exec. Dir., HACoLA, to N. Hickling, Deputy, 5th
23   District, dated Mar. 25, 2009 (stating that "[o]n March 19. 2009, we also provided the list of Section
     8 addresses to you to forward to the City of Lancaster").
24   [131] Email from R. Nishimura, HACoLA, to Erica Taylor, West Covina Police Department, dated
25   Mar. 4, 2010, attaching MS Excel file; email from R. Nishimura, HACoLA, to
     FFASULLO@GARDENAPD.ORG dated Mar. 8, 2010, attaching MS Excel file.
26   [132] See email from N. Hickling, County of Los Angeles 5th Dist., to Mar. 25, 2009 meeting
27   participants dated Mar. 27, 2009 re: Joint Cities and County Housing Authority/Section 8 Meeting.
     [133] See attachment to email from A. Gonzalez, HACoLA, to M. Badrakhan, HACoLA, dated Mar.
28   30, 2009 re: "Meeting Notes."

SECOND AMENDED COMPLAINT

least, the name of the head of each household.[134]   HACoLA's records from the meeting indicate that a senior HACoLA staffer planned to "work with the HACoLA attorney who is researching the language of such a request and provide it to Palmdale and Lancaster."[135]   Shortly after the meeting, each City sent a nearly identical public records request to HACoLA seeking a spreadsheet containing the current business license status, the property owner's name, the property owner's mailing address, and the Section 8 unit address – though notably not the tenant's name – for each Section 8 landlord in their respective jurisdictions.[136]   Beginning in May 2009, HACoLA provided lists that included not only the requested information but also the names of the Section 8 tenants.

70.   HACoLA was well aware that this information was not being used solely to verify that Section 8 landlords had licenses for their rental properties.   In addition to the Cities' obvious interest in the names of the tenants at the March 25 meeting – which would be irrelevant to whether the rental units were licensed – in August 2009, HACoLA Chief Investigator Nishimura was copied on an email from Palmdale's Kelly Long distributing that month's Section 8 list to more than 25 individuals, including numerous Sheriff's Department staff and officers in the City's Code Enforcement department.[137]   From this wide dissemination, it was clear that the Cities were not using the Section 8 lists to verify the landlord's business license, but rather

---

[134] See attachment to email from B. Lindsay, HACoLA, to M. Badrakhan, HACoLA, dated Mar. 31, 2009 re: "5thDistrictMtg.notes.32509."

[135] Id.

[136] See letter from B. Boswell, Lancaster Finance Dir., to C. Carrillo, HACoLA Acting Exec. Dir., dated Apr. 15, 2009; letter from S. Williams, Palmdale City Manager, to C. Carrillo, HACoLA Acting Exec. Dir., dated Apr. 28, 2009.

[137] See email from K. Long, Community Safety Supervisor, Palmdale, to Lee Derrico, Gary Brody, Paul Murphy, Rich Leon, Don Knight, Mike Reddy, Ron Maples, Bud Davis, Oscar Barraza, "LB", Dan Dantice, Henry Corral, Jason Lasley, Jim Molidor, Jim Phillips, Josh Gallagher, Kyle Bistline, Aaron Price, Anthony Bonelli, Cesar Jacobo, Margaret Espinosa, Mike McNeil, Sara Pico, Stacey Earley, Tina Williams, and Walter Jimison, copying Bob Nishimura, dated Aug. 11, 2009, with attached MS Excel file.

SECOND AMENDED COMPLAINT

1    to target Section 8 participants for harassment by law enforcement and code
2    enforcement officers.  HACoLA nonetheless continued to provide a monthly Section
3    8 list to the Cities until at least late 2010.

4         **D.    Additional Avenues for Harassment Pursued By Lancaster**

5         71.    Lancaster has greatly escalated its focus on Section 8 since 2008.  In
6    June 2008, newly elected Mayor R. Rex Parris was adamant about the need to address
7    the Section 8 "problem" and the animus he expressed against Section 8 participants
8    was palpable:  "[Mayor Parris stated t]he Section 8 housing issue needs to be dealt
9    with on a local level in an aggressive manner *rather than becoming a dumping*
10   *ground for Section 8 into the community*.  He stated that six months from now, he
11   hopes to see a much different approach to Section 8 in the Antelope Valley."[138]  In
12   response to the suggestion that the City should be targeting all rentals, not just
13   Section 8, Mayor Parris was unmoved: *"Make no mistake, this City wants to limit*
14   *the number of Section 8 units that are placed in this community*.  . . .  [I]t is a
15   problem that is crushing the community. . . .  [The County and HACoLA] *have been*
16   *dumping Section 8 here* in a much more rapid rate in the last few months.  They have
17   totally ignored the plight of the Antelope Valley and *it is time to go to war*."[139]
18   Notably, at the following City Council meeting, Mayor Parris clarified his intent with
19   respect to Section 8:  "Mayor Parris stated that there will not be any obstacle for
20   seniors and disabled people; the City is not going to do anything about law abiding
21   Section 8 citizens."[140]  Council Member Sherry Marquez reiterated that the City "will
22   not go after people who actually deserve Section 8 funding."[141]

23        72.    Lancaster's openly-expressed animus to Section 8 has continued
24   unabated.  For example, Mayor Parris repeated his hostility to the Section 8 program

25
26   [138] June 10, 2008 Lancaster City Council Minutes (emphasis added).
27   [139] Id. (emphasis added).
28   [140] June 24, 2008 Lancaster City Council Minutes.
     [141] Id.

SECOND AMENDED COMPLAINT

in subsequent communications with HACoLA officials later in 2008, stating that "for too long, the County has treated the City of Lancaster and the Antelope Valley as a repository for Section 8."[142]  Other Council Members have echoed his sentiments.  At the newly formed Section 8 Commission meetings, Council Member Marquez complained that "[u]nfortunately, those that receive the vouchers do not stay in the City of Los Angeles; they migrate to the Antelope Valley."[143]  Adhering to the rhetoric that casts Section 8 participants as criminals, she continued:  "Many prisoners are to be paroled soon which means a number of them will be receiving Section 8 housing, therefore, Lancaster will soon be inundated with another group."[144]  In fact, individuals on parole are not eligible for Section 8 vouchers per HACoLA regulations.[145]  In a March 2009 Lancaster City Council Meeting, Mayor Parris again proclaimed "there must be a reduction in rentals; reduction in Section 8 housing;" and that "he wants to see the numbers drop . . . it has been far too long that this issue has gone on; [the City] must come up with numbers and evaluate if the City is going in the right direction."[146]  The Lancaster City Manager "stated that *the goal of the City is to reduce the numbers to half of what is received now*."[147]

73.    Consistent with these sentiments, Lancaster has deployed a number of additional tactics in recent years above and beyond the intimidation and harassment already described.

74.    <u>Nuisance Ordinance.</u>  In June 2008, Mayor Parris asked the City Council to "[l]ook into a means for making it very easy for neighbors to file nuisance lawsuits with the assistance of the City against group homes and Section 8 housing that becomes a nuisance and where the owners of the property fail to protect the

---

[142] September 3, 2008 Lancaster City Council Minutes (emphasis added).

[143] February 19, 2009 Lancaster Section 8 Commission Minutes.

[144] <u>Id.</u>

[145] HACoLA Administrative Plan Section 2.8.1.

[146] March 24, 2009 Lancaster City Council Minutes.

[147] <u>Id.</u> (emphasis added).

SECOND AMENDED COMPLAINT

neighbors."[148]   The City Council obliged.  On October 14, 2008, it passed Ordinance 908, codified in Lancaster Municipal Code Ch. 8.52, which provides that if a property is the subject of five calls to law enforcement to report "nuisance activity" in a one-year period, the landlord and the tenant will receive a notice of abatement with a schedule of fees for future services.[149]   "Nuisance activity" is defined broadly in Ordinance 908 as including "[a]nything which is injurious to health, or is indecent, or offensive to the senses, or is an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property by an entire community or neighborhood, or by any considerable number of persons."[150]   Under Ordinance 908, the landlord is jointly and severally liable for all fees incurred, and failure to pay the fees will result in the revocation of the landlord's business license.[151]   However, Ordinance 908 gives the landlord an affirmative defense (against both the revocation of the license and the payment of the fees): evict the tenant.[152]   In a meeting of Lancaster's Section 8 Commission, Council Member Marquez heralded the newly passed Nuisance Ordinance as "a great tool to help the City move forward."[153]

75.   Section 8 Commission.  Also in June 2008, Mayor Parris requested that Council Member Marquez be appointed as the Chair of an Ad Hoc Committee to appoint a "Section 8 Commission."[154]   Council Member Marquez was, like Mayor Parris, newly elected, but had appeared before the City Council prior to her election as a citizen concerned about the purported effect of Section 8 on the community.[155] The purpose of the Section 8 Commission would be to "(1) ... look at a Joint Powers

---

[148] June 10, 2008 Lancaster City Council Minutes.
[149] Lancaster Muni. Code § 8.52.060.
[150] Lancaster Muni. Code § 8.52.030.
[151] Lancaster Muni. Code § 8.52.070 - 8.52.080.
[152] Lancaster Muni. Code § 8.52.090.
[153] Oct. 16, 2008 Lancaster Section 8 Commission Minutes.
[154] June 10, 2008 Lancaster City Council Minutes.
[155] Sept. 26, 2006 Lancaster City Council Minutes; May 8, 2007 Lancaster City Council Minutes.

SECOND AMENDED COMPLAINT

Agreement to take over the Section 8 for the Antelope Valley; (2) ... look into the enforcement of Section 8 in a much more aggressive manner; [and] (3) look into drafting an ordinance that would limit the number of business licenses for Section 8 housing . . . ."[156]

76.   One of the first ideas put forth by the Section 8 Commission was a so-called "Good Neighbor Guide," which was suggested by Council Member Marquez on the grounds that "[p]eople need to get involved in calling in on such things as Section 8 code violations," or as the City Manager called them, "problem renters."[157] The "Good Neighbor Guide" went through several iterations, but was up on Lancaster's city website by August 2009.[158]

77.   After formation of a regional housing authority was deemed cost-prohibitive, the Section 8 Commission was renamed the "Neighborhood Vitalization Commission." Nonetheless, its mission statement continued to reflect animus against Section 8 participants: "The Lancaster Neighborhood Vitalization Commission will examine the ongoing cumulative *negative effects of an over-abundance of publicly-subsidized housing*, and *recommend policies and programs to deter the proliferation of subsidized housing* until such time as the city is able to achieve fair-share parity with other cities in Los Angeles County."[159]  In practice, the Commission continued to have regular meetings with HACoLA and County staff and to focus much of its efforts on Section 8 participants.

78.   For example, in July 2009, the Neighborhood Vitalization Commission sent a letter to newly appointed HACoLA Executive Director Sean Rogan, purporting to follow up on a campaign discussed and agreed upon at the March 25, 2009 meeting to dissuade Section 8 participants from coming to the Antelope Valley.  The letter

---

[156] June 10, 2008 Lancaster City Council Minutes.

[157] July 8, 2008 Lancaster City Council Minutes; Sept. 3, 2008 Lancaster City Council Minutes.

[158] Aug. 3, 2009 Lancaster Neighborhood Vitalization Commission Minutes.

[159] Lancaster Neighborhood Vitalization Commission Mission Statement, Feb. 2009 (emphasis added).

SECOND AMENDED COMPLAINT

1  asked, among other things: "1. Where are we with the Cities of Lancaster and
2  Palmdale taking part in the orientation for new Section 8 Voucher holders at the
3  Palmdale office? Also, has a DVD been prepared that was discussed at the meeting in
4  Palmdale several months ago? 2. Where are we with the [HACoLA] doing an ad
5  campaign to let Voucher holders know that it is expensive to live in the Antelope
6  Valley and that there are very few available jobs in the area[?]"[160]   The DVD
7  referenced was apparently intended to focus on rule compliance and bases for
8  termination.[161]   Lancaster sought to "lay down the law" to Section 8 participants by
9  participating in the orientation process.[162]   The advertising campaign referenced was
10 an attempt to dissuade Section 8 participants from moving to the Antelope Valley due
11 to the high costs of heating and cooling a large home as well the lack of jobs and
12 services.[163]

13         79.    In addition, the Neighborhood Vitalization Commission wanted more
14 information from HACoLA on Section 8 participants.  The July 2009 letter stated:
15 "[a]lthough [HACoLA] is currently providing a periodic activity report, members of
16 our Commission have determined that there is insufficient information contained in
17 this existing report to assess progress in a number of other areas and would appreciate
18 a monthly report that contains the following information: 1. The number of elderly,
19 disabled and family Voucher holders in the City of Lancaster . . . ."[164]

20         80.    HACoLA's response denied some of Lancaster's requests, and made
21 clear that attempting to drive Section 8 participants away from the Antelope Valley
22 was illegal.  HACoLA's Rogan stated that Lancaster officials would be permitted to

---

[160] Letter from B. Banks, Lancaster Neighborhood Vitalization Commission, to S. Rogan, HACoLA Exec. Dir., dated July 7, 2009.

[161] See email from R. Nishimura, HACoLA, to M. Badrakhan, HACoLA, dated July 15, 2009 re: FW: City of Lancaster Letter.

[162] Id.

[163] See id.

[164] Letter from B. Banks, Lancaster Neighborhood Vitalization Commission, to S. Rogan, HACoLA Exec. Dir., dated July 7, 2009.

SECOND AMENDED COMPLAINT

1   participate in Section 8 orientations, but that their role would be primarily as
2   observers.[165]   Moreover, he instructed them that "[t]he Housing Authority did not
3   agree to do an ad campaign to let Voucher holders know that it is expensive to live in
4   the Antelope Valley and that there are very few available jobs in the area.   The
5   Housing Authority indicated that both landlords and tenants can access housing
6   availability throughout the County on the socialserve.com website.   *At the last
7   meeting it was mentioned that Fair Housing laws do not allow steering program
8   participants*."[166]   Rogan further refused to comply with Lancaster's request for
9   additional information on a monthly basis.[167]   However, he did provide the
10   information requested on a one-time basis, informing the Commission that the
11   number of elderly in Lancaster was 332, the number of disabled was 892, and the
12   remainder was 1157.[168]

13       81.   <u>Further Demands of HACoLA.</u>   Undeterred by the Neighborhood
14   Vitalization Commission's failure to get substantial cooperation from HACoLA in
15   these efforts to make Lancaster less attractive to Section 8 tenants, Lancaster City
16   Manager Mark Bozigian wrote to Rogan again in October 2009.   In his letter,
17   Bozigian asked HACoLA to create a local preference list for Lancaster; to create a
18   more onerous pre-approval process for Section 8 applicants by requiring inspections
19   and interviews in their current residences; and to develop specific qualification
20   criteria for Lancaster applicants and landlords, including criminal background checks
21   for all household members over the age of fifteen, extended background checks, and
22   imposing a "one strike" rule for drug-related activity.[169]   Moreover, Bozigian asked
23

---

24   [165] <u>See</u> letter from S. Rogan, HACoLA Exec. Dir., to B. Banks, Lancaster Neighborhood
25   Vitalization Commission, dated July 21, 2009.
     [166] <u>Id.</u> (emphasis added).
26   [167] <u>See</u> <u>id.</u>
27   [168] <u>Id.</u>
     [169] <u>See</u> letter from M. Bozigian, Lancaster City Manager, to S. Rogan, HACoLA Exec. Dir., dated
28   Oct. 16, 2009.

SECOND AMENDED COMPLAINT

that "[i]f any family member is arrested, regardless of the charge, the voucher holder must report the arrest to the Housing Authority, which will, in turn, report the arrest to the City of Lancaster and reevaluate the qualifications of the family to participate in the program."[170]   Again, HACoLA responded that it would not comply with many of Lancaster's requests, and in particular that "[l]ocalities within HACoLA's jurisdiction may not have separate policies, procedures or waiting lists."[171]

82.   In July 2010, Dorian Jenkins of HACoLA made a presentation to the Lancaster City Council, and Mayor Parris reiterated his frequent claims that Section 8 tenants were being "dumped" in Lancaster:   "[T]here is a drastic imbalance of Section 8 people being steered to the Antelope Valley ... the Housing Authority wants these people living in Lancaster."[172]   At this same City Council meeting, Mayor Parris's racial animus became even more blatant, as he asked Mr. Jenkins: "Why is it that over 70 % of your recipients are African Americans, when your population base is probably a third African American, a third Hispanic, and a third White?"[173]   Mayor Parris has elsewhere commented that "[t]he problem with Section 8 is that it's unbalanced.  African-Americans comprise 78 percent of the recipients but are only 20 percent of the population.  That's unfair."[174]

83.   In October 2010, the City Council suggested to HACoLA that it should "requir[e] families to adhere to all rules and laws including that their children attend school" and that HACoLA could "use Lancaster as a pilot program for this."[175] Notably, Mayor Parris conceded that he had no basis to believe that children from Section 8 families were not attending school: "That would require us first to find out,

---

[170] Id.

[171] Letter from S. Rogan, HACoLA Exec. Dir., to M. Bozigian, Lancaster City Manager, dated December 2, 2009.

[172] July 27, 2010 Lancaster City Council Minutes.

[173] July 27, 2010 Lancaster City Council Meeting Video.

[174] Tricia Tighe, Conversations with the Mayor: the Difficult Issue of Section 8, The AV News, http://www.avnewstodayonline.com/LancasterPageConversationsSection8.html.

[175] Oct. 26, 2010 Lancaster City Council Minutes.

SECOND AMENDED COMPLAINT

1   is it a problem? Maybe everybody on Section 8, all of their kids are attending school
2   and that would be something we should know. But if it's not, why can't we have a
3   pilot program in Lancaster to enforce that. We certainly have the network in
4   Lancaster that is capable of providing the information."[176]  The network Mayor Parris
5   referred to is a system of truancy ticketing and truancy sweeps under which students
6   may be fined for being late for school, and which has itself been criticized as
7   targeting black and Latino students.[177]  Although HACoLA has refused to accede to
8   Lancaster's request, as late as April 2011, Lancaster was still pursuing a means to
9   make truancy a ground for Section 8 termination, still in the complete absence of any
10  factual basis for asserting that truancy by the children in Section 8 participant
11  families is a problem.[178]

12      84.   Attempt to Secede from HACoLA.  Most recently, Lancaster has been
13  considering a revised proposal to seize control of Section 8 operations from
14  HACoLA, which would free it to devise Section 8 regulations as draconian as
15  possible within the broad discretion given by HUD to local housing authorities.[179]  As
16  noted above, Lancaster's Section 8 Commission was originally formed to explore the
17  possibility of creating a local Public Housing Authority that would replace HACoLA
18  as the Section 8 program administrator in Lancaster.[180]  Upon review of the financial
19  and logistical obstacles to creating its own Public Housing Authority, the
20  Commission and its consultants recommended in 2009 against taking over
21  administration of Section 8.[181]  Notably, the pertinent Commission minutes reflect that

22  _____

23  [176] Oct. 26, 2010 Lancaster City Council Meeting Video.

24  [177] See Britney M. Walker, Truancy Proving to Be a Costly Issue for Lancaster Students, Parents, Our Weekly, Mar. 10, 2011.

25  [178] See Apr. 5, 2011 Lancaster Neighborhood Vitalization Commission Agenda

26  [179] See Apr. 5, 2011 Lancaster Neighborhood Vitalization Commission Agenda; May 3, 2011 Lancaster Neighborhood Vitalization Commission Agenda.

27  [180] See Oct. 16, 2008 Lancaster Section 8 Commission Minutes; Feb. 19, 2009 Lancaster Section 8 Commission Minutes.

28  [181] See Feb. 19, 2009 Lancaster Section 8 Commission Minutes.

SECOND AMENDED COMPLAINT

1  "[t]he proposed recommendation not to take over the administration of the [Section 8]
2  program is not solely based on the lack of new vouchers, the cost to administer the
3  program, and lack of will to create a multi-jurisdictional housing authority.   The
4  recommendation is also based on the success of HACoLA's sustained efforts and
5  commitments to deter disorderly Section 8 tenants in Lancaster over the last three
6  years . . . ."[182]  Because HACoLA has not complied with all of Lancaster's demands
7  for action in the City's war on Section 8,[183] Lancaster initiated in 2010 a new study of
8  the feasibility of developing a local agency to manage Section 8 vouchers in
9  Lancaster, culminating in a consultant's report that was presented to the
10  Neighborhood Vitalization Commission in April 2011.[184]   The consultant's report
11  advised that "[i]f Lancaster believes and documents that HACoLA cannot properly
12  manage and administer the program for the city, we do recommend that Lancaster
13  submit an application to the State of California and HUD through the local field
14  office to establish the Lancaster [Public Housing Authority]."[185]   At its May 3, 2011
15  meeting, the Neighborhood Vitalization Commission proposed to do just that.[186]

16  **II.**   **SECTION 8 PARTICIPANTS MUST CHOOSE BETWEEN A**
17       **BETTER HOME FOR THEIR FAMILIES AND FLEEING**
18       **MUNICIPAL INTIMIDATION AND HARASSMENT**

19       85.   As a result of the Defendants' discriminatory harassment of Section 8
20  participants, Section 8 families in the Antelope Valley live in constant fear that they
21  or their families will draw attention to themselves and become a target for attack.  In
22  the cases of Plaintiffs Sheila Williams, Michelle Ross, and Jaquinn Davis, those fears

23  ---
[182] Id.
24  [183] See letter from S. Rogan, HACoLA Exec. Dir., to M. Bozigian, Lancaster City Manager, dated
25  December 2, 2009; letter from S. Rogan, HACoLA Exec. Dir., to B. Banks, Lancaster
   Neighborhood Vitalization Commission, dated July 21, 2009.
26  [184] See MFR Report: Feasibility Assessment for Development of a Local Public Housing Authority
27  for the City of Lancaster, dated March 22, 2011.
   [185] Id.
28  [186] See May 3, 2011 Lancaster Neighborhood Vitalization Commission Agenda.

SECOND AMENDED COMPLAINT

1  were borne out.  Ms. Williams, Ms. Ross, and Ms. Davis all came to the Antelope
2  Valley to find a better place to raise their children.  Instead, they suffered harassment
3  by City-funded investigators and, in the cases of Ms. Williams and Ms. Ross,
4  humiliation in front of a community turned hostile as a result of the Cities' anti-
5  Section 8 rhetoric.

6       86.    Sheila Williams is a black single mother and a participant in the Section
7  8 Housing Choice Voucher program.  She lived in Lancaster, California for about ten
8  years with her four youngest children.  While living in Lancaster, she worked as a
9  preschool teacher.  Her children attended the local schools and earned excellent
10  grades.

11       87.    While living in the Antelope Valley, Ms. Williams was always careful to
12  avoid telling anyone that she used Section 8 to help pay her rent, particularly in the
13  last few years.  Comments by Mayor Parris and others in the City government about
14  their desire to reduce the number of Section 8 participants in Lancaster made Ms.
15  Williams fear that she might lose her Section 8 voucher if she drew attention to
16  herself.  She also feared being branded with the stereotypes that Mayor Parris and
17  others ascribed to Section 8.  Her fears were heightened as she heard from friends that
18  many Section 8 families in Lancaster were having their vouchers terminated.

19       88.    In October 2009, Ms. Williams' fears were realized.  Sheriff's deputies
20  came to her home one day while she was at work, allegedly responding to a call about
21  a potential burglary.  There was no burglary; Ms. Williams' son and his friends were
22  at the home.  Rather than leaving once it was apparent that Ms. Williams' home was
23  not being burglarized, the Sheriff's deputies determined that the home was a Section
24  8 unit and contacted one of the City-funded housing investigators for Lancaster,
25  Allen Mullins.  Investigator Mullins arrived, and together with the deputies, searched
26  the entire home.  The deputies also reported Ms. Williams to the Department of
27  Children and Family Services and to Lancaster Code Enforcement.  Ms. Williams's
28  son called her at work to tell her about the deputies' and investigator's search.  She

SECOND AMENDED COMPLAINT

1   came home immediately but the deputies and investigator had already left by the time
2   she arrived.

3       89.    A few weeks later, Ms. Williams received a notice of proposed
4   termination of her Section 8 voucher – which she challenged at an informal hearing
5   and won.  The Department of Children and Family Services took no action against
6   her. However, the damage from the investigation had already been done.

7       90.    The investigation itself, and the months of worrying about losing her
8   voucher or, worse, her children, understandably took a toll on Ms. Williams.
9   Moreover, because of the Sheriff's deputies' and investigator's search of her home,
10  her neighbors discovered that her family was part of the Section 8 program.
11  Formerly friendly neighbors became hostile to her and her children, embracing the
12  negative image of Section 8 participants painted by Mayor Parris and the City.
13  Adding to Ms. Williams' discomfort, a marked Lancaster City car, with what
14  appeared to be a HACoLA staff person in it, began driving past her home at least two
15  to three times per week.  Sometimes it parked in front of her home for a period of
16  time. Ms. Williams felt she was under constant surveillance, and the presence of the
17  City vehicle made her family even more suspect in the eyes of her neighbors.  In
18  addition, after the investigation, Ms. Williams found that her landlord no longer
19  wanted her as a tenant because the City was monitoring the property closely, and the
20  landlord had apparently been fined under Lancaster's nuisance ordinance.  Thus, the
21  landlord began sitting outside of Ms. Williams' home and monitoring Ms. Williams'
22  family.

23      91.    After several months of this treatment, Ms. Williams decided she had to
24  leave the Antelope Valley.  She feared hostility from her neighbors and she feared
25  even more that the City or investigators would manufacture another reason to try to
26  take away her Section 8 voucher.  Without rental assistance, her family would be
27  homeless.  Thus, she left the Antelope Valley.  This entailed not only leaving her
28  home and uprooting her children from their schools, but also leaving her job.

SECOND AMENDED COMPLAINT

92.   Ms. Williams continues to live in Los Angeles County and still participates in the Section 8 voucher program.  She would consider moving back to Lancaster or Palmdale if she could feel safe from harassment and derision simply because she is a Section 8 participant.  She had a good job in Lancaster and has been unable to find another one since.

93.   Michelle Ross is a black single mother and a participant in the Section 8 housing choice voucher program.  Ms. Ross and her children lived in Palmdale for three and a half years.  She and her children lived in a home that was safe and comfortable, and her children attended the local schools and were happy there. Between May 2009 and November 2010, Palmdale's Investigator Brody and local Sheriff's deputies began a series of "compliance checks" (as the investigator called them) or "probation sweeps" (as the deputies called them), which ultimately led Ms. Ross to leave Palmdale.   Each of these checks was conducted without any justification, and most involved an excessive and intimidating show of force.

94.   At the first compliance check/probation sweep, in May 2009, investigator Brody and approximately fifteen Sheriff's deputies appeared at Ms. Ross's door with their guns out of their holsters.  In the face of this show of force, Ms. Ross allowed them to enter her home, fearing her Section 8 voucher would be in jeopardy if she did not.  Investigator Brody and the deputies asked her who in the household was on probation, and she responded that her two sons – both minors – were on probation.  Investigator Brody and the deputies then proceeded to search her home before they finally left.  The experience left Ms. Ross scared, because she did not understand why her home was being searched or why the deputies had their guns drawn.

95.   A few months later, in November 2009, Brody returned to Ms. Ross's home, again accompanied by about fifteen armed deputies.  Ms. Ross was not there when they arrived but came home shortly thereafter.  The deputies and Brody asked Ms. Ross where her sons were – they were in school.  Brody and the deputies left.

49

96.     A few months after that, in February 2010, Ms. Ross received a notice of proposed termination of her Section 8 voucher.  The ground for termination was her alleged failure to report her sons' juvenile adjudications.  HACoLA scheduled a conference at the Palmdale HACoLA office.  At the meeting, Brody showed Ms. Ross that he had her sons' juvenile records, telling her that the deputies give him any information he wants related to a Section 8 household.  Brody told Ms. Ross that her voucher could be terminated because she had not reported the contents of her sons' juvenile records to HACoLA.  He threatened Ms. Ross's 15-year-old son, telling him that his brother and sister would end up on the street because of him.  The case worker, however, reviewed the Section 8 program rules and determined that the termination Brody had proposed was improper.  Juvenile records are confidential and juvenile adjudications in the household are not a basis for terminating a Section 8 voucher.

97.     A few months after the meeting, in June 2010, Brody again appeared at Ms. Ross's home, again accompanied by approximately fifteen Sheriff's deputies with their guns drawn.  This time, they said they were looking for Ms. Ross's eldest son, who was not living in the home and had not been living there during any of the prior checks.  The deputies searched Ms. Ross's home again, and then left.

98.     What would become the final compliance check/probation sweep happened a few months later, in November 2010.  Brody and about twenty Sheriff's deputies came to Ms. Ross's home while she was not there.  Her son answered the door.  The deputies ran into the home and searched it.  Investigator Brody then apparently opened the garage and took pictures.  He told Ms. Ross's son to call her, so he could speak to her on the phone.  In that phone call, Brody asked Ms. Ross about two Hummer vehicles in her garage.  She told him that the vehicles belonged to a friend and gave Investigator Brody the owner's information.  It is Ms. Ross's understanding that HACoLA confirmed the vehicles belonged to her friend and not to Ms. Ross.

50

99.   Like Ms. Williams, after the searches, Ms. Ross quickly learned that many in her community embraced the Cities' stereotypes about Section 8 residents. After the last search, pictures of Ms. Ross's home and her open garage with the Hummer vehicles in it were posted on a Facebook page called "I HATE SECTION 8." The webpage identified her Section 8 status and where she lived. Comments on the webpage were full of violence and malice, and included a threat to burn her house down. Her children were taunted at school and by passers-by on her street. The taunts were blatantly racial: her children were called "dirty Section 8 niggers." Ms. Ross saw people she did not recognize stopping in front of her home and taking pictures.

100.   On January 3, 2011, as Ms. Ross was leaving home to drop her children off at school, she was shocked to discover that "I hate Section 8 Niggers," had been graffitied on her garage, and that a window had been broken. Ms. Ross called the Sheriff's department, but their only response was to accuse her children of breaking the window. After the graffiti incident, attacks on her children escalated. One day, young people drove by her home and threw what appeared to be urine at her children, again hurling the slur: "Section 8 niggers."

101.   After these incidents, Ms. Ross and her children so feared for their safety that they no longer slept in their home. They stayed with friends while looking for another landlord to accept Ms. Ross's Section 8 voucher. Ms. Ross had limited transportation and did not want to take her children out of their school, so she was constrained to look for housing in the Antelope Valley.

102.   Ms. Ross again found that the Cities' stigmatization of Section 8 tenants, as well as their harassment of Section 8 landlords, was having an effect. Most landlords she approached said they would not take a Section 8 voucher. Ms. Ross found that landlords in both Cities appeared to accept the Cities' message that most Section 8 tenants were criminals and should not be welcomed. Ms. Ross finally found a place to rent in Lancaster. After the filing of this lawsuit, which she

51

1   originally brought under the pseudonym Judy Doe, and after her true identity was
2   released to the Cities and the press without warning, Ms. Ross sought to relocate to a
3   home outside the Antelope Valley.   She continues to participate in the Section 8
4   program administered by HACoLA.   If her family could return to the Antelope
5   Valley without fear of harassment, Ms. Ross would welcome the opportunity to do
6   so, so that her children could take advantage of the neighborhoods and schools.

7       103.   Jaquinn Davis is a black single mother and a Section 8 participant.  She
8   recently completed cosmetology school and is currently interning at a beauty salon in
9   Los Angeles while she waits for her license.  Ms. Davis also receives assistance from
10  the Department of Public Social Services ("DPSS").  She moved to Lancaster in April
11  2010 because she could not find a unit to rent in Los Angeles that would both accept
12  Section 8 and did not have severe habitability problems.

13      104.   Ms. Davis has a young son who suffers from asthma.   The home they
14  rented using her Section 8 voucher in Los Angeles was infested with mold, presenting
15  a danger to any resident and a particularly acute danger to her asthmatic son.  She
16  looked for another home nearby, but found nothing better.  Ms. Davis turned to the
17  Antelope Valley in hopes of finding a clean, well-maintained home where her son's
18  health would not be in further jeopardy.

19      105.   Upon moving to Lancaster, she immediately enrolled her son in the local
20  elementary school.  Before moving to the Antelope Valley, her son was an honor roll
21  student, and she expected he would do just as well at a new school.   However, as
22  soon as her son began attending the local school in Lancaster, he became a target for
23  bullies, and as a result, his grades dropped.   Ms. Davis approached the school
24  administration, but they were of no help. At the start of the new school year, Ms.
25  Davis decided it was in her son's best interest to pull him out of the elementary
26  school in Lancaster and re-enroll him at his old school in Los Angeles. Free from
27  bullying, her son's grades went back up.

28

SECOND AMENDED COMPLAINT

1       106.  As a result, Ms. Davis and her son commute to Los Angeles from

2   Lancaster Monday through Friday each week.  She and her son take the train to a

3   train station in Los Angeles, where her mother picks up her son and takes him to

4   school and Ms. Davis herself catches the bus to the beauty salon where she interns.

5   This commute is long and exhausting, but Ms. Davis believes it is in the best interest

6   of her son to have him in a school where he is not bullied and is on the honor roll, and

7   it is in her own best interest to intern while she waits for her cosmetologist's license

8   so that she can learn a variety of skills and get a better job once she has her license.

9   In short, Ms. Davis is making sacrifices to help craft a better future for herself and her

10   son, one that she hopes will allow her to support herself without government

11   assistance.

12       107.  In February 2011, the DPSS fraud unit contacted Ms. Davis and

13   informed her that she was being investigated because DPSS did not believe she lived

14   in Lancaster.  The fraud unit questioned how she could afford to travel back and forth

15   from Lancaster to Los Angeles for work and for her son's schooling.  In order to

16   prove that she was living in Lancaster and had no unreported income, the DPSS case

17   worker asked her to provide a letter from her son's school indicating he lives in

18   Lancaster, rent receipts, utility bills, train stubs, and a declaration.  Ms. Davis

19   promptly submitted all these documents as requested, and responded immediately to

20   all of DPSS's follow up questions.  Within a few weeks, she was informed that DPSS

21   had closed its case and was satisfied that no fraud was being committed.

22       108.  Months later, in June 2011, Investigator Mullins appeared at Ms. Davis's

23   home and asked for authorization to conduct a compliance check.  Ms. Davis

24   consented, fearing she might lose her Section 8 voucher if she refused.  When Ms.

25   Davis asked Investigator Mullins why he was conducting the compliance check, he

26   said that DPSS had told him that she was subleasing her Section 8 unit.  Ms. Davis

27   explained that DPSS had cleared her of any fraud months earlier, and pulled out

28   copies of all of the documents she had sent to DPSS – documents that proved that she

lived in her unit.  Investigator Mullins told her that he already had copies of all of those documents.

109.  Despite the fact that DPSS had closed its investigation, and that Investigator Mullins already had extensive documentation demonstrating that Ms. Davis lived in her home, Mullins conducted an inspection of the entire home – pulling out bureau drawers and looking through closets.  Mullins expressed surprise that Ms. Davis's home was clean and well-kept, as though he expected otherwise.  Unsurprisingly, he found no evidence that she was subletting the home.

110.  Nonetheless, in July 2011, a HACoLA staff person scheduled Ms. Davis for a counseling session.  At the session, Ms. Davis was asked to sign a copy of the Housing Authority rules.  Ms. Davis never received a clear answer as to why she was being "counseled," as she had broken no rules, and had never been investigated prior to moving to Lancaster.

111.  Lancaster and Palmdale officials' statements have made it clear Ms. Davis and her son are not welcome, and the baseless investigation and counseling to which she was subjected confirm that animus.  Ms. Davis fears future unwarranted harassment, and even termination of her voucher.  Without the Section 8 voucher program, she and her son would be homeless.  She thus feels forced to choose between the better housing conditions she has found in the Antelope Valley and the fear that she could end up with no home at all.

## FIRST CAUSE OF ACTION
### 42 U.S.C. § 3604(a)
### AGAINST ALL DEFENDANTS

112.  Plaintiffs repeat and incorporate by reference the allegations set forth in paragraphs 1 through 110 above.

113.  The Fair Housing Act, 42 U.S.C. § 3604(a) provides that: "It shall be unlawful . . . [t]o refuse to sell or rent after the making of a bona fide offer, or to

SECOND AMENDED COMPLAINT

refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, . . . or national origin."

114.   The Cities of Lancaster and Palmdale have violated 42 U.S.C. § 3604(a) by undertaking a series of actions expressly designed to exclude and discriminate against Section 8 participants in their Cities, including: (1) subjecting current tenants to unwarranted, constant surveillance and harassment as well as frequent invasions of their homes under the guise of investigations and compliance checks; (2) attempting to dissuade landlords from renting to Section 8 tenants and subjecting those who do to increased surveillance and harassment; and (3) attempting additional action to dissuade would-be Lancaster and Palmdale residents from moving to the Antelope Valley.

115.   The County Entities have violated 42 U.S.C. § 3604(a) by aiding and abetting the Cities in their discriminatory scheme and failing to supervise their respective employees working in the Cities.  As a result of their actions, Section 8 participants have been subject to unwarranted, constant surveillance and harassment as well as frequent invasions of their homes under the guise of investigations and compliance checks.

116.   The vast majority of Section 8 participants are either black or Latino, and Section 8 has been targeted by Defendants because the vast majority of Section 8 participants are black or Latino.

117.   The Cities' actions constitute a pattern or practice of intentional exclusion and discrimination.  All Defendants' actions also have an unjustified disparate impact on blacks and Latinos, who make up the vast majority of Section 8 participants in Lancaster and Palmdale, and in Los Angeles County.  Therefore, these actions otherwise make unavailable or deny, a dwelling to Plaintiffs because of race, color, or national origin in violation of 42 U.S.C. § 3604(a).

SECOND AMENDED COMPLAINT

118.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have suffered irreparable harm and this harm will continue absent injunctive relief.

## SECOND CAUSE OF ACTION

## 42 U.S.C. § 3604(b)

## AGAINST ALL DEFENDANTS

119.   Plaintiffs repeat and incorporate by reference the allegations set forth in paragraphs 1 through 110 above.

120.   The Fair Housing Act, 42 U.S.C. § 3604(b) provides that: "It shall be unlawful . . . [t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, . . . or national origin."

121.   The Cities of Lancaster and Palmdale have violated 42 U.S.C. § 3604(b) by undertaking a series of actions expressly designed to exclude and discriminate against Section 8 participants in their Cities, including: (1) subjecting current tenants to unwarranted, constant surveillance and harassment as well as frequent invasions of their homes under the guise of investigations and compliance checks; (2) attempting to dissuade landlords from renting to Section 8 tenants and subjecting those who do to increased surveillance and harassment; and (3) attempting additional action to dissuade would-be Lancaster and Palmdale residents from moving to the Antelope Valley.

122.   The County Entities have violated 42 U.S.C. § 3604(b) by aiding and abetting the Cities in their discriminatory scheme and failing to supervise their respective employees working in the Cities.  As a result of their actions, Section 8 participants have been subject to unwarranted, constant surveillance and harassment as well as frequent invasions of their homes under the guise of investigations and compliance checks.

SECOND AMENDED COMPLAINT

123.   The vast majority of Section 8 participants are either black or Latino, and Section 8 has been targeted by Defendants because the vast majority of Section 8 participants are black or Latino.

124.   The Cities' actions constitute a pattern or practice of intentional exclusion and discrimination.   All Defendants' actions also have an unjustified disparate impact on blacks and Latinos, who make up the vast majority of Section 8 participants in Lancaster and Palmdale, and in Los Angeles County.   Therefore, these actions have the effect of discriminating against Plaintiffs in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith because of race, color or national origin in violation of 42 U.S.C. § 3604(b).

125.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have suffered irreparable harm and this harm will continue absent injunctive relief.

**THIRD CAUSE OF ACTION**

**42 U.S.C. § 3617**

**AGAINST THE CITIES**

126.   Plaintiffs repeat and incorporate by reference the allegations set forth in paragraphs 1 through 110 above.

127.   The Fair Housing Act, 42 U.S.C. § 3617 provides that: "It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title." Department of Housing and Urban Development regulation 24 C.F.R. § 100.400, which interprets Section 3617, provides that: "Conduct made unlawful under this section includes, but is not limited to, the following:  (1) Coercing a person, either orally, in writing, or by other means, to deny or limit the benefits provided that

57

1   person in connection with the sale or rental of a dwelling or in connection with a
2   residential real estate-related transaction because of race, color, . . . or national origin.
3   (2) Threatening, intimidating or interfering with persons in their enjoyment of a
4   dwelling because of the race, color, . . . or national origin of such persons, or of
5   visitors or associates of such persons."

6       128.   The Cities of Lancaster and Palmdale have violated 42 U.S.C. § 3617 by
7   undertaking a series of actions expressly designed to exclude and discriminate against
8   Section 8 participants in their Cities, including: (1) subjecting current tenants to
9   unwarranted, constant surveillance and harassment as well as frequent invasions of
10  their homes under the guise of investigations and compliance checks; (2) attempting
11  to dissuade landlords from renting to Section 8 tenants and subjecting those who do
12  to increased surveillance and harassment; and (3) attempting additional action to
13  dissuade would-be Lancaster and Palmdale residents from moving to the Antelope
14  Valley.

15      129.   The vast majority of Section 8 participants are either black or Latino,
16  and Section 8 has been targeted by Defendants because the vast majority of Section 8
17  participants are black or Latino.

18      130.   The Cities' actions constitute a pattern or practice of intentional
19  exclusion and discrimination.  Their actions also have an unjustified disparate impact
20  on blacks and Latinos, who make up the vast majority of Section 8 participants in
21  Lancaster and Palmdale, and in Los Angeles County.  Therefore, these actions have
22  the effect of coercing, intimidating, threatening, and interfering with Plaintiffs'
23  exercise of their Fair Housing rights because of race, color or national origin in
24  violation of 42 U.S.C. §3617.

25      131. As a direct and proximate result of Defendants' unlawful conduct,
26  Plaintiffs have suffered irreparable harm and this harm will continue absent
27  injunctive relief.

28

**FOURTH CAUSE OF ACTION**

**42 U.S.C. § 1983 / U.S. CONST. AMEND. XIV**

**AGAINST THE CITIES**

132.   Plaintiffs repeat and incorporate by reference the allegations set forth in paragraphs 1 through 110 above.

133.   42 U.S.C. § 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ." The Fourteenth Amendment to the United States Constitution provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws" on the basis of race or ethnicity.

134.   The Cities of Lancaster and Palmdale have violated the Equal Protection Clause of the Fourteenth Amendment by undertaking a series of actions expressly designed to exclude and discriminate against Section 8 participants in their Cities, including: (1) subjecting current tenants to unwarranted, constant surveillance and harassment as well as frequent invasions of their homes under the guise of investigations and compliance checks; (2) attempting to dissuade landlords from renting to Section 8 tenants and subjecting those who do to increased surveillance and harassment; and (3) attempting additional action to dissuade would-be Lancaster and Palmdale residents from moving to the Antelope Valley.

135.   The vast majority of Section 8 participants are either black or Latino, and Section 8 has been targeted by Defendants because the vast majority of Section 8 participants are black or Latino.

136.   The Cities' actions constitute a pattern or practice of intentional exclusion and discrimination on the basis of race and ethnicity.  Therefore, these

59

1   actions have the effect of denying Section 8 tenants within the Cities' jurisdiction the
2   equal protection of the laws.

3      137.   As  a  direct  and  proximate  result  of  Defendants'  unlawful  conduct,
4   Plaintiffs  have  suffered  irreparable  harm  and  this  harm  will  continue  absent
5   injunctive relief.

6                      **FIFTH CAUSE OF ACTION**
7                    **CAL. GOV'T CODE § 12955(k)**
8                    **AGAINST ALL DEFENDANTS**

9      138.   Plaintiffs repeat and incorporate by reference the allegations set forth in
10   paragraphs 1 through 110 above.

11     139.   California Government Code § 12955(k) provides: "It shall be unlawful:
12   . . . To otherwise make unavailable or deny a dwelling based on discrimination
13   because of race, color, . . . or national origin."

14     140.   The Cities of Lancaster and Palmdale have violated Cal. Gov't Code
15   § 12955(k) by undertaking a series of actions expressly designed to exclude and
16   discriminate against Section 8 participants in their Cities, including: (1) subjecting
17   current  tenants  to  unwarranted,  constant  surveillance  and  harassment  as  well  as
18   frequent invasions of their homes under the guise of investigations and compliance
19   checks; (2) attempting to dissuade landlords from renting to Section 8 tenants and
20   subjecting those who do to increased surveillance and harassment; and (3) attempting
21   additional  action  to  dissuade  would-be  Lancaster  and  Palmdale  residents  from
22   moving to the Antelope Valley.

23     141.   The County Entities have violated Cal. Gov't Code   § 12955(k) by
24   aiding and abetting the Cities in their discriminatory scheme and failing to supervise
25   their respective employees working in the Cities.  As a result of their actions, Section
26   8 participants have been subject to unwarranted, constant surveillance and harassment
27   as well as frequent invasions of their homes under the guise of investigations and
28   compliance checks.

1    142.  The vast majority of Section 8 participants are either black or Latino,
2    and Section 8 has been targeted by Defendants because the vast majority of Section 8
3    participants are black or Latino.

4    143.  The Cities' actions constitute a pattern or practice of intentional
5    exclusion and discrimination.  All Defendants' actions also have an unjustified
6    disparate impact on blacks and Latinos, who make up the vast majority of Section 8
7    participants in Lancaster and Palmdale, and in Los Angeles County.  Therefore, these
8    actions have the effect of making unavailable or denying a dwelling based on
9    discrimination because of race, color or national origin in violation of Cal. Gov't
10   Code § 12955(k).

11   144.  As a direct and proximate result of Defendants' unlawful conduct,
12   Plaintiffs have suffered irreparable harm and this harm will continue absent
13   injunctive relief.

14                          **SIXTH CAUSE OF ACTION**
15                        **CAL. GOV'T CODE § 11135**
16                       **AGAINST ALL DEFENDANTS**

17   145.  Plaintiffs repeat and incorporate by reference the allegations set forth in
18   paragraphs 1 through 110 above.

19   146.  California Government Code § 11135 provides that:  "No person in the
20   State of California shall, on the basis of race, national origin, ethnic group
21   identification, . . . [or] color, . . . be unlawfully subjected to discrimination under, any
22   program or activity that . . . receives any financial assistance from the state."

23   147.  The Cities of Lancaster and Palmdale and the County of Los Angeles
24   receive financial assistance from the State of California.

25   148.  The Cities of Lancaster and Palmdale violated Cal. Gov't Code § 11135
26   by undertaking a series of actions expressly designed to exclude and discriminate
27   against Section 8 participants in their Cities, including: (1) subjecting current tenants
28   to unwarranted, constant surveillance and harassment as well as frequent invasions of

1  their homes under the guise of investigations and compliance checks; (2) attempting
2  to dissuade landlords from renting to Section 8 tenants and subjecting those who do
3  to increased surveillance and harassment; and (3) attempting additional action to
4  dissuade would-be Lancaster and Palmdale residents from moving to the Antelope
5  Valley.

6      149.  The County Entities have violated Cal. Gov't Code § 11135 by aiding
7  and abetting the Cities in their discriminatory scheme and failing to supervise their
8  respective employees working in the Cities.  As a result of their actions, Section 8
9  participants have been subject to unwarranted, constant surveillance and harassment
10  as well as frequent invasions of their homes under the guise of investigations and
11  compliance checks.

12      150.  The vast majority of Section 8 participants are either black or Latino,
13  and Section 8 has been targeted by Defendants because the vast majority of Section 8
14  participants are black or Latino.

15      151.  The Cities' actions constitute a pattern or practice of intentional
16  exclusion and discrimination.  All Defendants' actions also have an unjustified
17  disparate impact on blacks and Latinos, who make up the vast majority of Section 8
18  participants in Lancaster and Palmdale, and in Los Angeles County.  Therefore, these
19  actions have the effect of discriminating on the basis of race, color, ethnic group
20  identification, or national origin in violation of Cal. Gov't Code § 11135.

21      152.  As a direct and proximate result of Defendants' unlawful conduct,
22  Plaintiffs have suffered irreparable harm and this harm will continue absent
23  injunctive relief.

## SEVENTH CAUSE OF ACTION
## CAL. CONST. ART. I § 7, ART. IV, § 16
## AGAINST THE CITIES

27      153.  Plaintiffs repeat and incorporate by reference the allegations set forth in
28  paragraphs 1 through 110 above.

SECOND AMENDED COMPLAINT

154.   Section 7(a) of Article I of the California Constitution provides that "[a] person may not be ... denied equal protection of the laws" on the basis of race or ethnicity.

155.   Section 16(a) of Article IV of the California Constitution provides that "[a]ll laws of a general nature have uniform operation."

156.   The Cities of Lancaster and Palmdale have violated the Equal Protection Clauses of the California Constitution by undertaking a series of actions expressly designed to exclude and discriminate against Section 8 participants in their Cities, including: (1) subjecting current tenants to unwarranted, constant surveillance and harassment as well as frequent invasions of their homes under the guise of investigations and compliance checks; (2) attempting to dissuade landlords from renting to Section 8 tenants and subjecting those who do to increased surveillance and harassment; and (3) attempting additional action to dissuade would-be Lancaster and Palmdale residents from moving to the Antelope Valley.

157.   The vast majority of Section 8 participants are either black or Latino, and Section 8 has been targeted by Defendants because the vast majority of Section 8 participants are black or Latino.

158.   The Cities' actions constitute a pattern or practice of intentional exclusion and discrimination on the basis of race and ethnicity.  Therefore, these actions have the effect of denying Section 8 tenants within the Cities' jurisdiction the equal protection of the laws.

159.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have suffered irreparable harm and this harm will continue absent injunctive relief.

1

## **PRAYER FOR RELIEF**

2   WHEREFORE, Plaintiffs pray for judgment:

3        1.      Declaring that Defendants' actions seeking to exclude and discriminate
4   against Section 8 participants or having the unjustified effect of excluding and
5   discriminating against Section 8 participants violate state and federal law;

6        2.      Enjoining Defendants from taking any further actions that are designed
7   to exclude and discriminate against Section 8 participants or that have the unjustified
8   effect of excluding and discriminating against Section 8 participants;

9        3.      Declaring that Defendants' actions seeking to dissuade Section 8
10  participants from residing in the Cities or having the unjustified effect of dissuading
11  Section 8 participants from residing in the Cities violate state and federal law;

12       4.      Enjoining Defendants from taking any further actions that are designed
13  to dissuade Section 8 participants from residing in the Cities or that have the
14  unjustified effect of dissuading Section 8 participants from residing in the Cities;

15       5.      Declaring that Defendants' actions seeking to dissuade landlords from
16  renting to Section 8 participants in the Cities or having the unjustified effect of
17  dissuading landlords from renting to Section 8 participants in the Cities violate state
18  and federal law;

19       6.      Enjoining Defendants from taking any further actions that are designed
20  to dissuade landlords from renting to Section 8 participants in the Cities or that have
21  the unjustified effect of dissuading landlords from renting to Section 8 participants in
22  the Cities;

23       7.      Ordering Defendants to take affirmative steps necessary to remedy the
24  effects of their unlawful acts;

25       8.      Awarding Plaintiffs the costs, expenses, and attorneys' fees incurred in
26  this action; and

27       9.      Awarding Plaintiffs such other and further relief as may be deemed by
28  this Court to be just and proper.

SECOND AMENDED COMPLAINT

| | |
|---|---|
| DATED: February 8, 2012 | *Catherine E. Llamon* /ACP |
| | Catherine E. Lhamon |
| | PUBLIC COUNSEL LAW CENTER |
| | Attorneys for Plaintiffs |
| | *Neal S. Dudovitz* /ACP |
| | Neal S. Dudovitz |
| | NEIGHBORHOOD LEGAL SERVICES OF |
| | LOS ANGELES COUNTY |
| | Attorneys for Plaintiffs |
| | *Gary L. Blasi* /ACP |
| | Gary L. Blasi |
| | Attorney for Plaintiffs |
| | *Bill Lann Lee* /ACP |
| | Bill Lann Lee |
| | LEWIS, FEINBERG, LEE, RENAKER, & |
| | JACKSON, P.C. |
| | Attorneys for Plaintiffs |
| | *Michael C. Small* /ACP |
| | Michael C. Small |
| | AKIN GUMP STRAUSS HAUER & FELD LLP |
| | Attorneys for Plaintiffs |
| | *Marcellus A. McRae* /ACP |
| | Marcellus A. McRae |
| | GIBSON DUNN & CRUTCHER LLP |
| | Attorneys for Plaintiffs |

SECOND AMENDED COMPLAINT